**UNITED STATES DISTRICT COURT**
**DISTRICT OF SOUTH CAROLINA**
**SPARTANBURG DIVISION**

| | |
|---|---|
| JANE DOE, | |
|                     Plaintiff, | Case No.: 7:21-cv-03193-JD |
| vs. | |
| LIMESTONE UNIVERSITY F/K/A LIMESTONE COLLEGE, COLLINS MURPHY, MG FREESITES, LTD., d/b/a PORNHUB.COM, and HAMMY MEDIA, LTD. d/b/a XHAMSTER.COM, | **HAMMY MEDIA LTD.'S MEMORANDUM IN SUPPORT OF RENEWED MOTION FOR JUDGMENT ON THE PLEADINGS** |
|            Defendants. | |

## <u>INTRODUCTION</u>

The third time is not a charm.

After a year – and three separate attempts – one thing has become abundantly clear: Plaintiff's Third Amended Complaint ("TAC") fails in every way imaginable with respect to Defendant Hammy Media, Ltd. ("HML"): it fails to allege facts from which this Court could properly find personal jurisdiction over HML; it fails to demonstrate how Plaintiff's claims fall outside the broad immunity afforded to HML under Section 230 of the Communications Decency Act; and, at the most basic level, it fails to state a claim upon which relief can be granted.

Indeed, in some respects, the TAC is worse than the iterations that proceeded it – not simply because it litters the landscape with a surplus of new, foreign defendants without ever explaining how any of those defendants proximately caused Plaintiff's alleged injuries – but also because the TAC is so replete with scandalous and irrelevant allegations concerning co-defendant MG Freesites, Ltd. (allegations with which Plaintiffs try to smear HML) that it would be impossible for the case to continue against HML without severing the Defendants from one another, at least for purposes of

trial. Rather than use their third amendment to narrow and clarify the issues, Plaintiff has moved in the opposite direction, fully embracing mud-slinging and guilt by association. Thankfully, Plaintiff's TAC is so deficient with respect to HML that the Court should not need to address this looming issue.

Put simply, Plaintiff, a resident of **Nevada**, seeks to hold HML, a **Cyprus**-based company, liable for the actions of another defendant (Collins Murphy), who allegedly took surreptitious videos of Plaintiff in various states of undress. Seven years later, someone – possibly Collins, though the TAC acknowledges that it does not actually know who – posted the videos to the xHamster website which HML manages out of **Cyprus**, utilizing servers located in the **Netherlands**, and which is accessible everywhere in the world that the internet is available. As the Court will see, HML – which removed the videos once it was notified of their existence – has no connections to South Carolina or the United States and is not subject to personal jurisdiction in this Court.

Additionally, even if this Court could exercise jurisdiction consistent with the Due Process requirements of the United States Constitution, Plaintiff's claims cannot survive inasmuch as HML is entitled to immunity under Section 230 of the Communications Decency Act with respect to those claims. And, finally, even if Plaintiff's claims could somehow escape Section 230 immunity, the TAC would still need to be dismissed inasmuch as it fails to state a claim upon which relief may be granted with respect to HML.

Accordingly, and pursuant to Fed. R. Civ. P. 12(c), HML respectively requests that this Court dismiss Plaintiff's Fifth Amended Complaint with respect to HML. In further support of its motion, HML states as follows.

## FACTS[1]

The Plaintiff is a resident of the state of Nevada. TAC ¶¶7.  In the Fall of 2012, Plaintiff, who was then a member of Indiana University's field hockey team, traveled to Limestone College ("Limestone") to participate in a game against the Limestone College team. TAC, ¶67.  Unbeknownst to Plaintiffs, Collins Murphy ("Murphy"), then Limestone's intramural/summer conference director, had surreptitiously placed cameras in the locker room and recorded Plaintiffs and their teammates as they changed their clothes and showered. TAC, ¶¶69-71.

*Seven years later* – in 2019 – the recordings of the Plaintiffs and their teammates were uploaded to "countless pornographic websites," including xHamster.com, which is owned and operated by HML. TAC, ¶¶76. Plaintiffs believe the videos to have been uploaded to these websites by Murphy "and/or other third parties…"  TAC, ¶¶ 80.

HML is a Cypriot company headquartered in Cyprus. TAC, ¶21; Answer, ¶21; Declaration of Mardiros Haladjian, ¶3. HML does not now have an office in Texas, nor has it ever had an office in Texas. Answer, ¶21; Haladjian Decl., ¶4. HML does not now have an office in South Carolina, nor has it ever had an office in South Carolina. Haladjian Decl., ¶5. Indeed, HML does not have an office in the United States, nor has it ever had an office in the United States. Haladjian Decl., ¶6. HML does not have employees in South Carolina or the United States; maintain a bank account in South Carolina or the United States; or pay taxes in South Carolina or the United States, nor has it ever had or done any of these things. Haladjian Decl., ¶¶7-9.

The xHamster website is free for visitors to use. Haladjian Decl., ¶10. The website is supported entirely by third-party advertising. *Id.* HML does not itself sell advertising on the website,

---

[1] The Facts stated are taken from the TAC; HML's Answer, or the Declaration of Mardiros Haladjian, as indicated. Where HML is without information as to the truth of certain of Plaintiff's allegations (because those allegations concern parties other than HML), HML accepts those allegations as true for the purposes of the present motion.

but rather advertising is placed through an ad broker company, which is also located in Cyprus. *Id.,* ¶11. The servers that store the content that is displayed on the xHamster website are located in the Netherlands. *Id.,* ¶12. HML utilizes three Content Delivery Network ("CDN") providers to speed the delivery of content to users, all of whom are located within Europe. *Id.,* ¶13.

The xHamster website is not aimed or directed at any state or any country, but rather it is universally accessible wherever the internet is available. *Id.,* ¶14.

The content that appears on the xHamster website is not created by HML, but rather it is what is known as user generated content ("UGC"). *Id.,* ¶15. This means that the users of the xHamster website themselves upload content to the website. *Id.* The xHamster website hosts more than 7,895,000 videos. *Id.*, ¶16. Users of the website upload approximately 1,000 videos a day. *Id.*

In November of 2019, HML was contacted by Brian Blanton, a Detective with the Gaffney Police Dept. Detective Blanton informed HML – for the first time – that surreptitiously-recorded videos had been uploaded by a user to the xHamster website. *Id.,* ¶17. Detective Blanton first requested information about the uploader of the video and HML immediately provided him with all of the information that it possessed. *Id.,* ¶18. Detective Blanton then requested that he be provided access to the videos so that they could be downloaded for evidence and, following such downloading, that the videos be taken down. xHamster complied with each of these requests. *Id.,* ¶19. Prior to being contacted by Detective Blanton, xHamster was unaware of the existence of the videos or that they had been recorded without consent. *Id.*, ¶20.

The videos at question in this litigation were uploaded to the xHamster website by a user with the username "cwdistribution."  *Id.,* ¶21. At the time the cwdistribution account was created, it was possible for users to upload videos without first going through an identity verification process. *Id.,* ¶22. xHamster does not know the identity of user "cdwdistribution."  *Id.,* ¶23. HML has since changed its systems so that uploads are accepted only from accounts which have gone through an

identity verification process, which includes providing a copy of a government-issued identification. *Id.,* ¶24. HML has never paid any compensation of any sort to the user "cwdistribution." *Id.,* ¶25. HML has never had any written or verbal communications with the user "cwdistribution." *Id.,* ¶26.

## ARGUMENT

### I.    Legal Standards

A motion for judgment on the pleadings pursuant to Fed. R. Civ. P. 12(c) is analyzed under the same standard as a Rule 12(b)(6) motion to dismiss for failure to state a claim. *Parks v. RL Enter. & Assocs.*, 2021 U.S. Dist. LEXIS 153886, at *3-4 (D.S.C. Feb. 23, 2021).  A rule 12(c) motion "scrutinizes the complaint in a manner similar to a motion to dismiss, except on a 12(c) motion, the court is to consider the answer as well as the complaint . . . . [as well as] documents attached to the pleadings." *Mead v. Gaston Cty.,* 2013 U.S. Dist. LEXIS 157687, at *4 (W.D.N.C. Nov. 1, 2013). As with a motion brought under Rule 12(b)(6), such a motion tests "the sufficiency of the complaint." *Id.* "[T]he facts alleged 'must be enough to raise a right to relief above the speculative level' and must provide 'enough facts to state a claim to relief that is plausible on its face.'" *Robinson v. American Honda Motor Co., Inc.,* 551 F.3d 218, 222 (4th Cir. 2009). The complaint "must contain something more . . . than . . . a statement of facts that merely creates a suspicion [of] a legally cognizable right of action." *Bell Atl. Corp. v. Twombly*, 550 U.S. 544, 555 (2007).

"Although the court must accept all of the complaint's factual allegations as true, this tenet 'is inapplicable to legal conclusions,' and '[t]hreadbare recitals of the elements of a cause of action [that are] supported by mere conclusory statements do not suffice.'" *Parks, supra,* at *4 (citations omitted). Similarly, "conclusory allegations are not entitled to an assumption of truth, and even those allegations pled with factual support need only be accepted to the extent that 'they plausibly give rise to an entitlement to relief.'  …The court need not accept unsupported legal allegations… legal conclusions couched as factual allegations… or conclusory factual allegations devoid of any

reference to specific acts, dates, or policies. …In sum, factual allegations must be enough to raise a right to relief above the speculative level, on the assumption that all the allegations in the complaint are true (even if doubtful in fact)." *Harrison v. Owens,* 2013 U.S. Dist. LEXIS 113217, at *3-6 (D.S.C. Aug. 12, 2013).

