## IN THE UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF SOUTH CAROLINA

JANE DOE,

PLAINTIFFS

vs.

COLLINS MURPHY et al.

DEFENDANTS

C/A No. 7:21-CV-03193-DCC

**PLAINTIFFS' RESPONSE IN OPPOSITION TO HAMMY MEDIA LTD.'s MOTION FOR JUDGMENT ON THE PLEADINGS**

## INTRODUCTION

Defendant Hammy Media, Ltd. ("Hammy") argues that the Court lacks personal jurisdiction over it and the Complaint fails to state a claim for relief. Neither of these assertions has merit and their Motion should be denied in its entirely.

## ARGUMENT

Plaintiffs do not dispute that personal jurisdiction is essential to the District Court's ability to adjudicate a case. *Ruhrgas AG v. Marathon Oil Co.*, 526 U.S. 574, 119 S. Ct. 1563, 143 L. Ed. 2d 760 (1999). Hammy claims that personal jurisdiction is lacking here because it is a Cypress company without (it alleges) sufficient contacts with the United States. Hammy is wrong and its analysis of the question of personal jurisdiction is flawed and incomplete.

The inquiry appropriate to determine questions of personal jurisdiction was nicely summarized recently in *Epic Games, Inc. v. Shenzhen Tairuo Tech. Co*., No. 5:21-CV-224-FL, 2022 WL 894243 (E.D.N.C, 2022):

> To demonstrate personal jurisdiction over a defendant consistent with the Due Process Clause, a plaintiff must show (1) a State's **general** jurisdiction over the

defendant by demonstrating the defendant's continuous and systematic contact with the State; (2) a State's **specific** jurisdiction over the defendant by demonstrating that the defendant purposely established minimum contacts in the forum state such that it should reasonably anticipate being haled into court there on a claim arising out of those contacts; **or** (3) **Rule 4(k)(2)** jurisdiction by demonstrating that no State can exercise personal jurisdiction over the defendant and that the defendant has sufficient contacts with the United States such that exercising jurisdiction over the defendant would be consistent with the U.S. Constitution and laws.

*Epic Games, Inc.* at *2 (quoting *Sneha Media & Ent., LLC v. Associated Broad. Co. P Ltd.*, 911 F.3d 192 (4th Cir. 2018))(emphasis added).  Under any measure, Hammy checks all the boxes necessary for this court's exercise of personal jurisdiction.

To defeat Hammy's motion to dismiss, the Plaintiffs need only make a *prima facie* showing of personal jurisdiction. See, e.g., *Grayson v. Anderson*, 816 F.3d 262, 267 (4th Cir. 2016). Exercise of personal jurisdiction under Rule 4(k)(2) of the Federal Rules of Civil Procedure is proper in cases "arising under federal law" when the defendant is not subject to personal jurisdiction in any state court but has sufficient contacts with the United States as a whole.

Thus, a plaintiff who seeks to invoke Rule 4(k)(2) as a basis for jurisdiction must show that (1) the claim "arise[s] under federal law;" (2) the defendant is "not subject to the jurisdiction of the courts of general jurisdiction of any state;" and (3) the court's exercise of jurisdiction would be "consistent with the Constitution and laws of the United States." Fed.R.Civ.P. 4(k)(2); *Base Metal Trading, Ltd. v. OJSC "Novokuznetsky Aluminum Factory"*, 283 F.3d 208, 215 (4th Cir. 2002).

In the present case, the condition that the Plaintiffs' claims arise under federal law is incontrovertible.  Hammy itself acknowledges that the Complaint[1] alleges claims under the Trafficking Victims Protection Reauthorization Act ("TVPRA") (18 U.S.C. §§1591, 1595) and RICO violations. (Hammy's Memorandum in Support, Dk. 109-1, p. 17; Third Amended Complaint, generally; Dk. 91).  The Plaintiffs clearly allege claims arising under federal law.

---

[1] The operative Complaint is the Third Amended Complaint.  (Dk. 91).

Strictly speaking, the second prong of the Rule 4(k)(2) jurisdiction analysis ("the defendant is "not subject to the jurisdiction of the courts of general jurisdiction of any state") is not conceded by the Plaintiffs.  However, as Rule 4(k)(2) is the most straightforward path to proving personal jurisdiction, Plaintiffs will accept Hammy's own denial of general jurisdiction for the immediate purpose of this analysis.  This advances the inquiry to the heart of the matter; that the exercise of personal jurisdiction over Hammy is "consistent with the Constitution and laws of the United States", i.e. due process.  It is here that Hammy's challenge fails.

