**IN THE UNITED STATES DISTRICT COURT**
**FOR THE DISTRICT OF SOUTH CAROLINA**
**SPARTANBURG DIVISION**

| | |
|---|---|
| JANE DOE, | |
| Plaintiff, | Case No.: 7:21-cv-03193 |
| vs. | |
| LIMESTONE UNIVERSITY F/K/A LIMESTONE COLLEGE, COLLINS MURPHY, MG FREESITES, LTD., d/b/a PORNHUB.COM, and HAMMY MEDIA, LTD. d/b/a XHAMSTER.COM, | **HAMMY MEDIA LTD.'S REPLY IN SUPPORT OF RENEWED MOTION FOR JUDGMENT ON THE PLEADINGS** |
| Defendants. | |

**ARGUMENT**

I.     **Plaintiff's Near Non-Existent Arguments Concerning Section 230 Immunity Are Both Factually and Legally Without Merit.**

Perhaps the most surprising thing about Plaintiff's Opposition to HML's Motion for Judgment on the Pleadings is what it *doesn't* say: faced with extensive argument and overwhelming case law to support HML's position that Plaintiff's claims are all subject to dismissal pursuant to the broad immunity afforded to HML pursuant to Section 230 of the Communications Decency Act (*see* HML's Memorandum, ¶¶14-34), Plaintiffs say… almost nothing.  Instead, Plaintiffs (1) argue that HML's motion is premature, citing an earlier ruling from this Court in connection with a Motion to Dismiss brought by a different defendant, and (2) make the most perfunctory argument possible that Section 230 does not preclude their claim brought under the Trafficking Victims Protection Reauthorization Act ("TVPRA").  Both of these arguments are without merit.

With respect to the first argument (and although the Court here has not previously ruled on any motion by any party related to Section 230), Plaintiff nonetheless argues that HML should not now be allowed to "reargue" the Section 230 question, presumably referring to a Rule 12(b)(6) motion brought by a different defendant in a related case. More specifically, some 21 months ago, in February of 2021, defendant MG Freesites, Ltd. filed a Rule 12(b)(6) motion to dismiss the Fourth Amended Complaint in the companion case. (Docket No. 20-cv-00947, D.E. 104). At the time, HML had not even been served in that case. As part of its Motion to Dismiss in that case, MG Freesites argued that it was entitled to dismissal of Plaintiffs' Complaint, pursuant to Section 230. On June 16, 2021 (again, before HML was ever served in that matter), the Court (Dawson, J.) partially granted and partially denied Mg Freesites' Motion. (D.E. 133). In that ruling, Judge Dawson declined to consider the merits of MG Freesites' Section 230 argument, holding that – because Section 230 was an affirmative defense – MG Freesites should have properly brought its motion pursuant to Rule 12(c), seeking Judgment on the Pleadings and not Rule 12(b)(6).

Preliminarily, it should be noted that most federal courts to consider the question have found that Section 230 immunity may be properly raised under Rule 12(b)(6). *See, e.g., Monsarrat v. Newman*, 28 F.4th 314, 318 (1st Cir. 2022)(affirming district court's 12(b)(6) dismissal of plaintiff's claims based on Section 230 immunity because "affirmative defenses may be raised on a motion to dismiss under Rule 12(b)(6) so long as the facts establishing the defense are clear from the face of the complaint as supplemented by 'matters fairly incorporated within it and matters susceptible to judicial notice'");*Dyroff v. Ultimate Software Grp., Inc.,* 934 F.3d 1093, 1096 (9th Cir. 2019)(affirming district Court's 12(b)(6) dismissal of Plaintiff's complaint based on Section 230 immunity); *Force v. Facebook, Inc.,* 934 F.3d 53 (2nd Cir. 2019)(same); *Marshall's Locksmith Serv. v. Google, LLC,* 925 F.3d 1263, 1267 (2019)("Consistent with Congress' intent to confer

broad immunity for the re-publication of third-party content, internet services may invoke § 230 immunity as grounds for dismissal under Federal Rule of Civil Procedure 12(b)(6). 'Preemption under the Communications Decency Act is an affirmative defense, but it can still support a motion to dismiss if the statute's barrier to suit is evident from the face of the complaint.'"); *Barnes v. Yahoo!, Inc.,* 570 F.3d 1096, 1105-06 (9th Cir. 2009)("To summarize, we hold that section 230(c)(1) bars Barnes' claim, under Oregon law, for negligent provision of services that Yahoo undertook to provide. The district court properly granted Yahoo's motion to dismiss that cause of action.").