Rule 12(b)(6) motions test the sufficiency of the allegations within the four corners of the complaint, considering *only* the facts as alleged in the complaint, documents attached to the complaint, and documents that are referenced in, and central to, the complaint. *See, e.g., Sullivan v. City of Frederick,* 738 F. App'x 198, 199 (4th Cir. 2018); *In re Derivium Capital, LLC v. Cathcart,* 2008 U.S. Dist. LEXIS 138245, at *4 (D.S.C. June 17, 2008). In considering a motion under Rule 12(c), the court expands its inquiry to also include the answer and the documents attached to or referenced in the answer. *See, e.g., Clavon v. S.C. Dep't of Corr.,* 2021 U.S. Dist. LEXIS 34493, at *7 (D.S.C. 2021)("The key difference between a Rule 12(b)(6) motion and a Rule 12(c) motion is that the court 'consider[s] the answer as well as the complaint' and 'documents incorporated by reference in the pleadings' on a Rule 12(c) motion"); *RLI Ins. Co. v. Innovative Emp'r Sols., LLC,* 2021 U.S. Dist. LEXIS 256438, at *1 (D.S.C. 2021)("in addressing a Rule 12(c) motion, the Court may consider the Answer and attached exhibits in addition to the Complaint.")

With respect to the jurisdictional portion of this motion (akin to a Rule 12(b)(2) motion), however, the Court considers not only the four corners of the pleadings, but also the affidavits submitted by the parties. And, to the extent that Defendants submit an affidavit contesting a fact asserted in the Complaint, the alleged fact is no longer assumed to be true, but rather the Plaintiffs must submit evidence to support the allegation to support their opposition to the motion. *See, e.g., Wolf v. Richmond Cty. Hosp. Auth.,* 745 F.2d 904, 908-09 (4th Cir. 1984)("In ruling on a motion to dismiss for lack of personal jurisdiction, the allegations of the complaint, except insofar as controverted by the defendant's affidavit, must be taken as true"); *Grayson v. Anderson*, 816 F.3d

262, 268 (4th Cir. 2016) (providing a district court may consider affidavits when ruling on challenges to personal jurisdiction); *Clark v. Remark*, 993 F.2d 228 (4th Cir. 1993)("The plaintiff, however, must present affidavits or other evidence if the defendant counters plaintiff's allegations with evidence that minimum contacts do not exist"); *Neal v. Cigniti Techs., Inc.,* 2018 U.S. Dist. LEXIS 170939, at *2 n.1 (D.S.C. Aug. 9, 2018)("Plaintiff incorrectly argues it is premature to consider evidence from the parties when ruling on a motion pursuant to Rule 12(b)(2). … Plaintiff may not solely rely on the allegations in her pleading to establish jurisdiction when the defendant introduces contradictory evidence"); *Callum v. CVS Health Corp.,* 137 F. Supp. 3d 817, 835 (D.S.C. 2015)(" However, whenever a defendant's sworn affidavit contests the allegations in the complaint, the plaintiff can no longer rest on those allegations. …Instead, the plaintiff bears the burden to present an affidavit or other evidence showing jurisdiction exists over the nonresident defendant"); *Orangeburg Pecan Co. v. Farmers Inv. Co.,* 869 F. Supp. 351, 353 (D.S.C. 1994); *Orangeburg Pecan Co. v. Farmers Inv. Co.,* 869 F. Supp. 351, 353 (D.S.C. 1994)("As to the motion to dismiss for lack of personal jurisdiction, the allegations of the complaint are to be taken as true insofar as they are not controverted by Defendant's affidavits; where affidavits of both parties contain contradictory factual allegations, those related in Plaintiff's complaint and affidavits will be accepted as true"); *Thomas v. Huff*, 2012 U.S. Dist. LEXIS 204829, at *4 (D.S.C. Dec. 6, 2012)("When a defendant provides affidavits to support a Rule 12(b)(2) motion, the plaintiff may not simply rest on the allegations of the complaint.").

## II.     **Plaintiff's Complaint Must Be Dismissed For Lack of Personal Jurisdiction.**

Once a defendant raises a challenge to the exercise of personal jurisdiction "the plaintiff bears the burden of demonstrating personal jurisdiction at every stage following such a challenge." *Grayson v. Anderson*, 816 F.3d 262, 267 (4th Cir. 2016). And, although a determination of personal jurisdiction under a state's long-arm statute is often viewed as a two-step process – consideration of

whether the state statute authorizes an exercise of jurisdiction, followed by a constitutional due process analysis – where, as here, the state's long-arm statute extends to the limits of the United States Constitution's Due Process Clause, the two inquiries merge into one. *See*, *e.g.*, *Wallace v. Yamaha Motors Corp., U.S.A.,* 2022 U.S. App. LEXIS 447, at *4-5 (4th Cir. Jan. 6, 2022)("Because South Carolina has interpreted its long-arm statute to extend personal jurisdiction to the constitutional limits imposed by federal due process, our inquiry must focus on due process")(citations omitted); *Goldowsky v. Gareri,* 2018 U.S. Dist. LEXIS 26212, at *4-5 (D.S.C. Jan. 29, 2018)("The South Carolina Supreme Court has held that the State's long-arm statute, S.C. Code Ann. § 36-2-(803), is coextensive with the limits of the Due Process Clause. …As a result, 'the statutory inquiry necessarily merges with the constitutional inquiry, and the two inquiries essentially become one.'")(citations omitted). Under Fed. R. Civ. P. 4(k)(2), the Court conducts the same constitutional analysis, only applied to the entire country as opposed to a single state. *See*, *e.g.*, *Base Metal Trading v. Ojsc Novokuznetsky Aluminum Factory*, 283 F.3d 208, 215 (4th Cir. 2002)("Rule 4(k)(2) allows a federal court to assert jurisdiction in cases 'arising under federal law' when the defendant is not subject to personal jurisdiction in any state court, but has contacts with the United States as a whole.").

"To satisfy the constitutional due process requirement, a defendant must have sufficient 'minimum contacts' with the forum state such that 'the maintenance of the suit does not offend traditional notions of fair play and substantial justice.'" *Consulting Eng'rs Corp. v. Geometric Ltd.*, 561 F.3d 273, 277 (4th Cir. 2009)(quoting *Int'l Shoe Co. v. Wash*., 326 U.S. 310, 316 (1945)). "The minimum contacts test requires the plaintiff to show that the defendant 'purposefully directed his activities at the residents of the forum' and that the plaintiff's cause of action 'arise[s] out of' those activities." *Id.* (quoting *Burger King Corp. v. Rudzewicz*, 471 U.S. 462, 472 (1985)). "This test is designed to ensure that the defendant is not 'haled into a jurisdiction solely as a result of random,

fortuitous, or attenuated contacts.' ... It protects a defendant from having to defend himself in a forum where he should not have anticipated being sued." *Id.* (citations omitted).

The United States Supreme Court has reaffirmed that the due process inquiry must focus "'on the relationship among the defendant, the forum, and the litigation.'" *Walden v. Fiore*, 571 U.S. 277, 283 (2014) (quoting *Keeton v. Hustler Magazine, Inc.*, 465 U.S. 770, 775 (1984)). As the *Walden* court explained:

> For a State to exercise jurisdiction consistent with due process, the defendant's suit-related conduct must create a substantial connection with the forum State. Two related aspects of this necessary relationship are relevant in this case.
>
> First, the relationship must arise out of contacts that the "defendant *himself*" creates with the forum State.... We have consistently rejected attempts to satisfy the defendant-focused 'minimum contacts' inquiry by demonstrating contacts between the plaintiff (or third parties) and the forum State....
>
> Second, our "minimum contacts" analysis looks to the defendant's contacts with the forum State itself, not the defendant's contacts with persons who reside there.

*Id.* at 284-85.

In conducting its analysis, the Court must take extra care before exercising jurisdiction over foreign defendants. As the Supreme Court and the Fourth Circuit have cautioned: "Great care and reserve should be exercised when extending our notions of personal jurisdiction into the international field." *Asahi Metal Indus. Co., Ltd. v. Superior Court of Cal.*, 480 U.S. 102, 115 (1987); *Ellicott Mach. Corp. v. John Holland Party, Ltd.,* 995 F.2d 474, 479 (4th Cir. 1993)(quoting *Asahi* and noting that the need for caution in exercising personal jurisdiction applies "with particular force in actions against foreign national defendants").

The Fourth Circuit has "synthesized the due process requirements for asserting specific personal jurisdiction in a three-part test in which 'we consider (1) the extent to which the defendant purposefully availed itself of the privilege of conducting activities in the State; (2) whether the

Plaintiff's claims arise out of those activities directed at the State; and (3) whether the exercise of personal jurisdiction would be constitutionally reasonable.'" *Consulting Eng'rs Corp.*, 561 F.3d at 277 (quoting *ALS Scan, Inc. v. Digital Serv. Consultants, Inc*., 293 F.3d 707, 712 (4th Cir. 2002)).