It is the Fifth Amendment that controls due process analysis in non-diversity, or federal question, cases.  The due process inquiry under the Fifth Amendment is broader than that under the parallel clause of the Fourteenth Amendment.  The Fourth Circuit has synthesized three due process requirements for the exercise of specific personal jurisdiction: (1) the defendant must have "purposefully availed" itself of the privilege of conducting activities in the forum state; (2) the plaintiff's claims must arise out of or relate to those activities directed at the forum state; (3) the exercise of jurisdiction must be "constitutionally reasonable." *Bradley v. DentalPlans.com*., 2022 WL 2973979, at *4 (D. Md. 2022) (citing *UMG Recordings, Inc. v. Kurbanov*, 963 F.3d 344, 351–52 (4th Cir. 2020), cert. denied, ––– U.S. –––, 141 S. Ct. 1057, 208 L.Ed.2d 525 (2021)).

Although Hammy's arguments presume that the "forum state" required for this analysis is South Carolina, that is incorrect.  Rule 4(k)(2) does not link personal jurisdiction to the existence of personal jurisdiction in the local state courts.  Indeed, its express purpose is to permit jurisdiction where no state court has personal jurisdiction.  Thus, the due process question under Rule 4(k)(2) depends solely on whether the defendant has sufficient contacts with the United States as a whole. See, *Graduate Mgmt. Admission Council v. Raju*, 241 F. Supp. 2d 589, 597 n.16 (E.D. Va. 2003).

Accordingly, substituting the United States as the relevant forum, the proper test for personal jurisdiction requires a showing in this case (1) that Hammy purposefully availed itself of the privilege of conducting activities in the United States; (2) that the plaintiffs' claims arise out of those activities directed at the United States; and (3) that Hammy's activity creates a potential cause of action in a person within the United States that is cognizable in the United States' courts. *Epic Games, Inc.* at *3; *Raju* at 597. The Fourth Circuit has explicitly endorsed this analysis in the context of foreign internet activity. *Epic Games, Inc.*, supra; *Automobili Lamborghini S.P.A. v. Lamborghini Latino Am. USA*, 400 F. Supp. 3d 471, 474 (E.D. Va. 2019).

With these precepts in mind, recognition of personal jurisdiction over Hammy is supported under the facts of this case. When determining whether there is personal jurisdiction over a case, a district court must accept as true the uncontroverted factual allegations in the plaintiff's complaint. *Apex Advanced Tech. LLC v. RMSI Priv. Ltd*., 2022 WL 4826335, at *3 (E.D. Va. 2022). In doing so, the court must resolve factual disputes and draw all reasonable inferences in favor of the party asserting jurisdiction. The court may also rely on the contents of any other relevant matter submitted by the Plaintiffs to assist in determining jurisdictional facts. *Apex Advanced Tech. LLC* at *3. This includes material included in the pleadings and information found on the internet – including defendants' own website. *O'Toole v. Northrop Grumman Corp*., 499 F.3d 1218, 1225 (10th Cir.2007) (holding that "it is not uncommon for courts to take judicial notice of factual information found on the world wide web").

Plaintiffs properly allege that Hammy knowingly and purposely availed itself of the benefits of conducting business in the United States. (Complaint ¶¶ 5, 30). Hammy counters with a carefully crafted affidavit of Mardiros Haladjian, purported Director of Hammy Media, Ltd., setting forth several assertions designed to distance Hammy from any meaningful contacts with

the United States. However, the Affidavit is more remarkable for what it does not say in comparison to what is known about the Hammy conglomerate and the facts alleged in the Complaint. A closer look reveals that, between the lines of Haladjian's Affidavit, Hammy aims to do business in the United States and despite Haladjian's denial, (Affidavit of Haladjian, ¶ 14) there is plenty of evidence to establish a prima facia case in this regard.

The Complaint alleges (Complaint ¶ 39), and Haladjian confirms (Affidavit ¶ 10), that the xHamster website is supported by ad revenues. By Hammy's own admission, xHamster.com[2], hosts nearly 8 million sexually explicit videos, with users uploading approximately 1,000 more every day. (Affidavit ¶16). That's not the whole story.