Indeed, the seminal case in the Fourth Circuit, *Nemet Chevrolet, Ltd. v. Consumeraffairs.com, Inc.*, 591 F.3d 250 (4th Cir. 2009), was a case in which the Fourth Circuit affirmed the district court's Rule 12(b)(6) dismissal of Plaintiff's complaint on Section 230 grounds. In so deciding, the Fourth Circuit held that: "Section 230 immunity, like other forms of immunity, is generally accorded effect at the first logical point in the litigation process." *Id.* at 254. Relying on *Nemet*, other district courts within the Fourth Circuit have not hesitated to dismiss claims barred by Section 230 immunity at the Rule 12(b)(6) stage. *See, e.g., Advanfort Co. v. Cartner*, 2015 U.S. Dist. LEXIS 199411, at *13-14 (E.D. Va. Oct. 30, 2015)("Finally, this Court is not persuaded by Plaintiffs insistence that this issue be decided on a motion for summary judgment after some discovery has been conducted, as opposed to at the motion to dismiss stage. Fourth Circuit precedent directs this Court 'to resolve the question of Section 230 immunity at the earliest possible stage of the case because that immunity protects websites not only from ultimate liability, but also from having to fight costly and protracted legal battles.' … As MarEx points out, the Eastern District of Virginia has not hesitated to grant motions to dismiss based on CDA immunity. ... Plaintiffs have also cited no binding

authority that dictates that this Court must grant the Plaintiffs time to conduct discovery on the issue. Considering the Fourth Circuit's policy of resolving CDA immunity as early as possible, this Court finds dismissal is appropriate at this stage")(citations omitted).

In reality, though, this is all somewhat moot. Even if there was some question about whether the best practice was to raise Section 230 immunity in a Rule 12(b)(6) motion or wait for a Rule 12(c) motion, HML took Judge Dawson's admonition to MG Freesites in the companion case to heart; it answered Plaintiff's Amended Complaint in the present case, and then promptly moved for Judgment on the Pleadings, precisely as Judge Dawson said MG Freesites should have done in the companion case.  Plaintiffs' attempts to now use Judge Dawson's earlier (non-substantive) order directed at a different defendant (in a different case) as a reason to delay a ruling on HML's Section 230 immunity defense here is both frivolous and in direct contravention of the Fourth Circuit's unambiguous directive that "Section 230 immunity, like other forms of immunity, is generally accorded effect at the first logical point in the litigation process."  HML's entitlement to immunity under Section 230 is clearly ripe for review.

Turning then to the substance of Plaintiff's Section 230 opposition, the Court will quickly see that there is no substance.  Preliminarily, it should be noted that ***Plaintiff made no substantive argument whatsoever as to why any of her claims other than the TVPRA are exempt from Section 230 immunity***.  For this reason alone (as well as for all the reasons cited in HML's Memorandum), the non-TVPRA claims should be dismissed.

Plaintiff's substantive TVPRA "argument" fairs no better.  Read generously, Plaintiff's Opposition argues that FOSTA/SESTA (47 U.S.C., §230(e)(5)(A) amended the TVPRA so as to exempt certain TVPRA claims from Section 230 immunity.  This is true, as far as it goes.  Indeed, HML itself started its Section 230 argument by acknowledging that "As a starting point, it is true that FOSTA carved out a narrow subset of claims under the TVPRA and exempted such claims from

the reach of Section 230 immunity." Memorandum, p. 21. HML's Memorandum, however, then goes on to discuss over the next four-and-one-half pages the specific reasons why Plaintiff's TVPRA claim does not fall within this narrow subset, citing and discussing at length some of the various federal cases that support HML's position. Memorandum, pp. 21-25. Plaintiff's Opposition says nothing about these arguments and cases other than to state (without explanation) that Section 230 immunity "is more properly addressed after all of the Defendants have been served and there has been some opportunity for discovery." Opposition, p. 20.