### A.     Purposeful Availment

The Fourth Circuit has articulated a series of nonexclusive factors to be considered in determining whether a defendant has engaged in purposeful availment including: "whether the defendant maintains offices or agents in the forum state ... whether the defendant owns property in the forum state ... whether the defendant reached into the forum state to solicit or initiate business ... whether the defendant deliberately engaged in significant or long-term business activities in the forum state ... whether the parties contractually agreed that the law of the forum state would govern disputes ... whether the defendant made in-person contact with the resident of the forum in the forum state regarding the business relationship ... the nature, quality and extent of the parties' communications about the business being transacted ... and whether the performance of contractual duties was to occur within the forum." *Consulting Eng'rs Corp.*, 561 F.3d at 278.

In the present case, none of the articulated factors are met: HML has no offices or agents in South Carolina or the United States; has never solicited or initiated business in South Carolina or the United States; has no significant or long-term business activities in South Carolina or the United States; there is no contract between HML and Plaintiff selecting South Carolina or United States law (indeed, there is no contract at all between the parties); HML has made no in-person contact with residents of South Carolina or the United States regarding a business relationship; the parties have never communicated with one another; and there were no contractual duties to be performed within South Carolina or the United States. Quite to the contrary, any actions taken by HML were taken wholly and entirely within Cyprus, where HML is headquartered.

Plaintiff's complaint reveals little about her assertion of personal jurisdiction over HML other than to: (a) erroneously claim that HML had an office in Texas;[2] and (b) state that HML has "made purposeful electronic contacts with the State of South Carolina which resulted in a cause of action recognized by South Carolina." TAC, ¶¶21-22. Presumably, Plaintiff is referring to HML's operation of the xHamster website, which is equally accessible anywhere that the internet is available. The operation of a universally accessible website, however, is an insufficient basis for the exercise of personal jurisdiction.

This Court and the Fourth Circuit have soundly rejected the idea that Plaintiffs can meet their burden of proving express aiming simply by pointing to the accessibility of a website within the jurisdiction, even if the website is popular within the relevant jurisdiction. *See, e.g., Conrad v. Benson,* 2020 U.S. Dist. LEXIS 149427, at *6 (D.S.C. Aug. 13, 2020)(finding no personal jurisdiction over the owners of the popular vacation rental website, HomeAway: "the Court finds it lacks specific jurisdiction over HomeAway. HomeAway has shown, and Plaintiff does not substantively dispute, that HomeAway neither targets South Carolina in particular nor leases properties directly to South Carolina residents, acting instead 'as an online marketplace that enables third-party property owners and/or managers to list their properties and potential Travelers to search for and book those properties and engage in rental transactions directly with those property owners.' …HomeAway's website is 'accessible to all but targeted at no one in particular'…"); *Fidrych v. Marriott Int'l, Inc.,* 952 F.3d 124, 142-43 (4th Cir. 2020)("Marriott obviously intends to engage in

---

[2] It is unclear where Plaintiff got the misimpression that HML had an office in Texas, but this misimpression is not entitled to be assumed as true in the face of HML's sworn statement to the contrary. *See, e.g., Maseng v. Lenox Corp.*, 483 F. Supp. 3d 360, 373 n.8 (D.S.C. 2020)("Plaintiff argues that in deciding the Rule 12(b)(2) motion, this court must accept as true her allegation that the Tea Kettle was 'designed, manufactured, tested, packaged, tested, imported, inspected, promoted, sold and/or distributed by Defendants.' …The court disagrees. 'To determine whether a plaintiff has satisfied her burden, the court may consider *both defendant's and plaintiff's* pleadings, *affidavits*, and other supporting documents presented to the court'")(citations omitted).

commercial transactions through the website. Nonetheless, the website is not directed at the residents of any particular forum. ... Plaintiffs focus much of their attention on the fact that the website includes South Carolina as an option in the drop-down menu used by customers to select their state of residence when making reservations. South Carolina's inclusion in a list of every other state in the country (and every other country in the world) shows that Marriott was willing to accept reservations from South Carolina residents, but it does not show that Marriott was targeting South Carolina residents through its website. To the contrary, the list of options confirms that the website was accessible to all but targeted at no one in particular"); *ESAB Group, Inc. v. Centricut, L.L.C.*, 34 F. Supp. 2d 323, 331 (D.S.C. 1999) ("While it is true that anyone, anywhere could access Centricut's home page, including someone in South Carolina, it cannot be inferred from this fact alone that Centricut deliberately directed its efforts toward South Carolina residents.").[3]

---

[3] Numerous other federal courts have similarly held that the maintenance of a website is relevant to specific jurisdiction only where the site is expressly aimed at the forum, which requires the plaintiff to prove that such acts "are performed for the very purpose of having their consequences felt in the forum state." *Dakota Indus., Inc. v. Dakota Sportswear, Inc.,* 946 F.2d 1384, 1390-91 (8th Cir. 1991) (quoting *Brainerd v. Governors of Univ. of Alberta*, 873 F.2d 1257, 1260 (9th Cir. 1989)). *See also AMA Multimedia, Ltd. Liab. Co. v. Wanat*, 970 F.3d 1201, 1210 (9th Cir. 2020)(finding no jurisdiction despite the fact that popular adult website received 20 percent of its traffic was from the United States because "'the market for adult content is global,' evidenced by the fact that the other 80% of ePorner's viewers were outside the United States," concluding that "the United States was not 'the focal point' of the website 'and of the harm suffered.' …AMA therefore has not shown Wanat purposefully directed his activities at the United States. The district court correctly found that, on this record, it lacked specific jurisdiction over Wanat"); *Fraserside IP L.L.C. v. Hammy Media, LTD*, 2012 U.S. Dist. LEXIS 5359, *24-25 (N.D. Iowa Jan. 17, 2012) ("Although I accept as true Fraserside's allegations that xHamster intentionally infringed Fraserside's registered copyrights and trademarks, these allegations, alone, fail to demonstrate that xHamster 'uniquely or expressly aimed' its tortious acts at Iowa.... Although xHamster's website is both commercial and interactive, as an Iowa district court noted in a case presenting similar facts, such a website 'is arguably no more directed at Iowa than at Uzbekistan.'"); *be2 LLC v. Ivanov*, 642 F.3d 555, 558 (7th Cir. 2011) ("If the defendant merely operates a website, even a 'highly interactive' website, that is accessible from, but does not target, the forum state, then the defendant may not be haled into court in that state without offending the Constitution."); *Toys "R" Us, Inc. V. Step Two, S.A.*, 318 F.3d 446, 452-54 (3d Cir. 2003) ("[T]he mere operation of a commercially interactive web site should not subject the operator to jurisdiction.... Rather, there must be evidence that the defendant 'purposefully availed' itself of conducting activity in the [jurisdiction]."); *Johnson v. Arden*, 614 F.3d 785, 797-98 (8th Cir.

B.    **The Claims do not Arise Out of Activities Directed at the Forum**

Given that HML has not aimed any of its activities at South Carolina or the United States, as discussed in detail above, Plaintiff's claims cannot have arisen out of such actions.

C.    **The Exercise of Jurisdiction Would Not Be Reasonable**

In determining if an exercise of personal jurisdiction is constitutionally reasonable, the Fourth Circuit has dictated the consideration of five factors: (1) the burden on the defendant of litigating in the forum; (2) the interest of the forum state in adjudicating the dispute; (3) the plaintiff's interest in obtaining convenient and effective relief; (4) the shared interest of the states in obtaining efficient resolution of disputes; and (5) the interests of the states in furthering substantive social policies. *Consulting Eng'rs Corp,* 561 F.3d at 277-79 (citations omitted).

1.    *Burden on the Defendant* – HML is a Cypriot company with no employees or offices in South Carolina or the United States and, as such, it would present a great burden for HML to be required to defend itself in this Court.

2.    *The Interest of the Forum State* – Certainly a state has an interest in protecting its citizens from harm, including the harm allegedly inflicted on the Plaintiff in this action. The Plaintiff, however, is not a resident of South Carolina and HML is not alleged to have taken any actions within South Carolina or the United States, as such, the state has a diminished interest in the resolution of the present complaint, at least insofar as it sounds against HML.

---

2010) ("[T]he Johnsons have failed to prove that www.BoutiqueKittens.com is uniquely or expressly aimed at Missouri; thus *Calder* provides no support for their Lanham Act claim."); *Instabook Corp. v. Instapublisher.com*, 469 F. Supp. 2d 1120, 1127 (S.D. Fla. 2006) (finding insufficient contacts in a patent infringement case since, among other reasons, "Defendant could not reasonably anticipate being haled into court in Florida based on its operation of interactive websites accessible in Florida and its sales to two Florida residents" in the absence of "targeting or solicitation of Florida residents"); *Liberty Media Holdings, LLC v. Letyagin, et al.*, 2011 WL 13217328 at *4 (S.D. Fla. Dec. 14, 2011) ("Precedent, however, establishes that maintaining a website accessible to users in a jurisdiction does not subject a defendant to be sued there: those users must be directly targeted, such that the defendant can foresee having to defend a lawsuit...." (and cases cited therein)).

3.      *Plaintiff's Interests in Convenient and Effective Relief* – Plaintiff would undoubtedly face her own burdens in having to litigate claims against HML in Cyprus, and yet, as discussed below, her claims against HML are, in any event, barred by United States law.  More to the point, Plaintiffs can obtain complete and effective relief from other defendants in this action who are undoubtably subject to the jurisdiction of this Court.