According to the website traffic and market share analytics company Similarweb,[3] xHamster.com garnered *1.4 billion* internet visits in the month of October, 2022 and is the 4th most popular adult website in the United States. In fact, the United States is the **top** source of traffic to xHamster, accounting for roughly 20% of its entire viewer base. The math indicates that in October of 2022 alone, xHamster enjoyed 271,320,000 visits from United States customers for its 'entirely ad revenue-supported' porn site. Similarweb tracked an average of 6.92 xHamster pages viewed per visit, meaning that well over 1.8 billion xHamster pages (and the ads placed therein)

---

[2]  xHamster is registered under the top-level domain name ".com". Verisign, Inc. is the registry operator for all ".com" domain names and it is located in Reston, Virginia. *Chen Lunxi v. Doe*, 2020 WL 2026333 (E.D. Va. 2020). Platintiffs recognize that Hammy's choice of domain registry alone does not confer in personam jurisdiction. It is simply the starting place for the more comprehensive picture of internet commerce.

[3]  SimilarWeb is a web analytics platform offering a range of data intelligence solutions. SimilarWeb describes itself as an 'official measure of the digital world'. It's used by famous names, including Booking.com, Walmart, Google, Adidas, Adobe, DHL, and many other digital brands. In fact, SimilarWeb says that more than 50% of Fortune 500 companies rely on its data. Hedge Fund Magazine chose SimilarWeb as the Best Alternative Data Provider in 2020 at the European Technology Awards. In 2021, SimilarWeb went public on the New York Stock Exchange with a valuation of $1.6bn.

7:21-cv-03193-DCC     Date Filed 11/14/22     Entry Number 110     Page 6 of 21

were viewed from within the United States in a single month - facts omitted from Mr. Haladjian's Affidavit.

Hammy shrugs and argues that xHamster is open to everyone in the world and therefore these numbers prove nothing - as if the company would do nothing to target its top market or that its market share has no effect on its ad revenues. But Hammy does not hesitate to avail itself of the protections and laws of the United States when convenient or necessary and it tailors its rules for 'verified users' to United States customers and to comply with United States laws. Hammy has maintained a Digital Millennium Copyright Act ("DMCA") agent in the U.S. for service of takedown notices[4] since at least 2011 and vigorously monitors the US market for infringement. xHamster.com's information pages contain the following:

11/11/22, 1:20 PM                                        DMCA | xHamster

# DMCA Notice & Takedown Policy and Procedures

This website ("SITE") qualifies as a "Service Provider" within the meaning of 17 U.S.C. §512(k)(1) of the Digital Millennium Copyright Act ("DMCA"). Accordingly, it is entitled to certain protections from claims of copyright infringement under the DMCA, commonly referred to as the "safe harbor" provisions. We respect the intellectual property of others, and we ask our users to do the same. Accordingly, we observe and comply with the DMCA, and have adopted the following Notice and Takedown Policy relating to claims of copyright infringement by our customers, subscribers or users.

See Exhibit B.

Hammy also clearly targets the United States in its Terms & Conditions / User Agreement, made part of the xHamster website for 'verified' users, which is presented by default in English.[5] xHamster states it has "adopted a policy regarding termination of repeat copyright infringers under the Digital Millennium Copyright Act." (4.5); and it provides a notice specifically designated as

---

[4] Exhibit A
[5] Exhibit C

"Section 230 Notice" which it provides "[p]ursuant to 47 U.S.C. §230(d). xHamster specifically promises compliance with 18 U.S.C. §2258A. (3.2.5) and it advises that "all of the Materials and Content constitute expressive content that, amongst other laws and regulations, may be fully protected by the First Amendment to the United States Constitution, and other similar legal principles." (4.2). Verified users are required to affirm the following:

**6.3** Any of your submissions are compliant with all applicable laws, including but not limited to 18 U.S.C. §2257 and 28 C.F.R. 75 and you are able to provide such documents as required upon your Verification and/or Content submission.

Section 13.1 of the Agreement states that

**13.1** You understand and acknowledge that the software elements of the Materials on the Site may be subject to regulation by agencies of the United States Government, including the United States Department of Commerce, which prohibits export or diversion of software and other goods to certain countries and third parties. Diversion of such Materials contrary to United States' or international law is prohibited.

Disputes arising under the Terms & Conditions Agreement are subject to an arbitration clause that defines "Arbitral Claims" as including, but not limited to " … contract and tort claims of all kinds, and all claims based on any *federal, state or local law, statute, or regulation* …" In addition to being evidence from which the Court may infer that Hammy expressly aims its activities and avails itself of the United States and its laws, these statements are tacit admissions that xHamster is fully aware that its activities may result in cognizable claims of harm resulting from the content it provides.