This is, of course, directly contrary not only to the Fourth Circuit's explicit holding in *Nemet Chevrolet, Ltd.*, but also the rationale underlying that holding. And (if that weren't enough), Plaintiffs provide the Court with no rationale for *why* a decision on Section 230 immunity is "more properly addressed" later in the litigation or what "discovery" they believe would show their claim to be exempt from Section 230 immunity. As the case law indicates, HML is entitled not only to immunity from "ultimate liability, but also from having to fight costly and protracted legal battles." The time to decide the question of Section 230 immunity is now and, despite having had ample opportunity to do so, Plaintiff has provided this Court with no explanation whatsoever as to why the complaint against HML should not be dismissed in its entirety.

## II.    Plaintiff Has Not Bothered To Respond to Arguments That She Has Failed to Allege Facts Sufficient To State A Claim.

Although Plaintiff does address in her Opposition Section 230 immunity (albeit in an erroneous and conclusory manner) and personal jurisdiction (as discussed below), she appears to ignore entirely HML's specific arguments as to why each of the five counts alleged against HML fail to state a claim upon which relief may be granted. And, although a reply brief is not the place to repeat those arguments, HML simply notes that the arguments having been made – and not

rebutted by Plaintiff – should lead the Court to suspect that Plaintiff has not responded to those arguments for the simple reason that she has nothing to say in response.[1]

### III.  With Respect to Personal Jurisdiction, Plaintiff Relies on Facts That Are Not Contained Within The Pleadings, Are Not Supported By Affidavit, And Which Are Ultimately Not Compelling.

#### A.    References To The U.S. Dollar in HML's Annual Reports Are Irrelevant.

As "evidence" of HML's alleged connections to the United States, Plaintiff cites to HML's 2018 Financial Statement, noting that the statement refers to the U.S. dollar as HML's functional currency.  Putting aside the fact that this allegation – and the financial statement – fall outside of the Pleadings and are not supported by affidavit, HML's reporting of financial data in U.S. dollars says nothing about personal jurisdiction generally and even less about the specific personal jurisdiction that Plaintiff must prove here.

First, it should hardly need to be stated, but the U.S. dollar is the most dominant currency in the world.  As the Federal Reserve notes in "The International Role of the U.S. Dollar," (October 2021), attached here as Exhibit 1:

> For most of the last century, the preeminent role of the U.S. dollar in the global economy has been supported by the size and strength of the U.S. economy, its stability and openness to trade and capital flows, and strong property rights and the rule of law. As a result, the depth and liquidity of U.S. financial markets is unmatched, and there is a large supply of extremely safe dollar-denominated assets. By most measures the dollar is the dominant currency and plays an outsized international role relative to the U.S. share of global GDP.

*Id.* at p. 1.

The article goes on to discuss how many countries anchor their own currencies to the U.S. dollar (*id.* at. p. 6) and also how the vast majority of international transactions are completed using

---

[1] Plaintiff did not lack the space to respond – her opposition was fifteen (15) pages under the Court's page limitations.

the U.S. dollar (*id.* at p. 7)("The U.S. dollar is overwhelmingly the world's most frequently used currency in global trade. …Over the period 1999-2019, the dollar accounted for 96 percent of trade invoicing in the Americas, 74 percent in the Asia-Pacific region, and 79 percent in the rest of the world.")

Additionally, it is worth noting that the United States (and its territories and protectorates) are not the only countries to utilize the U.S. dollar as their primary currency.  Numerous other countries do so, including: the British Virgin Islands, Ecuador, the Republic of El Salvador, the Republic of Zimbabwe, the Democratic Republic of Timor-Leste, Bonaire, the Federated States of Micronesia, the Republic of Palau, the Marshall Islands, Panama, and Turks and Caicos.  *See* "Countries Using the U.S. Dollar," located at https://www.investopedia.com/articles/forex/040915/countries-use-us-dollar.asp.