4.      *The Final Factors* – To the extent that the final factors are applicable, they weigh in favor of a denial of personal jurisdiction given the important sovereignty concerns at play. *Ellicot Mach. Corp.*, 995 F.2d at 480 ("Continuing in the *World-Wide Volkswagen* analysis, we perceive that the issues here implicate fundamental substantive social policies affecting international trade, business, and sovereignty concerns. The involvement of these policies weighs against the reasonableness of jurisdiction in Maryland.... In our view, the total picture implicates the concerns expressed in *Asahi* for constraint in the exercise of personal jurisdiction in an international context."). *See also*, *Sinatra v. National Enquirer*, 854 F.2d 1191, 1199 (9th Cir. 1988) ("a higher jurisdictional barrier" exists where, as here, the defendants are aliens as opposed to simply citizens from different states "because important sovereignty concerns exist.").

Accordingly, an exercise of personal jurisdiction over HML would not be reasonable.

**III.**   **Plaintiff's Claims Must Be Dismissed As They Are Barred In Their Entirety By The Immunity Afforded to HML Under Section 230 of the Communications Decency Act and Fail To State A Claim Upon Which Relief May Be Granted.**

Even if the Court could exercise personal jurisdiction over HML, it would still need to dismiss Plaintiff's complaint inasmuch as Plaintiff's claims are precluded by the immunity afforded to HML under Section 230 the Communications Decency Act ("CDA") and because Plaintiff has failed to state a claim upon which relief may be granted.

Section 230(c)(1) of the CDA provides that "No provider or user of an interactive computer service shall be treated as the publisher or speaker of any information provided by another

14

information content provider."  47 U.S.C. §230(c)(1). In explaining the import of this section, the Fourth Circuit – in one of the earliest cases interpreting Section 230 – held that "by its plain language, § 230 creates a federal immunity to any cause of action that would make service providers liable for information originating with a third-party user of the service. Specifically, § 230 precludes courts from entertaining claims that would place a computer service provider in a publisher's role."  *Zeran v. Am. Online, Inc.,* 129 F.3d 327, 330 (4th Cir. 1997).  As the *Zeran* court noted, "the purpose of this statutory immunity is not difficult to discern. Congress recognized the threat that tort-based lawsuits pose to freedom of speech in the new and burgeoning Internet medium. …Section 230 was enacted, in part, to maintain the robust nature of Internet communication and, accordingly, to keep government interference in the medium to a minimum."  *Id.*

Recognizing the importance of Section 230 as a *complete bar* to most civil suits, the Fourth Circuit and courts within this circuit have routinely held that the question of Section 230 immunity should be determined at the "earliest possible stage" of a litigation because, "as we have often explained in the qualified immunity context, 'immunity is an *immunity from suit* rather than a mere defense to liability' and 'it is effectively lost if a case is erroneously permitted to go to trial.'  … We thus aim to resolve the question of § 230 immunity at the earliest possible stage of the case because that immunity protects websites not only from 'ultimate liability,' but also from 'having to fight costly and protracted legal battles.'"  *Nemet Chevrolet, Ltd. v. Consumeraffairs.com, Inc.,* 591 F.3d 250, 254-55 (4th Cir. 2009)(citations omitted)(italics in original). *See also Advanfort Co. v. Cartner,* 2015 U.S. Dist. LEXIS 199411, at *13-14 (E.D. Va. Oct. 30, 2015)("this Court is not persuaded by Plaintiffs insistence that this issue be decided on a motion for summary judgment after some discovery has been conducted, as opposed to at the motion to dismiss stage. Fourth Circuit precedent directs this Court 'to resolve the question of Section 230 immunity at the earliest possible stage of the case because that immunity protects websites not only from ultimate liability, but also from

15

having to fight costly and protracted legal battles.' …As MarEx points out, the Eastern District of Virginia has not hesitated to grant motions to dismiss based on CDA immunity"); *Russell v. Implode-Explode Heavy Indus.*, 2013 U.S. Dist. LEXIS 133358, at *14-15 (D. Md. Sep. 18, 2013)("Moreover, Section 230 immunity, like other forms of immunity, is generally accorded effect at the earliest point in the litigation because it is otherwise 'effectively lost if a case is erroneously permitted to go to trial.'"). Indeed, the *Zeran* case itself involved the Fourth Circuit affirming the District Court's dismissal of plaintiff's complaint pursuant to §230 on a motion for judgment on the pleadings.

And, as the Fourth Circuit has also noted, "to further the policies underlying the CDA, courts have generally accorded § 230 immunity a broad scope." *Nemet Chevrolet, Ltd. v. Consumeraffairs.com, Inc.*, 591 F.3d 250, 254 (4th Cir. 2009)(citations omitted). *See also Doe v. Backpage.com, LLC,* 817 F.3d 12, 18-19 (1st Cir. 2016)("There has been near-universal agreement that section 230 should not be construed grudgingly. …This preference for broad construction recognizes that websites that display third-party content may have an infinite number of users generating an enormous amount of potentially harmful content, and holding website operators liable for that content 'would have an obvious chilling effect' in light of the difficulty of screening posts for potential issues")(citations omitted); *Russell v. Implode-Explode Heavy Indus.*, 2013 U.S. Dist. LEXIS 133358, at *14 (D. Md. Sep. 18, 2013)("Notably, the reasoning in Zeran is now accepted by courts across the country, and '[t]he broad reach of the CDA to bar a panoply of torts is supported by other courts that have considered the CDA's reach.'").

As other federal courts have recognized, part of affording §230 a "broad scope" is recognizing that a plaintiff should not be allowed to impose civil liability on a provider through the use of creative pleading. *See, e.g.*, *Barnes v. Yahoo!, Inc.,* 565 F.3d 560, 562 (9th Cir. 2009)("a plaintiff cannot sue someone for publishing third-party content simply by changing the name of the theory from defamation to negligence. Nor can he or she escape section 230(c) by labeling as a

'negligent undertaking' an action that is quintessentially that of a publisher. …It is because such conduct is publishing conduct that we have insisted that section 230 protects from liability 'any activity that can be boiled down to deciding whether to exclude material that third parties seek to post online'")(citations omitted); *Doe v. MySpace Inc.,* 528 F.3d 413, 420 (5th Cir. 2008)("No matter how artfully Plaintiffs seek to plead their claims, the Court views Plaintiff's claims as directed toward MySpace in its publishing, editorial, and/or screening capacities"); *M.A. v. Vill. Voice Media Holdings*, 809 F. Supp. 2d 1041, 1058 (E.D. Mo. 2011)("Plaintiff artfully and eloquently attempts to phrase her allegations to avoid the reach of § 230. Those allegations, however, do not distinguish the complained-of actions of Backpage from any other website that posted content that led to an innocent person's injury. Congress has declared such websites to be immune from suits arising from such injuries. It is for Congress to change the policy that gave rise to such immunity.").

In the TAC, Plaintiff alleges five causes of action against HML: liability under the Trafficking Victims Protections Reauthorization Act ("TVPRA"), 18 U.S.C., §§1591, 1595 (Count I); Civil RICO (Count II); Negligent Monitoring (Count IX); False Light (Count X); and Civil Conspiracy (Count XI). All are subject to dismissal under §230.

By its very terms, only three conditions are necessary for §230 immunity to apply: (1) the defendant must be a "provider of an interactive computer service" (such as a website); (2) the offending content must have been created by someone other than the defendant (i.e., an "information content provider"); and (3) the liability sought to be imposed must arise from the defendant's actions in "publishing" the offending content. *See, e.g., Zeran v. Am. Online, Inc.,* 129 F.3d 327, 330 (4th Cir. 1997)("The relevant portion of § 230 states: 'No provider or user of an interactive computer service shall be treated as the publisher or speaker of any information provided by another information content provider.' 47 U.S.C. § 230(c)(1). By its plain language, § 230 creates a federal immunity to any cause of action that would make service providers liable for information originating

with a third-party user of the service. Specifically, § 230 precludes courts from entertaining claims that would place a computer service provider in a publisher's role. Thus, lawsuits seeking to hold a service provider liable for its exercise of a publisher's traditional editorial functions -- such as deciding whether to publish, withdraw, postpone or alter content -- are barred.").

There can be no question, of course, but that HML, as the operator of the xHamster.com website, is a provider of an interactive computer service. Nor is there any question but that the content in question was created entirely by Defendant Murphy (indeed, the entire TAC is premised upon precisely that assertion). And, despite Plaintiff's "artful pleading," the TAC makes clear that Plaintiffs seek to hold HML liable as a publisher of content (the videos at issue) that were created by Murphy and posted to the website by a third-party (Murphy or some other individual).

Given the allegations of the TAC, Plaintiff apparently believes that two lines of argument strip HML of its immunity under §230: (1) that HML allegedly knew from other, unnamed women (not party to this action) that users sometimes posted videos taken without the subjects' consent, and (2) that the xHamster website was structured in such a way as to enable those looking for nonconsensual content to find it more easily. Even if the Court were to assume the truth of these allegations for the purposes of the present motion, however, neither would take HML outside of the protections of §230.