By Hammy's own terms, unauthorized use of xHamster services, dishonored fees, or infringement incurs liquidated damages in US dollars. (Terms & Conditions, §§1.2.2; 2.3.7; 5.2.19; 5.5; 7.2). This is not surprising, because Hammy's Financial Statements[6] report all revenues, profits, losses and other income data in U.S. dollars. The notes to Hammy's Financial Statements supply the explanation:

---

[6] Hammy's 2018 Financial Statement is provided as Exhibit D

## HAMMY MEDIA LIMITED

## NOTES TO THE FINANCIAL STATEMENTS
Year ended 31 December 2018

**2. Accounting policies (continued)**

**Foreign currency translation**

(1)    Functional and presentation currency
Items included in the Company's financial statements are measured using the currency of the primary economic environment in which the entity operates ('the functional currency'). The financial statements are presented in United States Dollars (US$), which is the Company's functional and presentation currency.

Hammy presents its financial data measured in U.S. currency because the United States is its primary economic environment.

This is not surprising. xHamster.com geolocates the "third-party advertising" that appears on those 8 million video pages that reap hundreds of millions of hits every month from its largest market – the United States. And the specificity of the geolocation is not simply general to the United States as a whole – **it offers explicit advertising from the locale of the user**. As discussed in Plaintiffs previous Response to Hammy's last Motion to Dismiss (Dk. 184), this means that when counsel accessed the xHamster website from Louisville, Kentucky, the ads displayed were for advertisers in Louisville, Kentucky.

In *Mavrix Photo, Inc. v. Brand Techs., Inc*., 647 F.3d 1218, 1227-28 (9th Cir. 2011), the Court explained how targeted advertising by third party advertisers can constitute express aiming of a website for purposes of exercising personal jurisdiction over the website's operator:

> [Defendant] makes money by selling advertising space on its website to third-party advertisers: the more visitors there are to the site, the more hits that are made on the advertisements; the more hits that are made on the advertisements, the more money that is paid by the advertisers to [defendant]. A substantial number of hits to [defendant's] website came from California residents. One of the ways we know this is that some of the third-party advertisers on [defendant's] website had advertisements directed to Californians. In this context, it is immaterial whether the third-party advertisers or [defendant] targeted California residents. The fact that the

advertisements targeted California residents indicates that [defendant] knows—either actually or constructively—about its California user base, and that it exploits that base for commercial gain by selling space on its website for advertisements.

*Mavrix*, 647 F.3d at 1230.

The value of geolocated advertising is not lost on xHamster or Hammy, who carefully and publicly track their target market:



Most Americans chose to have their own private fireworks BEFORE the festivities began, rising as much as 20% above normal prior to departing for the holiday. By 11PM, traffic had fall -32% below normal, before it started to rebound.

Alex Hawkins

Vice President, xHamster

alex.hawkins@xhamster.com

Found at: https://xhamster.com/media/news/america-the-beautiful.

But Hammy does more than merely track its U.S. customer base – it takes an active role in marketing to its United States audience in specific locales to advance its own political agenda within the United States.  In response to lawmakers in Utah rejecting a sexual education bill in February 2017, xHamster started presenting a popup to visitors from Utah, encouraging them to view xHamster's sexual education series "The Box" on YouTube[7].



📷 xHamster redirects users from Utah to a sex education website after lawmakers rejected a sex education bill. Photograph: xHamster

The rejected House Bill 215 would have allowed parents to opt their children in for more comprehensive sexual education than the abstinence-only sex education common in Utah but was opposed for encouraging sexual behavior and allowing children to be taught how to have sex.

---

[7] *Utah rejects sex education bill, so porn site redirects to instructional videos*, The Guardian, Feb. 13, 2017; https://www.theguardian.com/education/2017/feb/13/utah-sex-education-bill-porn-xhamster

In support of US civil servants during the 2019 government shutdown, the site offered all furloughed United States government employees access to all premium pornographic content with this tweet:



This not only demonstrates that xHamster targets its content to the United States (*indeed, United States government employees!*), it raises the question of Hammy's claim that xHamster is "free". It obviously offers paid 'premium' content that it is willing to provide on a complimentary basis to enlage its audience among US government workers.