It is far from surprising, then, that an international company conducting business in all parts of the world, would utilize the world's most dominant currency as a measure of its financial performance.  Doing so, however, says nothing about whether the xHamster.com website is expressly aimed at the United States.  And, perhaps more to the point, the fact that HML reports its financial performance in U.S. dollars is simply unrelated to Plaintiff's claims and, as such, is wholly irrelevant to the Court's jurisdictional inquiry.

> **B.**     **XHamster's Blog References To Certain U.S. Holidays and Events Does Not Demonstrate that the Website is Expressly Aimed at The United States.**

While superficially appealing, Plaintiff's cherry-picked citations to certain xHamster blog posts referencing U.S. holiday or U.S. events demonstrates only that HML anticipated that some of its viewers would come from the United States, not that it aimed its conduct at the United States. Indeed, as its blog posts demonstrate, HML anticipates that it will have viewers from countries

around the world. *See, e.g.,* "Congratulations, Australia!" (celebrating marriage equality in Australia, located at: https://xhamster.com/blog/posts/726639); *"#CultureDeViol,"* (using the French holiday of Bastille Day as an opportunity to explain why xHamster would not allow the term "viol," the French term for "rape" to be used as a search term, despite being the ninth most searched French term, located at https://xhamster.com/blog/posts/1003433); "xHamster on #Repealthe8th" (discussing xHamster's support for efforts to repeal the Eight Amendment in Ireland, which (prior to its repeal) banned abortion, located at https://xhamster.com/blog/posts/805694); "Traffic Drop During Ramadan," discussing effect of Ramadan on traffic to xHamster, including statics concerning website visits from Algeria, Yemen, Egypt, Libya, Afghanistan, Tunisia, Palestine, Jordan, Saudi Arabia, Kuwait, Syria, Indonesia, Turkey, Iraq, Qatar, Malaysia, Lebanon, United Arab Emirates, Oman, Iran, and Morocco, located at: https://xhamster.com/blog/posts/973185); "xHamster: The World Cup 2018 Porn Data" (discussing the effect of the World Cup on porn viewership in Morocco, Saudi Arabia, Senegal, Tunisia, Egypt, the United States, Colombia, Costa Rica, Brazil, Portugal, Mexico, Argentina, Costa Rica, and Croatia, located at https://xhamster.com/media/news/xhamster-the-world-cup-2018-porn-data); "The Catalan Referendum," discussing the effect of the Spanish vote concerning Catalonian independence on porn viewership in Spain, located at https://xhamster.com/blog/posts/708825); "Why We're Still Opposing the Digital Economy Act" (discussing the UK's implementation of a law that would require UK residents to register in a special database to access adult entertainment websites, located at: https://xhamster.com/blog/posts/682496); "xHamster Royal Wedding" (discussing xHamster's attempts to "hire Markle family for royal wedding parody" located at: https://xhamster.com/blog/posts/802909); and "Oh Canada!" (using Canada Day to discuss search

8

patterns from Canadian visitors to xHamster, located at: https://xhamster.com/blog/posts/995879).
These are but a few examples of xHamster's international scope.

　　　This is entirely unsurprising, given the global market for adult entertainment.  And, indeed,
it only proves the point that – because the xHamster.com website is equally aimed at the entire
world – it is *not* expressly aimed at the United States (or South Carolina).  *See, e.g., AMA
Multimedia, Ltd. Liab. Co. v. Wanat*, 970 F.3d 1201, 1210 (9th Cir. 2020)("Although similar in
some respects, this case materially differs from *Mavrix* in several important respects. First, Brand's
website had 'a specific focus on the California-centered celebrity and entertainment industries.'
…By contrast, ePorner lacks a forum-specific focus. As the district court noted, 'the market for
adult content is global,' evidenced by the fact that the other 80% of ePorner's viewers were outside
the United States.  …Although Wanat may have foreseen that ePorner would attract a substantial
number of viewers in the United States, this alone does not support a finding of express aiming");
*Fidrych v. Marriott Int'l, Inc.,* 952 F.3d 124, 141 (4th Cir. 2020)("While Marriott obviously uses
its website to engage in commercial transactions, the website does not target South Carolina
residents for commercial transactions any more than it targets any other state. Instead of targeting
any particular state, the website makes itself available to any one who seeks it out, regardless of
where they live. In our view, the mere fact that the website is accessible in a given state does not
mean that Marriott is targeting its activities at that state"); *Yeager v. Airbus Grp. SE*, 2021 U.S.
Dist. LEXIS 38313, at *17-18 (C.D. Cal. Jan. 26, 2021)("Plaintiffs have proffered no evidence in
support of the proposition that the Airbus website targets California consumers above and beyond
consumers in any other geographic locations. Instead, as noted above, Plaintiffs point to several
California-related press releases on the Airbus website, which announce Airbus's major California
transactions and highlight various projects in California that use Airbus aircrafts or other