With respect to the "notice" argument, the Fourth Circuit rejected this proposition in *Zeran*:

Liability upon notice would defeat the dual purposes advanced by § 230 of the CDA. …If computer service providers were subject to distributor liability, they would face potential liability each time they receive notice of a potentially defamatory statement -- from any party, concerning any message. Each notification would require a careful yet rapid investigation of the circumstances surrounding the posted information, a legal judgment concerning the information's defamatory character, and an on-the-spot editorial decision whether to risk liability by allowing the continued publication of that information.

…In light of the vast amount of speech communicated through interactive computer services, these notices could produce an impossible burden for service providers, who would be faced with ceaseless choices of suppressing controversial speech or

18

sustaining prohibitive liability. Because the probable effects of distributor liability on the vigor of Internet speech and on service provider self-regulation are directly contrary to § 230's statutory purposes, we will not assume that Congress intended to leave liability upon notice intact.

*Zeran, 129* F.3d at 333.

Court after court has held similarly. *See, e.g., Beyond Sys. v. Keynetics, Inc.*, 422 F. Supp. 2d 523, 536 (D. Md. 2006)("Case law clearly establishes that CDA immunity applies even where an ISP knew of its customers' potentially illegal activity"); *M.A. v. Vill. Voice Media Holdings*, 809 F. Supp. 2d 1041, 1049-51 (E.D. Mo. 2011)("The First Circuit noted in 2007 that '[i]t is, by now, well established that notice of the unlawful nature of the information provided is not enough to make it the service provider's own speech.' …Section 230 immunity applies even after notice of the potentially unlawful nature of the third-party content. Thus, even if a service provider knows that third parties are posting illegal content, 'the service provider's failure to intervene is immunized.'")(collecting cases); *Baldino's Lock & Key Serv. v. Google, Inc.,* 88 F. Supp. 3d 543, 546-50 (E.D. Va. 2015)("A publishing website is immune under the CDA even when given notice that it has published false information"); *Poole v. Tumblr, Inc.*, 404 F. Supp. 3d 637, 642-43 (D. Conn. 2019)("Section 230 immunity applies even after notice of the potentially unlawful nature of the third-party content"); *Universal Commun. Sys. v. Lycos, Inc.,* 478 F.3d 413, 420 (1st Cir. 2007)("It is, by now, well established that notice of the unlawful nature of the information provided is not enough to make it the service provider's own speech. …We confirm that view and join the other courts that have held that Section 230 immunity applies even after notice of the potentially unlawful nature of the third-party content.").

Similarly doomed is Plaintiff's argument that HML is stripped of immunity by virtue of having (allegedly) structured its website in such a way that users could more easily find nonconsensual content. *See Doe v. Backpage.com, LLC,* 817 F.3d 12, 29 (1st Cir. 2016)("The appellants' core argument is that Backpage has tailored its website to make sex trafficking

easier….But Congress did not sound an uncertain trumpet when it enacted the CDA, and it chose to grant broad protections to internet publishers. Showing that a website operates through a meretricious business model is not enough to strip away those protections. If the evils that the appellants have identified are deemed to outweigh the First Amendment values that drive the CDA, the remedy is through legislation, not through litigation"); *Universal Commun. Sys., supra* at 420 ("At best, UCS's allegations establish that Lycos's conduct may have made it marginally easier for others to develop and disseminate misinformation. That is not enough to overcome Section 230 immunity"); *M.A. v. Vill. Voice Media Holdings*, 809 F. Supp. 2d 1041, 1049-1050 (E.D. Mo. 2011)("to find Backpage to be not immune from suit based on M.A.'s allegations about how it structured its website in order to increase its profits would be to create a for-profit exception to § 230's broad grant of immunity. This the Court may not do"); *Nemet Chevrolet, Ltd. v. Consumeraffairs.com, Inc.,* 591 F.3d 250, 258 (4th Cir. 2009)("Even accepting as true all of the facts Nemet pled as to Consumeraffairs.com's liability for the structure and design of its website, the amended complaint 'does not show, or even intimate,' that Consumeraffairs.com contributed to the allegedly fraudulent nature of the comments at issue. …Thus, as to these claimed facts in the Development Paragraph, Nemet's pleading not only fails to show it is plausible that Consumeraffairs.com is an information content provider, but not that it is even a likely possibility.").

Ultimately, each of Plaintiff's claims falls squarely within the protections of §230 and must be dismissed.

### A.    Commercial Sex Trafficking (Count I)

Plaintiff's entire goal in amending her complaint for a *third* time was to assert a (new) claim for commercial sex trafficking under the TVPRA, believing that such a claim would be exempt from Section 230 immunity because of the carve-out created by the Allow States and Victims to Fight

Online Trafficking Act of 2017 (FOSTA). Plaintiff, however, is mistaken in her belief and, in any event, has failed to allege a viable claim under the TVPRA with respect to HML.

As a starting point, it is true that FOSTA carved out a narrow subset of claims under the TVPRA and exempted such claims from the reach of Section 230 immunity. Specifically, FOSTA amended 47 U.S.C. §230(e)(5)(A) to provide that nothing within Section 230 "shall be construed to impair or limit… any claim in a civil action brought under section 1595 of title 18, if the conduct underlying the claim constitutes a violation of section 1591 of that title."

In a closely analogous case, the Ninth Circuit recently had occasion to examine in depth the limits of the FOSTA carve-out to Section 230 immunity. *Does v. Reddit, Inc.,* 2022 U.S. App. LEXIS 29510 (9th Cir. Oct. 24, 2022). The plaintiffs there were:

> the parents of minors, and one former minor, who have had sexually explicit images and videos of them posted to Reddit. Each plaintiff tells a similar story: after discovering explicit images or videos of their children (or themselves) posted to one or more subreddits, they immediately reported the content to the subreddit moderators and to Reddit employees. In response, Reddit sometimes—though not always—removed the content, only for it to be reposted shortly afterward. This cycle repeated again and again across different subreddits. Collectively, the plaintiffs contacted Reddit hundreds of times to report the explicit posts.
>
> The plaintiffs allege that the presence of child pornography on Reddit is blatant, but Reddit has done little to remove the unlawful content or prevent it from being posted, because it drives user traffic and revenue. As of April 2021, when this suit was filed, Reddit hosted many subreddits that openly and explicitly marketed themselves as fora for child pornography, with names like /r/BestofYoungNSFW, r/teensdirtie, /r/TeenBeauties, and /r/YoungGirlsGoneWild. Users publicly "trade" and solicit child pornography on these pages, and advocacy groups and the press have repeatedly reported this activity to Reddit.
>
> Plaintiffs allege that Reddit earns substantial advertising revenue from subreddits that feature child pornography because they generate controversy and attract viewers. Indeed, third-party advertising tools have listed several subreddits dedicated to child pornography as some of the most popular pages on the platform, which encourages advertisers to buy ad space on those pages. As such, the plaintiffs contend that Reddit financially benefits from openly hosting child pornography.
>
> The plaintiffs further contend that, because it enjoys the revenue generated by child pornography, Reddit has taken little action to block it from the platform. The plaintiffs allege that Reddit does not adequately train its moderators to screen and remove

unlawful content and that some moderators post child pornography themselves. Moreover, Reddit has not implemented basic security measures, such as age verification or IP-address tracking to ban repeat offenders, and it delayed adoption of automated image-recognition technologies like "PhotoDNA," which can detect child pornography and prevent it from being posted.

*Id.* at *4-6.

It is against this backdrop that the Ninth Circuit examined the limited circumstances under which a website may be found liable for its users' violations of the TVPRA despite the immunity usually afforded to websites by Section 230 (precisely the question at issue here). First, the Ninth Circuit concluded that, to avoid Section 230 immunity, a Plaintiff had to be able to meet the higher standard required for criminal beneficiary liability under section 1591: "to be held criminally liable as a beneficiary, a defendant must have actual knowledge of the trafficking and must 'assist[], support[], or facilitat[e]' the trafficking venture." *Id.* at *8-9. The *Reddit* Court next rejected the argument "that a website may be liable as a beneficiary when *someone's* conduct (likely a user's conduct) violated the criminal statute and the claim against the website derives from that violation," holding instead that a website can only be held liable if its own conduct – not a third party's – violates 18 U.S.C. §1591. *Id.* at *10.

After discussing FOSTA's legislative history, the Ninth Circuit concluded that, as enacted, FOSTA only "eliminate[s] section 230 as a defense for websites that *knowingly* facilitate sex trafficking," finding that "the bill's 'knowing standard' was intended to create a 'high bar' for liability." *Id.* at 17. The Court additionally found that the statute required that the website knowing participate in the sex trafficking venture, utilizing the statutory definition of "participation" which requires "'knowingly assisting, supporting, or facilitating sex trafficking activities.' …To run afoul of § 1591, a defendant must knowingly benefit from and knowingly assist, support, or facilitate sex trafficking activities. Mere association with sex traffickers is insufficient absent some knowing 'participation' in the form of assistance, support, or facilitation. …The statute does not target those

that merely 'turn a blind eye to the source of their [revenue].' …And knowingly benefitting from participation in such a venture requires actual knowledge and a causal relationship between affirmative conduct furthering the sex-trafficking venture and receipt of a benefit." *Id.* at *19-20.