As if any more evidence were necessary to show that xHamster targets the United States, in February 2017, xHamster held auditions for US President Donald Trump, Trump's family members, and Trump cabinet member lookalikes. The winners will be cast in porn parodies. Alex

Hawkins (VP of xHamster) said, "*there is nothing more that the American public needs than quality adult content parodies to help them understand the ever-shifting landscape of their Executive Branch of government*."[8]

Hammy's ties to the United States go beyond the businss transactions with its viewers and its direct marketing, promotion and advertising efforts directed at the US.  Although Haladjian's Affidavit avers that the servers that store the content displayed on the xHamster website are located in the Netherlands (¶ 12), if a 'whois' search is run on xhamster.com, the Domain Name Server ("DNS") is listed as "cloudflare"[9].  Cloudflare, Inc. is an American content delivery network ("CDN") and DDoS mitigation company, founded in 2010. It primarily acts as a reverse proxy between a website's visitor and the Cloudflare customer's hosting provider.  Its headquarters are in San Francisco, California.

CDN's are significant because if the content is traveling from afar, such as a european country, the video streaming would be unstable for viewing in the US, unless you have cdns in geographic proximity to buffer the content quickly to US customers.  It would be impossible for XHamster to reliably serve the massive US market they serve without US CDNs.  Cloudflare, a US company, is inetgral in delivering xHamster content to the United States.  A foreign defendant's contracting with a U.S. entity to provide services to defendant's customers demonstrates express aiming at the United States, when use of the U.S. entity allows the foreign defendant to deliver better service to its US customers.  *Ayla, LLC v. Alya Skin Pty. Ltd*., 11 F.4th 972 (9th Cir. 2021).

---

[8] *Porn site holds Donald Trump lookalike auditions to hire Xrated actor for series of presidential parodies*, The Mirror, Feb. 6, 2017; https://www.mirror.co.uk/news/weird-news/porn-site-holds-donald-trump-9766866

[9] Exhibit E

Taking all the allegations in the Complaint as true for the purposes of deciding jurisdiction, "Hammy Media / xHamster operates as the visible internet front for a tangle of shell corporations and affiliates designed to conceal their illegal operations and shield them from liability. This network includes a company called TrafficStars LTD, which is ostensibly the advertising arm of the company, owned in turn by a Cypriot company called Wisebits LTD. It is believed that a separate arm of the xHamster enterprise is Wisebits IP Ltd. which also owns a company in the British Virgin Islands called xHamster IP Holdings, also known as Online Media Entertainment Holding. Online Media Entertainment Holding owns companies called Technius LTD and Tecom LTD. These companies, in turn, own two more of the xHamster paid pornographic sites, xHamster Live and Faphouse. All of these companies operate in reality as a single business entity and are alter egos of each other." (FA Complaint, ¶40). Hammy denies this in its Answer, but it has offered no information, evidence or proof to refute, discredit or explain the gordian knot that comprises the xHamster enterprise.

Among other things, Plaintiffs have alleged that xHamster offered opportunities for uploaders to share ad revenue, without meaningful safeguards to ensure that the content was legal. (Complaint ¶41). Plaintiffs allege that Hammy deliberately trafficked in illegal content. (Complaint ¶42) They have alleged that Hammy was aware of the volume of non-consensual content on its platform and elected to monetize and exploit it. (Complaint ¶64). Plaintiffs allege that they were induced to 'perform' in the videos by fraud. (Complaint ¶¶ 75-79). Plaintiffs allege that Hammy received the content that is alleged to have caused the harm in this case through user accounts and Hammy knew or should have known that the videos depicted non-consensual pornographic material. (Complaint ¶63). Plaintiffs have alleged that Hammy actively or tacitly encouraged the uploading of such content, and derived profit from the publication of the videos.

(Complaint ¶90). Hammy denies all substantive allegations in the Complaint, but the Affidavit of Mardiros Haladjian does not effectively rebut any of these allegations, and so they too must be considered as true at this stage.