machinery. …Plaintiffs further aver that searching the term 'California' yields 190 hits and the term 'Los Angeles' yields 227 hits on the website. …Finally, they submit a declaration in support of the proposition that California 'has a large . . . demand for aerospace and aviation products.' …The demand for Defendants' products and the fact that the website mentions Defendants' transactions here, however, is not evidence that the Airbus website is "expressly aimed" at the California market. As noted above, under *AMA Multimedia*, the subject matter of the website and Defendants' efforts to target California are especially important. There, plaintiff proffered facts to show that 20% of the website's users were from the U.S. and that defendant profited from ads directed at them. Still, the court held the 'express aiming' requirement was not satisfied because defendant had made no efforts to target the U.S. market above others"); *Knuttel v. Omaze, Inc.,* 572 F. Supp. 3d 866, 871 (N.D. Cal. 2021)("If anything, Plaintiffs' complaint suggests that Omaze's fundraising campaigns are intended to reach a global audience, given that residents of nearly every country in North America, South America, Europe, and Australia may participate. ... Thus, '[a]lthough [Omaze] may have foreseen that [its website] would attract a substantial number of viewers in the [Northern District], this alone does not support a finding of express aiming'"); *Conrad v. Benson*, 2020 U.S. Dist. LEXIS 149427, at *11-12 (D.S.C. Aug. 13, 2020)(discussing the Fourth Circuit's holding in *Fidrych v. Marriott Int'l, Inc.*, 952 F.3d 124 (4th Cir. 2020) and holding that: "Like Marriott's website, HomeAway's website is 'accessible to all but targeted at no one in particular,' allowing users 'to input their travel dates to view available [properties],' 'to book [rentals] online,' and 'require[ing] [users] to provide personal and financial information' for payment. ...The fact HomeAway might be a 'continuing platform' whereby third parties, such as Foley and Benson, discuss rentals is, despite Plaintiff's contentions to the contrary… irrelevant to

the question of whether *HomeAway* purposefully directed electronic activity toward South Carolina with the intent of engaging in business.").

C.    **Plaintiff's References To Content Delivery Networks and Domain Name Servers Are Erroneous and Misleading.**

The wisdom of the Court confining its review to facts alleged in the pleadings and sworn supporting statements is perhaps nowhere more evident than in Plaintiff's discussion of Content Delivery Networks ("CDNs") and Domain Name Servers ("DNSs").  It is apparent from their Opposition that Plaintiff either misunderstand these services (which they treat as interchangeable even though they are not) or she is attempting to mislead the Court about the same.  As a starting point, it should be noted that Plaintiff's Complaint makes no allegations whatsoever about either CDNs or DNSs, nor has Plaintiff provided the Court with any declarations supporting its assertions (made only in its opposition) concerning the use of Cloudflare for CDN or DNS services.