> Applying the law to the facts of the case, the Ninth Circuit held that:
>
> In this case, the plaintiffs have not alleged that Reddit knowingly participated in or benefitted from a sex trafficking venture. They allege that Reddit provides a platform where it is easy to share child pornography, highlights subreddits that feature child pornography to sell advertising on those pages, allows users who share child pornography to serve as subreddit moderators, and fails to remove child pornography even when users report it, as the plaintiffs did in this case. Together, they say, this amounts to knowing participation in a sex trafficking venture.
>
> Taken as true, these allegations suggest only that Reddit "turned a blind eye" to the unlawful content posted on its platform, not that it actively participated in sex trafficking. … Moreover, the plaintiffs have not alleged a connection between the child pornography posted on Reddit and the revenue Reddit generates, other than the fact that Reddit makes money from advertising on all popular subreddits.

*Id.* at *20-21.

Having concluded that Plaintiffs failed to properly allege that Reddit's violated §1591, the Court found that Reddit remained entitled to immunity under Section 230, and accordingly affirmed the dismissal of Plaintiff's complaint. Other courts have reached the same conclusion. *See, e.g., Doe v. Kik Interactive, Inc.,* 482 F. Supp. 3d 1242, 1249-51 (S.D. Fla. 2020)("[Plaintiff] asserts that her claim is that Defendants violated 18 U.S.C. § 1591 by failing to enact policies that would have prevented her from being trafficked by fellow Kik users. But this is exactly the type of claim that CDA immunity bars. ...FOSTA removes CDA immunity only for claims 'under section 1595 of Title 18, if the conduct underlying the claim constitutes a violation of section 1591 of that title.' … Defendants argue that the Congressional history of FOSTA shows that Congress only intended to create a narrow exception to the CDA …where it was plausible for a plaintiff to allege actual knowledge and overt participation… and that a finding of actual knowledge and overt participation in a venture of sexual trafficking is required to defeat CDA immunity. This is consistent with the

language of FOSTA. By its terms, FOSTA did not abrogate CDA immunity for all claims arising from sex trafficking; FOSTA permits civil liability for websites only if the conduct underlying the claim constitutes a violation of section 1591. And section 1591 requires knowing and active participation in sex trafficking by the defendants. …Plaintiff has not alleged facts that would plausibly establish that Defendants knowingly participated in the sex trafficking venture involving her; she alleges that Defendants knew that other sex trafficking incidents occurred on Kik. This does not satisfy FOSTA's requirement that the conduct underlying the claim violate 18 U.S.C. § 1591. For this reason, Plaintiff's claims against Defendants are barred by the immunity provisions of the CDA, 47 U.S.C. § 230(e), and the Complaint, therefore, must be dismissed"); *M.H. v. Omegle.com, LLC*, 2022 U.S. Dist. LEXIS 4543, at *16-18 (M.D. Fla. Jan. 10, 2022)("the legislative history of the CDA confirms that generalized knowledge that sex trafficking occurs on a website is insufficient to maintain a plausible 18 U.S.C. § 1591 claim that survives CDA immunity. … Plaintiffs here assert that Omegle had knowledge of prior instances of sex trafficking and knew that the platform had been used as a sex trafficking tool in the past… Yet… the asserted claims against Omegle are premised upon general, constructive knowledge of past sex trafficking incidents. …The generalized knowledge of past instances of sex trafficking are not enough to satisfy an exception to immunity…Without allegations that Omegle had actual knowledge of, or overtly participated in the sex trafficking venture by John Doe, Plaintiffs fail to state a plausible sex trafficking claim that would escape CDA 230 immunity").

Plaintiff's TAC here suffers from the same deficiencies and then some. In addition to failing to allege that HML knowingly participated in or knowingly benefitted from a sex trafficking venture, it is far from clear that the TAC actually alleges either that Plaintiff was "trafficked" or that there was a commercial sex act. Although the Plaintiff traveled to South Carolina to participate in a sporting event at Limestone College, there is no allegation that Collins (or Limestone College for

that matter) lured Plaintiff to South Carolina to participate in a commercial sex act. At most, the TAC suggests that Collins took advantage of the fact that Plaintiff had voluntarily traveled to South Carolina to surreptitiously record her. To find that this constitutes "trafficking" would convert every opportunistic crime of this sort into "trafficking" based on the random and fortuitous question of whether the Plaintiff had traveled to the place where the crime occurred. So, for example, had Collins surreptitious recorded Limestone's own students, it would not constitute trafficking, but (under Plaintiff's theory), the same conduct is transformed into "trafficking" simply by the happenstance of Plaintiff's voluntary travel. Such a result would be ludicrous. Additionally, Plaintiff's complaint does not actually allege a "commercial sex act," which is defined by the statute to mean "any sex act, on account of which anything of value is given to or received by any person." Putting aside the question of whether Plaintiff undressing and showering constitutes a "sex act," HML did not give and Collins did not receive (from HML at least) anything of value on account of said act. For these reasons, too, Plaintiff has failed to allege a violation of §1591 by HML. Accordingly, dismissal is required both because HML remains entitled to Section 230 immunity and because Plaintiff has failed to state a claim upon which relief may be granted.

**B.     Civil RICO (Count II)**

Although Plaintiff argued previously that Section 230 does not apply to Civil RICO claims, in reality, those federal courts to have directly addressed the question have found that Section 230 does indeed preclude Civil RICO claims.[4] *See, e.g., Baldino's Lock & Key Serv. v. Google, Inc.*, 88

---

[4] One federal court questioned – in *dicta* – whether Section 230 applied to Civil RICO claims, but ultimately decided that it need not answer the question inasmuch as Plaintiff had failed to properly allege a RICO claim in any event. *Nieman v. Versuslaw, Inc.,* 2012 U.S. Dist. LEXIS 109069, at *25-26 (C.D. Ill. Aug. 2, 2012) ("Finally, it is unclear whether § 230 would bar a RICO claim. This Court has found no caselaw on the issue. …arguably, § 230 of the CDA may not be used to bar a civil RICO claim because that would impair the enforcement of a Federal criminal statute. However, the Court need not resolve these issues as the Court has already determined that Plaintiff has not stated a claim under any of the Counts he alleged in his Second Amended Complaint.") In *Doe v.*

F. Supp. 3d 543, 547 (E.D. Va. 2015)(first holding that all of plaintiff's claims, including its Civil RICO claims, were precluded by §230, before also holding that plaintiff had failed to properly plead a claim for Civil RICO); *Doe v. Backpage.com, LLC*, 104 F. Supp. 3d 149 (D. Mass. 2015)(rejecting Plaintiff's arguments that §230 did not apply to Civil RICO claims and collecting cases in support of this argument); *Icon Health & Fitness, Inc. v. ConsumerAffairs.com*, 2017 U.S. Dist. LEXIS 97761, at *13 (D. Utah June 22, 2017)("The court rejects Plaintiff's argument that the CDA does not immunize RICO violations. Plaintiff first cites to a portion of the CDA that states the Act must not 'be construed to impair the enforcement of . . . any other Federal criminal statute.' 47 U.S.C. § 230(e)(1). Plaintiff appears to believe this language exempts its civil RICO claim from application of the CDA. Yet the explicit statutory language of this exception precludes application of the CDA to federal *criminal* cases. It has no effect on civil matters.")  *See also Doe v. Mark Bates & Yahoo!*, No. 52006 U.S. Dist. LEXIS 116461, at *43 (E.D. Tex. Jan. 18, 2006)("Congress decided not to allow private litigants to bring civil claims based on their own beliefs that a service provider's actions violated the criminal laws. As Defendant explained in its briefing, the reason is evident. If civil liability were possible, the incentive to bring a civil claim for the settlement value could be immense, even if a plaintiff's claim was without merit.")

Plaintiff's Civil RICO claim must also be dismissed for failing to state a claim upon which relief may be granted. Although it could reasonably be argued that Plaintiff's TAC fails to meet *any* of the elements of a Civil RICO claim, for the purposes of this motion, it is sufficient to focus on just three deficiencies that are readily apparent on the face of the TAC: (1) Plaintiff does not allege an injury to her "business or property"; (2) Plaintiff does not properly allege a common scheme as between the Defendants; and (3) Plaintiff does not properly allege that some act or

---

*Backpage.com, LLC, supra*, however, the Court specifically examined this question and concluded that Section 230 was applicable inasmuch as Plaintiff's claims were civil, not criminal.

omission of HML (made in furtherance of the non-existent common scheme) was the proximate cause of her injuries.

In the TAC, Plaintiff alleges that she suffered emotional distress as a result of Defendant Collins' surreptitious recordings and the subsequent posting of videos to websites including xHamster.com. Even assuming the truth of these allegations, they are insufficient to meet the specific damage requirements of the Civil RICO statute. *See, e.g., Brandenburg v. Seidel*, 859 F.2d 1179, 1187 (4th Cir. 1988)("it is clear that a civil RICO complaint is vulnerable to a motion to dismiss if it fails to allege either an adequate injury to business or property, ⋯ or an adequate causal nexus between that injury and the predicate acts of racketeering activity alleged"); *Bast v. Cohen, Dunn & Sinclair, P.C.,* 59 F.3d 492, 495 (4th Cir. 1995)("Bast does not have standing to assert a claim for civil damages under 18 U.S.C. § 1964(c) because he fails to allege any 'injury in his business or property' that was proximately caused by the alleged RICO violation. 18 U.S.C. § 1964(c); ...At most, Bast pleads that he 'suffered extreme mental anguish' when he learned of Pettit's recordings. … An allegation of personal injury and pecuniary losses occurring therefrom are not sufficient to meet the statutory requirement of injury to 'business or property'")(citations omitted); *Dickerson v. TLC The Laser Eye Ctr. Inst., Inc.,* 493 F. App'x 390, 394 (4th Cir. 2012) ("Dickerson can only recover if he shows that his injury caused by the RICO violation damaged his business or property. … Thus, any allegation of personal injuries and losses from those injuries will not be considered injuries to business or property under the act"); *Bowen v. Adidas Am., Inc.,* 541 F. Supp. 3d 670, 676 (D.S.C. 2021)("Allegations of personal injuries and the pecuniary losses incurred therefrom do not qualify as injury to 'business or property.'").