Against this backdrop, Hammy argues that it has not aimed any of its activities at the United States and the exercise of personal jurisdiction is not supported or reasonable. To the extent that Hammy attempts to slide the focus to require the Plaintiffs to present evidence specifically of South Carolina contacts, they are choosing the wrong analysis again. When a federal court is asked to exercise personal jurisdiction over an alien defendant sued on a claim arising out of federal law, jurisdiction may appropriately be determined on the basis of the alien's *aggregated* contacts with the United States as a whole, regardless of whether the contacts with the state in which the district court sits would be sufficient if considered alone. *Bd. of Trustees Sheet Metal Workers' Nat. Pension Fund v. McD Metals, Inc.*, 964 F. Supp. 1040, 1044–45 (E.D. Va. 1997); *Medeco Sec. Locks, Inc. v. Fichet-Bauche,* 568 F. Supp. 405, 409 (W.D. Va. 1983).

Very recently, the Court in *Will Co. v. Lee*, 47 F.4th 917 (9th Cir. 2022) considered a similar situation involving a personal jurisdiction challenge by foreign website operators who have appealed to and profited from the U.S. market and who have caused foreseeable harm in the United States. In *Will Co.*, the plaintiff, a Japanese adult entertainment producer, brought copyright infringement claims against the Canadian and Hong Kong owners and operators of " ThisAV.com", a Japanese website providing pornographic videos uploaded by users. *Id.* at 919.

The foreign defendants had "a relatively limited role in operating [ThisAV.com] on a day-to-day basis. They d[id] not themselves post any content, as all of the videos on the site [were] uploaded by users." *Id.* at 923. Also, while advertising was ThisAV.com's sole source of

revenue, the defendants themselves did not "place any ads; rather, they s[old] all of the advertising space on the site to third-party vendors. ***Several of those third-party ad vendors use geo- targeting to place their ads***, which means that viewers in a particular location are served ads relevant to that location." *Id.* (emphasis added). The vast majority of ThisAV.com's viewers were in Asia (nearly 85% were in Japan, Taiwan, and Hong Kong), and only 4.6% of viewers (or 1.3 million views) were from the United States. See *Id.* at 921.  The District Court found that this was not enough to exercise personal jurisdiction.

The Court of Appeals reversed and remanded on the question of personal jurisdiction.  In doing so, the Court clarified several significant points relevant to personal jurisdiction:

- Geo-targeted advertising can be a significant jurisdictional fact, even if the advertising was placed by a third-party, when the foreign website operator earns considerable revenue from the U.S. market.

- Using a content delivery network ("CDN") with servers in North America that provide faster and more efficient service to U.S. users is a significant jurisdictional fact.

- Choosing to operate a foreign website in compliance with, and under the protections of, U.S. law is a significant jurisdictional fact.

- A foreign website's number of views in the United States is relevant to whether the foreign defendant "directly targeted" the United States by "profiting" from, and making decisions to "appeal" to, the U.S. market.

- A foreign website operator's conduct causes foreseeable harm in the United States when the operator "actively appealed to a U.S. audience, knew that a significant number of people in the United States were actually viewing the website" (e.g., as little as 4% of the website's total views), and a U.S. plaintiff put the operator on notice of the basis of her claims.

District Courts in the Forth Circuit have used similar criteria to determine significant contacts with the United States for purposes of personal jurisdiction.  In *Silver Ring Splint Co. v. Digisplint, Inc.*, 508 F. Supp. 2d 508 (W.D. Va. 2007), a copyright and unfair trade practices case,

the Court found sufficient contacts to support personal jurisdiction against the Defendant.  The Court found the following contacts with the United States to be jurisdictionally significant:

- United States sales amounting to 3.142% of Defendant's total sales in a year;

- A website accessible to U.S. residents;

- Emails or targeted communications promoting the Defendant's presence in the US market;

- A U.S. trademark registration;

- Designation of a U.S. agent and registration with the U.S. Food and Drug Administration;

- Continuing efforts to market and sell its products to customers in the United States;

Id. at 514-515.

Collectively, the jurisdictional facts in this case are more compelling than either *Will Co.* or *Digisplint*.  Hammy's revenue source is its advertisers, who can geolocate their ads down to the city of the viewer.  The website traffic in the US is enormous.  Hammy has registered and maintains a United States agent under the DMCA.  It promotes that it operates in compliance with, and under, the protection of United States law.  Its terms and conditions for its users and other significant documents are in English and primarily reference United States laws.  Hammy does its business in US dollars and publishes its financial statements accordingly - declaring US currency to be its functional and presentational currency.  Hammy has made numerous efforts to direct advertising and marketing materials explicitly to US audiences and it selected a US company to handle its content delivery.  To pretend that Hammy and the xHamster brand do not knowingly make enormous sums of money from the site's deliberate focus on the U.S. market is absurd.