In any event, CDNs help speed access to information stored on a website's servers so that the website's pages load more quickly, while a DNS simply connects a website's name (such as xHamster.com or NewYorkTimes.com) with the proper IP address where the servers are located on the internet.  Or, as Cloudflare itself explains: "The Domain Name System (DNS) is the phonebook of the Internet. When users type domain names such as 'google.com' or 'nytimes.com' into web browsers, DNS is responsible for finding the correct IP address for those sites. Browsers then use those addresses to communicate with origin servers or CDN edge servers to access website information. This all happens thanks to DNS servers: machines dedicated to answering DNS queries." *See* https://www.cloudflare.com/learning/dns/what-is-a-dns-server/.  And, while Plaintiffs failed to present the Court with any evidence to support its unfounded assumption that xHamster utilizes Cloudflare for CDN services, HML specifically stated in its Memorandum (and supporting declaration of Mardiros Haladjian) that: "HML utilizes three Content Delivery Network

11

("CDN") providers to speed the delivery of content to users, all of whom are located within Europe. Haladjian Declaration, ¶13.

Unlike CDNs (which are designed to speed the loading of a website), the primary use of a DNS server such as Cloudflare's (a free service that Cloudflare provides to millions of websites worldwide) is defensive – it prevents scammers and hackers (located anywhere in the world) from using a website's IP address as a means to exploit the website. *See, e.g.,* *https://developers.cloudflare.com/fundamentals/get-started/concepts/how-cloudflare-works/* and *https://www.cloudflare.com/learning/dns/what-is-1.1.1.1/*

In short, Domain Name Servers (which, incidentally, is ***not*** the server that serves the website's content to the end user) simply allow a website to prevent attacks using a website's actual IP address because, instead, when someone searches for the website's actual IP address (as Plaintiffs did when they ran a WHOIS search), they are instead directed to Cloudflare's DNS servers. None of this has anything to do with express aiming anywhere, much less at the United States.

  **D.**  **The Fact That the XHamster.com Website is Popular In The United States Does Not Establish Personal Jurisdiction.**

Plaintiff also argues that HML should be subject to personal jurisdiction in the United States simply because the xHamster website attracts a large number of visitors from the United States. Preliminarily, the facts used by Plaintiff to support this assertion: (1) appear nowhere in the Amended Complaint, and (2) are unverified statistics from a website called SimilarWeb.com. By its own admission, SimilarWeb only provides an "estimate" of the number of visitors to a website.[2] This is, of course, understandable because SimilarWeb does not actually have access

---

[2] *See* https://support.similarweb.com/hc/en-us/articles/360002329778-Similarweb-vs-Direct-Measurement, last accessed November 21, 2022.

to the logs or servers of the websites for which it is attempting to estimate traffic.  For this reason alone, Plaintiff's argument should be rejected.

Even if this were not the case, however, Plaintiff's focus on the raw number of U.S. visitors to the website is misplaced.  Numerous other federal courts have, in similar situations, rejected the argument that a foreign defendant may be subject to personal jurisdiction in the United States based simply on the amount of traffic generated by the website originating from the United States. *See*, *e.g.*, *AMA Multimedia, supra* at 1211 ("Although Wanat may have foreseen that ePorner would attract a substantial number of viewers in the United States, this alone does not support a finding of express aiming.  …Here, nearly 20% of ePorner's traffic comes from U.S. users. But this does not establish that Wanat expressly aimed at the U.S. market…"); *Liberty Media Holdings, LLC v. Letyagin, et al.*, 2011 WL 13217328 at *4 (S.D. Fla. Dec. 14, 2011) ("Plaintiff contends that Defendant has 'considerable' web traffic originating from the United States and has presented an exhibit showing that fifteen percent of the visitors to the website are from the United States. Precedent, however, establishes that maintaining a website accessible to users in a jurisdiction does not subject a defendant to be sued there: those users must be directly targeted, such that the defendant can foresee having to defend a lawsuit…."); *Fraserside IP L.L.C. v. Hammy Media, LTD*, 2012 U.S. Dist. LEXIS 5359 (N.D. Iowa Jan. 17, 2012) (rejecting personal jurisdiction despite allegations that "xHamster's website www.xHamster.com is visited daily by over 1,500,000 internet users worldwide with roughly 20 percent of the site's visitors being from the United States"); *Fraserside IP, L.L.C. v. Youngtek Solutions, Ltd.*, 2013 U.S. Dist. LEXIS 3779 (N.D. Iowa Jan. 10, 2013) (allegations that "17 to 20 percent of visitors to Youngtek's websites are U.S. citizens"); *Fraserside IP L.L.C. v. Netvertising Ltd.*, 2012 U.S. Dist. LEXIS 180949 (N.D. Iowa Dec. 21, 2012) (allegations that "16.7% percent of HardSexTube's website's daily visitors