The TAC also fails to properly support any allegation of a common scheme as between Collins and HML (or some unnamed person who posted the videos, and HML). This is not surprising given the ***seven-year gap in time*** between when Collins recorded the videos and someone posted the

videos to the xHamster.com website. This failure is also fatal to Plaintiff's Civil RICO claim. *See, e.g., Johnson v. Sallie Mae Servicing, L.P.,* 2007 U.S. Dist. LEXIS 112172, at *18 (D.S.C. Mar. 27, 2007)("the plaintiff in a civil RICO action must prove (1) a scheme disclosing an intent to defraud; and (2) the use, respectively, of the mails or interstate wires in furtherance of the scheme"); *Anderson v. Found. for Advancement*, 155 F.3d 500, 505 (4th Cir. 1998)("a plaintiff must allege a continuing pattern and a relationship among the defendant's activities showing they had the same or similar purpose"); *W. Town Bank & Tr. v. Forman*, 2020 U.S. Dist. LEXIS 210290, at *13-19 (D.S.C. Nov. 9, 2020)("Thus, a RICO enterprise requires the existence of collaboration or agreement between the members of the enterprise. … the Court agrees with Defendants that Plaintiff's failure to sufficiently allege that Defendants functioned with a common purpose and as a coordinating unit is fatal to their RICO claims. … The lack of well-pleaded allegations showing that Golding or Jefferies entered into an agreement to violate § 1962(c) is fatal to their conspiracy claim").

Finally, the TAC simply fails to allege with any particularity, how the acts or omissions of *HML* (as opposed to Collins or the mystery poster) were the proximate cause of Plaintiff's injuries. *See, e.g., Sadighi v. Daghighfekr*, 36 F. Supp. 2d 279, 286 (D.S.C. 1999)("Plaintiffs must allege that Defendants' violations were a proximate cause of their injuries. …the Supreme Court cautioned lower courts against an overly expansive view of the common law doctrine of proximate cause by noting that 'a plaintiff who complained of harm flowing from the misfortunes visited upon a third person by the defendant's acts [is] generally said to stand at too remote a distance to recover.' …Instead, proximate cause requires a nexus between the proscribed acts and the injuries"); *Cardwell v. Sears Roebuck & Co.,* 821 F. Supp. 406, 408 (D.S.C. 1993)("it is not enough that a civil RICO plaintiff prove that, but for the defendant's violation, he would not have been injured; he must also show that the violation *proximately* caused the harm. ···The pertinent inquiry in determining the

existence of proximate, or 'legal' cause, is 'whether the conduct has been so significant and important a cause that the defendant should be held responsible.'")

C.    **Negligent Monitoring (Count IX)**

Plaintiff next attempts to state a claim for the "negligent monitoring" of the xHamster.com website, alleging that HML had a legal duty "to properly monitor their content for illegal and nonconsensual material." TAC, §183. Putting aside for the moment the fact that no such legal duty actually exists, even if it did, court after court after court has held that such a claim fails squarely within the immunity offered by Section 230. *See, e.g., Zeran v. Am. Online, Inc.,* 129 F.3d 327, 331 (4th Cir. 1997)("Congress' purpose in providing the § 230 immunity was thus evident. Interactive computer services have millions of users. ⋯The amount of information communicated via interactive computer services is therefore staggering. The specter of tort liability in an area of such prolific speech would have an obvious chilling effect. It would be impossible for service providers to screen each of their millions of postings for possible problems. Faced with potential liability for each message republished by their services, interactive computer service providers might choose to severely restrict the number and type of messages posted. Congress considered the weight of the speech interests implicated and chose to immunize service providers to avoid any such restrictive effect"); *924 Bel Air Rd., LLC v. Zillow Grp., Inc.*, 2020 U.S. Dist. LEXIS 27249, *10 (C.D. Cal. Feb. 18, 2020)("The Court does not find this to be a close case. Bel Air's negligence claim against Zillow falls squarely within the bounds of CDA immunity. The duty that Bel Air alleges Zillow violated, to monitor new users and prevent or remove false claims or postings, derives from Zillow's status and conduct as a publisher. Bel Air's …attempts to circumvent CDA immunity by using new labels for what is inherently publisher's conduct do not change this claim's fundamental character. Bel Air's Complaint against Zillow is barred as a matter of law by section 230(c)"); *M.L. v. Craigslist Inc.,* 2020 U.S. Dist. LEXIS 166836, at *39 (W.D. Wash. Apr. 17, 2020)("Plaintiff clarifies, in her

29

response, that she seeks to hold craigslist liable for negligence for failing to monitor their website and for failing to take affirmative steps to prevent sex trafficking on their website. …The Ninth Circuit has determined that failing to monitor third party content and failing to remove third-party content when the website knows that it is illegal, is immune under the CDA, because monitoring and removing content is the function of a publisher, not a content creator"); *Green v. Am. Online (AOL)*, 318 F.3d 465, 471 (3d Cir. 2003) ("Green thus attempts to hold AOL liable for decisions relating to the monitoring, screening, and deletion of content from its network -- actions quintessentially related to a publisher's role. Section 230 'specifically proscribes liability' in such circumstances"); *Saponaro v. Grindr, LLC*, 93 F. Supp. 3d 319, 323 (D.N.J. 2015)("The Third Circuit has recognized the CDA's immunity provision to protect internet service providers from allegations of negligently failing to monitor their websites"); *Doe v. MySpace Inc.,* 528 F.3d 413, 417, 420 (5th Cir. 2008)(finding that Section 230 provided immunity for Plaintiff's claim that "Defendants owed a legal duty to 14-year-old Julie to institute and enforce appropriate security measures and policies that would substantially decrease the likelihood of danger and harm that MySpace posed to her." "Their claims are barred by the CDA, notwithstanding their assertion that they only seek to hold MySpace liable for its failure to implement measures that would have prevented Julie Doe from communicating with Solis. Their allegations are merely another way of claiming that MySpace was liable for publishing the communications and they speak to MySpace's role as a publisher of online third-party-generated content"); *Doe v. Kik Interactive, Inc.,* 482 F. Supp. 3d 1242, 1249 (S.D. Fla. 2020)("Plaintiff denies that her claims treat Defendants as though they were merely publishers of the explicit photographs and videos. She asserts that her claim is that Defendants violated 18 U.S.C. § 1591 by failing to enact policies that would have prevented her from being trafficked by fellow Kik users. But this is exactly the type of claim that CDA immunity bars"); *Doe v. Backpage.com, LLC*, 817 F.3d 12, 21 (1st Cir. 2016)(claims that defendants' negligent design

of website resulted in their being trafficked for sex barred by the operation of Section 230); *Beckman v. Match.com*, 2013 U.S. Dist. LEXIS 78339, at *17 (D. Nev. May 29, 2013)("Plaintiff is basically asserting she never would have met or been attacked by Ridley had Match.com warned her or did not negligently misrepresent a profile or the safety of its website. The court finds that these claims are actually directed at Match.com's publishing, editorial, and/or screening functions—all of which are clearly entitled to immunity under the CDA"); *M.H. v. Omegle.com, LLC,* 2022 U.S. Dist. LEXIS 4543, at *14 (M.D. Fla. Jan. 10, 2022)("Through the negligence and public nuisance claims, Plaintiffs allege that Omegle knew or should have known about the dangers that the platform posed to minor children, and that Omegle failed to ensure that minor children did not fall prey to child predators that may use the website. The CDA bars such claims as they seek to redirect liability onto Omegle for the ultimate actions of their users"); *Saponaro v. Grindr, LLC,* 93 F. Supp. 3d 319, 326 n.4 (D.N.J. 2015)("with regards to the public interest, this Opinion has already touched upon the express public policy that supports CDA immunity. This same policy, namely the promotion of free speech on the internet, weighs against imposing a common-law duty on Defendant to monitor its website for the protection of non-users.")

Even if Plaintiff could somehow overcome Section 230 immunity, her claim would still fail inasmuch as there is no independent duty for a website to monitor the content posted by third parties. *M.L. v. Craigslist Inc.,* 2020 U.S. Dist. LEXIS 166836, at *38 (W.D. Wash. Apr. 17, 2020)("plaintiff provides no factual basis or argument supporting her assertion that craigslist has a generally duty to ensure that their website is not endangering minors. Additionally, plaintiff cites no authority, and the undersigned is aware of none, supporting the proposition that craigslist has a general duty to ensure that their website does not endanger minors. Accordingly, plaintiff's bald assertion that craigslist has some duty to protect minors is insufficient to state a claim for negligence"); *Doe v. MySpace, Inc.,* 474 F. Supp. 2d 843, 851-52 (W.D. Tex. 2007)("Plaintiffs have failed to state a claim for negligence

or gross negligence because MySpace had no legal duty to prevent the alleged sexual assault….MySpace had no duty to protect Julie Doe from Pete Solis's criminal acts nor to institute reasonable safety measures on its website"); *Doe v. GTE Corp.,* 347 F.3d 655, 661 (7th Cir. 2003)(internet service provider that hosted website selling videotapes of sports teams secretly recorded in locker rooms and bathrooms had no duty to plaintiffs to prevent the misuse of its services).