The facts also support a finding that Hammy's activities were a foreseeable cause of the Plaintiffs' cognizable harm, as they allege.  Once again, Hammy's efforts to parse its audience to South Carolina or to compare the percentage of US viewership to xHamster's worldwide total are misguided.  If a jurisdictionally sufficient amount of harm is suffered in the forum it does not

matter that even more harm might have been suffered in another forum. *Yahoo! Inc. v. La Ligue Contre Le Racisme Et L'Antisemitisme*, 433 F.3d 1199, 1207 (9th Cir. 2006) (en banc).

For example, in *Keeton v. Hustler Magazine*, 465 U.S. 770, 104 S.Ct. 1473, 79 L.Ed.2d 790 (1984), (a specific jurisdiction question applied to a single state) the Supreme Court held that New Hampshire had personal jurisdiction over the publisher of a national magazine, Hustler, even though just over one percent of sales occurred in that state, because that one percent still amounted to "a substantial number of copies." Id. at 780–81, 104 S.Ct. 1473. About 20% of xHamster's views occur in the relevant forum here, the United States, which amount to hundreds of millions of page visits per month - an undeniably "substantial" number. See also *Will Co.*, supra. Hammy actively appealed to a U.S. audience, knew that a significant number of people in the United States were actually viewing the website, and were put on notice that they were hosting infringing content when the Plaintiffs sent them a takedown notice. In fact, taken as true, Plaintiffs Complaint alleges a previous pattern of ineffective response to takedown requests. Hammy was aware of the cognizable harm within the United States. Allowing the Defendant to refuse to submit to the jurisdiction of this Court would be to ignore the reality of Defendant's reach.

If the Court somehow remains unconvinced that Plaintiffs have made the required prima facie showing of the basis for personal jurisdiction, the Plaintiffs ask for limited jurisdictional discovery to resolve any lingering questions. The Fourth Circuit has repeatedly expressed its preference that courts develop a fuller evidentiary record when the existence of personal jurisdiction turns on a factual dispute. *Grayson v. Anderson*, 816 F.3d 262, 268 (4th Cir. 2016); *Pandit v. Pandit*, 808 F. App'x 179, 183 (4th Cir. 2020) ("Jurisdictional discovery is proper when the plaintiff has alleged sufficient facts to suggest the possible existence of personal jurisdiction."); *Yacht Basin Provision Co.*, 2021 WL 6493858, at *2 (synthesizing cases). To accomplish this, the

Fourth Circuit urges courts to "consider jurisdictional evidence in the form of depositions, interrogatory answers ... or other appropriate forms." *Grayson* at 269.

The Plaintiffs in this case already served a short, targeted set of Interrogatories to Hammy on April 20, 2022. Those Interrogatories were designed to gain information that would further reveal the scope of Hammy's business presence in the United States. Hammy has not answered as of the date of this writing. Defendant moved instead to stay discovery. (Dk. 188). "The rules of discovery were not designed to encourage procedural gamesmanship." *Beach Mart, Inc. v. L & L Wings, Inc.*, 302 F.R.D. 396, 415 (E.D.N.C. 2014), aff'd sub nom. *Beach Mart, Inc. v. L&L Wings, Inc.*, 784 F. App'x 118 (4th Cir. 2019). The Court has "broad discretion" in permitting discovery on jurisdictional issues. See, *Carefirst of Md., Inc. v. Carefirst Pregnancy Centers, Inc.*, 334 F.3d 390, 402 (4th Cir. 2003). If the Court feels that it does not have sufficient facts to exercise jurisdiction over the Defendant, it is not unreasonable to allow Plaintiffs the opportunity for jurisdictional discovery.

Finally, Hammy's invitation to reargue questions presented under §230 of the Communications Decency Act (47 U.S.C. § 230) at this time are premature. Section 230(c)(1) of the CDA provides that "No provider or user of an interactive computer service shall be treated as the publisher or speaker of any information provided by another information content provider." This Court has already denied a similar motion to dismiss under §230 by Defendant MindGeek in October of 2020 (Dk. 58) under the Third Amended Complaint. Since that time, the operative Complaint in this case has been amended to allege civil causes of action under the TVPRA 18 U.S.C. § 1591, et seq. as modified by FOSTA/SESTA, 47 U.S.C. § 230(e)(5)(A).