are from the United States"); *Fraserside IP L.L.C. v. Letyagin*, 885 F.Supp.2d 906 (N.D. Iowa 2012) (allegations that "eighteen percent of SunPorno's website's 2,500,000 daily visitors are from the United States); *Fraserside IP L.L.C. v. Youngtek Solutions Ltd.*, 2012 U.S. Dist. LEXIS 98041 (N.D. Iowa July 16, 2012) (allegations that "the EmpFlix.com website is allegedly visited daily by over 1,500,000 internet users worldwide with approximately 16.9 percent of the site's visitors coming from the United States. The TNAFlix.com website is allegedly visited daily by over 3,000,000 internet users worldwide with approximately 21.5 percent of the site's visitors coming from the United States.").

The same holds true here. While the xHamster website certainly attracts a large number of visitors from the United States, that alone does not prove that HML expressly aimed the website at the United States. Instead, it proves only as the *AMA* Court held, that "the market for adult content is global."

IV.     **Plaintiff's Passing Suggestion That She Might Need Jurisdictional Discovery Is Unavailing And Ignores This Court's Prior Directives.**

Finally, Plaintiff's passing suggestion that she should be afforded the opportunity to take jurisdictional discovery if the Court were inclined to dismiss the case for lack of personal jurisdiction is both unpersuasive and ignores this Court's prior admonitions. Plaintiff has failed to articulate *what* discovery she would take or how it would help her meet her burden of proving personal jurisdiction and she has offered little to support her assertions that personal jurisdiction is proper. Under such circumstances, jurisdictional discovery is properly denied. *See, e.g., Carefirst of Md., Inc. v. Carefirst Pregnancy Ctrs., Inc.*, 334 F.3d 390, 402 (4th Cir. 2003)("When a plaintiff offers only speculation or conclusory assertions about contacts with a forum state, a court is within its discretion in denying jurisdictional discovery"); *Black Magic, LLC v. Hartford Fin. Servs. Grp., Inc.,* 2021 U.S. Dist. LEXIS 48027, at *13-14 (D.S.C. Mar. 12,

14

2021)("Defendants have readily demonstrated that both subject matter and personal jurisdiction are lacking. Allowing Black Magic to conduct jurisdictional discovery under the circumstances would be a waste of resources for the Court and the parties. Therefore, Black Magic's request for jurisdictional discovery is denied.")  Additionally, when Plaintiff raised the possible need for jurisdictional discovery during the August 25, 2022 status conference with the Court, the Court instructed Plaintiff to file a motion for such discovery – if it was needed – within 30 days of the status conference.  Plaintiff chose not to do so and she should be held to that choice.

## CONCLUSION

For the reasons stated herein and in HML's Memorandum in Support of its Renewed Motion For Judgment on the Pleadings, Plaintiff's Complaint should be dismissed in its entirety as to Defendant Hammy Media Ltd.

Respectfully Submitted,

/s/ Hannah Rogers Metcalfe
Hannah Rogers Metcalfe, Fed ID. 9943
Metcalfe & Atkinson, LLC
1395 South Church Street
Greenville, South Carolina 29605
(864) 214-2319

Evan Fray-Witzer (*pro hac vice*)
CIAMPA FRAY-WITZER, LLP
20 Park Plaza, Suite 505
Boston, Massachusetts 02116
Telephone: 617-426-0000
Facsimile: 617-423-4855
Evan@CFWLegal.com

Valentin D. Gurvits (*pro hac vice*)
Frank Scardino (*pro hac vice*)
BOSTON LAW GROUP, PC
825 Beacon Street, Suite 20
Newton Centre, Massachusetts 02459
Telephone: 617-928-1804

15

Facsimile: 617-928-1802
vgurvits@bostonlawgroup.com
frank@bostonlawgroup.com

*Attorneys for Defendant Hammy Media LTD*

November 22, 2022
Greenville, South Carolina