### D.     <u>False Light (Count X)</u>

Plaintiff appears to believe that her state law claim for false light, a tort most closely related to defamation, is exempt from Section 230 immunity. She is mistaken, as numerous federal courts have repeatedly held. *See, e.g., Shrader v. Beann*, 503 F. App'x 650, 654 (10th Cir. 2012)(affirming district court's dismissal of plaintiff's "false light invasion of privacy" claim both because Colorado does not recognize such a cause of action and because of Section 230 immunity); *Jones v. Dirty World Entm't Recordings LLC*, 755 F.3d 398, 405 (6th Cir. 2014)(vacating jury verdict and reversing trial court's denial of defendants' motion for summary judgment, holding that "claims of defamation, libel *per se*, false light, and intentional inflection of emotional distress" were all precluded by Section 230 and should not have been allowed to go to trial); *In re Zoom Video Communs. Privacy Litig.,* 525 F. Supp. 3d 1017, 1032 (N.D. Cal. 2021)("Other immunized claims include those for 'false light'—which penalize falsehoods that inflict emotional distress—and 'negligent publication of advertisements that cause harm to third parties'"); *Giveforward, Inc. v. Hodges*, 2015 U.S. Dist. LEXIS 102961, at *22 (D. Md. Aug. 6, 2015)(dismissing plethora of state law claims under Section 230 including claim for "false light"); *Echenique v. Google, Inc.,* Civil Action No. 12-cv-00883-BNB, 2012 U.S. Dist. LEXIS 92729, at *2-3 (D. Colo. July 5, 2012)(holding that, where plaintiff alleged that "her name was used in a pornographic posting on You Tube and subsequently on Google," casting her "in a false light" causing "mental, emotional, and economic injuries," it was

"clear" that such claims "must be dismissed because the claims are barred by the immunity established in § 230(c)"); *Dowbenko v. Google Inc.,* 991 F. Supp. 2d 1219, 1220 (S.D. Fla. 2013)(dismissing plaintiff's "False Light Invasion of Privacy" claim because of Section 230 immunity); *In re Zoom Video Communs. Privacy Litig.,* 525 F. Supp. 3d 1017, 1032 (N.D. Cal. 2021)("Other immunized claims include those for 'false light'—which penalize falsehoods that inflict emotional distress—and 'negligent publication of advertisements that cause harm to third parties'"); *Coffee v. Google, LLC,* 2021 U.S. Dist. LEXIS 26750, at *16 (N.D. Cal. Feb. 10, 2021)("While acknowledging that defamation is the most common claim to be discussed in Section 230 cases, the Ninth Circuit made clear that 'many causes of action might be premised on the …false light against the First Lady and campaign aides...").

Moreover, as noted above, South Carolina simply does not recognize a cause of action for "false light" and, as such, this claim must be dismissed. *See, e.g., Erickson v. Jones St. Publishers, LLC*, 368 S.C. 444, 482 (2006); *Brown v. Peterson*, 326 S.C. 409, 422 (1997); *Parker v. Evening Post Publishing Co.*, 317 S.C. 236, 246 1994).

## E.   Civil Conspiracy

Finally, Plaintiff's claim for civil conspiracy is similarly barred by the operation of Section 230. *See, e.g., Beyond Sys. v. Keynetics, Inc.,* 422 F. Supp. 2d 523, 536 (D. Md. 2006)(dismissing civil conspiracy claim, among others, under Section 230); *J.B. v. G6 Hosp., LLC*, 2020 U.S. Dist. LEXIS 151213, at *10 (N.D. Cal. Aug. 20, 2020)(finding that "that all state claims (participation in sex trafficking venture under the CTVPA, negligence per se, and civil conspiracy) fail as a matter of law because [of] Section 230(c)(1)"); *Doe v. Mark Bates & Yahoo!, Inc*., 2006 U.S. Dist. LEXIS 93348 (E.D. Tex. Dec. 27, 2006)(defendant could not be held liable for civil conspiracy (among other counts) despite allegations that defendant's website "conspired" to allow the posting of child pornography); *Doe v. MySpace, Inc.,* 474 F. Supp. 2d 843, 849 (W.D. Tex. 2007)("Nothing on the

face of the statute supports Plaintiff's narrow interpretation that the CDA's immunity applies only to cases involving defamation and defamation-related claims. 47 U.S.C. § 230. The Eastern District of Texas recently addressed the application of CDA immunity in a case involving claims of negligence, negligence per se, intentional infliction of emotional distress, invasion of privacy, civil conspiracy, and distribution of child pornography"); *Bauer v. Armslist, LLC*, 2021 U.S. Dist. LEXIS 223661, 2021 WL 5416017, at **25-26 (E.D. Wis. Nov. 19, 2021) (dismissing, among others, negligence, public nuisance, aiding and abetting tortious conduct, and civil conspiracy claims, against ICS provider website that was used to facilitate unlawful firearm sales).

And, once again, even if Plaintiff could avoid the sweep of Section 230, the count would be subject to dismissal inasmuch as it fails to state a claim upon which relief may be granted. Under South Carolina law, "a plaintiff asserting a civil conspiracy claim must establish (1) the combination or agreement of two or more persons, (2) to commit an unlawful act or a lawful act by unlawful means, (3) together with the commission of an overt act in furtherance of the agreement, and (4) damages proximately resulting to the plaintiff." *Paradis v. Charleston Cty. Sch. Dist.*, 433 S.C. 562, 574, 861 S.E.2d 774, 780 (2021). As discussed in detail, above, Plaintiffs have failed to allege a combination or agreement as between HML and Collins (or the mystery poster) as well as damages proximately caused by HML's acts or omissions.

### IV. The TAC Is So Vague In Its Allegations As To Which Defendant Committed Which Act as to Constitute a "Shotgun Pleading," Requiring Dismissal.

Finally, dismissal is required in this case because the TAC intentionally blurs the lines between defendants, resulting in a situation where it is impossible for HML to properly respond to the allegations against it. *See, e.g., Addahoumi v. Pastides,* 2018 U.S. Dist. LEXIS 15280, at *6 (D.S.C. Jan. 30, 2018)(dismissing complaint as a shotgun pleading where the complaint required "the court to constantly cross-reference the lengthy facts section and 'wade indeterminately through the morass of superfluous detail'" in an attempt to discern which claims sounded against which

34

7:21-cv-03193-DCC    Date Filed 10/31/22    Entry Number 109-1    Page 35 of 36

defendants). The TAC is replete with instances in which Plaintiff alleges that MindGeek "and/or" xHamster did something. So, for example, although the Second Amended Complaint had alleged that Murphy himself uploaded the videos to xHamster and received compensation from xHamster for doing so, the TAC removes those allegations, alleging instead that "one or more individuals or entities received monetary payment from MindGeek and/or xHamster" for views of the videos of Plaintiffs. TAC, ¶88. Similarly, in the most recent iteration of the Complaint, Plaintiffs have added an entire section entitled "Background," which is separate and distinct from the TAC's "Facts" section (*see* TAC, ¶¶28-64), which consists almost entirely of allegations unrelated to Plaintiff's claims and which are clearly included solely to cast a derogatory light on defendants in a publicly-available document. And, the vast majority of these new and scandalous allegations are directed at MindGeek and not Hammy, it is also true that the TAC then attempts to blur the lines between the defendants and tar Hammy with allegations that are not only unrelated to Plaintiff's claims but which are also unrelated to the Hammy at all. This is a problem entirely of Plaintiff's own making. Rather than clarifying the allegations against Defendants, Plaintiffs have used the TAC to make the allegations *more* diffuse and *less* Defendant-specific in the hope that the Court will look at Defendants collectively. This is the opposite of what the Rules require. The TAC constitutes a shotgun pleading and, given that Plaintiffs have had five chances to get it right, the TAC should be dismissed with prejudice.

## CONCLUSION

For the reasons stated hereinabove, Plaintiff's Third Amended Complaint should be dismissed in its entirety with respect to Hammy Media, Ltd.

**\*\*Signature On Following Page\*\***

Respectfully Submitted,


/s/ Hannah Rogers Metcalfe
Hannah Rogers Metcalfe, Fed ID. 9943
Metcalfe & Atkinson, LLC
1395 South Church Street
Greenville, South Carolina 29605
(864) 214-2319

Evan Fray-Witzer (*pro hac vice*)
CIAMPA FRAY-WITZER, LLP
20 Park Plaza, Suite 505
Boston, Massachusetts 02116
Telephone: 617-426-0000
Facsimile: 617-423-4855
Evan@CFWLegal.com

Valentin D. Gurvits (*pro hac vice*)
Frank Scardino (*pro hac vice*)
BOSTON LAW GROUP, PC
825 Beacon Street, Suite 20
Newton Centre, Massachusetts 02459
Telephone: 617-928-1804
Facsimile: 617-928-1802
vgurvits@bostonlawgroup.com
frank@bostonlawgroup.com

*Attorneys for Defendant Hammy Media LTD*

October 31, 2022
Greenville, South Carolina