The Trafficking Victims Protection Reauthorization Act ("TVPRA") was the first comprehensive law in the United States to penalize the full range of human trafficking offenses,

including sex trafficking of children under the age of 18 or sex trafficking by force, fraud, or coercion. In doing so, it created a civil cause of action, codified at 18 U.S.C. § 1595. That provision of the TVPRA permits a party to bring a civil claim against perpetrators of sex trafficking and against persons or entities who, although not the direct perpetrator, knowingly benefitted from participating in what they knew or should have known was a sex trafficking venture. See 18 U.S.C. § 1595(a).

The Allow States to Fight Online Sex Trafficking Act ("FOSTA"), enacted by Congress in 2018. See Pub. L. 115-164, § 2, Apr. 11, 2018, 132 Stat. 1253; 47 U.S.C. § 230(e)(5)(A), added a specific exception to Section 230 of the CDA. It exempts certain provisions of the TVPRA, discussed above, from Section 230's immunity. Specifically, FOSTA provides that Section 230 has "no effect on sex trafficking law" and that "[n]othing in this section ... shall be construed to impair or limit ... any claim in a civil action under section 1595 of Title 18, if the conduct underlying the claim constitutes a violation of section 1591 of that title." 47 U.S.C. § 230(e)(5)(A). The FOSTA amendment to Section 230 is retroactive. See, 132 Stat. 1253, § 4(b); see also *Woodhull Freedom Found v. United States*, 948 F.3d 363, 368 (D.C. Cir. 2020).

Congress passed FOSTA to "narrow Section 230's scope and provide prosecutors with new tools to combat the sex trafficking of both minors and adults." *Woodhull Freedom Foundation*, 948 F.3d at 368; see also 164 Cong. Rec. S1849-08, 164 Cong. Rec. S1849-08, S1849 (reflecting that FOSTA was enacted in response to an increase in sex trafficking resulting from "the presence of [sex trafficking] organizations online that are using the ruthless efficiency of the internet to sell women and children"). The FOSTA exception references both sections 1591 and 1595 of the TVPRA, abrogating Section 230 immunity for civil section 1595 claims, as long as "the conduct underlying the claim constitutes a violation of section 1591." See, *Doe #1 v. MG Freesites, LTD*,

No. 7:21-CV-00220-LSC, 2022 WL 407147, at *10 (N.D. Ala. 2022).  The upshot is that Section 230 immunity is no longer a bar to civil actions like those alleged by the Plaintiffs here.

The more complex and intricate details of the application of the sex trafficking laws and the possible defenses available to the Defendants is more properly addressed after all of the Defendants have been served and there has been some opportunity for discovery.  Several of the Hammy affiliated Defendants are still awaiting service under the Hague Service Convention. Defendants' efforts to truncate examination of their businesses through the use of §230 as both a sword and a shield should be resisted – at least in the absence of any discovery.

## **<u>CONCLUSION</u>**

For the reasons stated above, the Defendant Hammy Media Ltd.'s Moton to Dismiss should be denied in its entirely.

[SIGNATURE BLOCK ON FOLLOWING PAGE.]

Respectfully submitted,

**BELL LEGAL GROUP, LLC**

<u>*s/J. Edward Bell, III*</u>
J. Edward Bell, III (1280)
Joshua M. W. Salley (13214)
219 North Ridge Street
Georgetown, SC  29440
TEL.: (843) 546-2408
FAX: (8430 546-9604
ebell@edbelllaw.com


**DOLT, THOMPSON, SHEPHERD &
CONWAY, PSC**

Tyler S. Thompson (admitted Pro Hac Vice)
Liz J. Shepherd (admitted Pro Hac Vice)
Jordan A. Stanton (admitted Pro Hac Vice)
13800 Lake Point Circle
Louisville, KY 40223
Telephone: (502) 244-7772
tthompson@kytrial.com
lshepherd@kytrial.com
jstanton@kytrial.com

**NATIONAL CENTER ON SEXUAL
EXPLOITATION**

Benjamin Bull ( admitted Pro Hac Vic)
Danielle Bianculli Pinter ( admitted Pro Hac Vice)
Christen Price ( admitted Pro Hac Vice)
Peter Gentala (admitted Pro Hac Vice)
1201 F Street NW
Washington, D.C.20004
bbull@ncose.com
dpinter@ncoselaw.org
cprice@ncoselaw.org
pgentala@ncoselaw.org


**ATTORNEYS FOR PLAINTIFF**

November 14, 2022
Georgetown, SC