Research Article

CONVERGENCE

Convergence: The International
Journal of Research into
New Media Technologies
2023, Vol. 29(6) 1609–1623
© The Author(s) 2023
Article reuse guidelines:
sagepub.com/journals-permissions
DOI: 10.1177/13548565231193694
journals.sagepub.com/home/con

Sage

# The (not so) secret governors of the internet: Morality policing and platform politics

**Zachary J McDowell** 
University of Illinois at Chicago, USA

**Katrin Tiidenberg**
Tallinn University, Estonia

## Abstract
A growing body of academic work on internet governance focuses on the 'deplatforming of sex', or the removal and suppression of sexual expression from the internet. Often, this is linked to the 2018 passing of FOSTA/SESTA – much-criticized twin bills that make internet intermediaries liable for content that promotes or facilitates prostitution or sex trafficking. We suggest analyzing both internet governance and the deplatforming of sex in conjunction with long-term agendas of conservative lobbying groups. Specifically, we combine media historiography, policy analysis, and thematic and discourse analysis of the National Center on Sexual Exploitation's (NCOSE, formerly Morality in Media) press releases and media texts to show how conservative moral entrepreneurs weaponize ideas of morality, obscenity, and harm in internet governance. We illustrate how NCOSE has, directly and indirectly, interfered in internet governance, first by lobbying for rigorous enforcement of obscenity laws and then for creating internet-specific obscenity laws (which we argue CDA, COPA, and FOSTA/SESTA all were for NCOSE). We show how NCOSE adjusted their rhetoric to first link pornography to addiction and pedophilia and later to trafficking and exploitation; how they took advantage of the #metoo momentum; mastered legal language, and incorporated an explicit anti-internet stance.

## Keywords
Deplatforming, platform politics, internet governance, media history, National Center on Sexual Exploitation, FOSTA/SESTA, CDA230

**Corresponding author:**
Zachary J McDowell, Department of Communication, University of Illinois at Chicago, 1007 W Harrison St, Chicago, IL 60607, USA.
Email: zjm@uic.edu

## Introduction/morality police on the internet

A growing body of academic work on internet governance focuses on what Stephen Moldrem (2006) aptly called the 'deplatforming of sex'. Linked usually to the American Senate passing the Allow States and Victims to Fight Online Sex Trafficking Act and the Stop Enabling Sex Traffickers Act (FOSTA/SESTA) that permit holding internet intermediaries responsible for 'promoting or facilitating prostitution' or 'knowingly assisting, facilitating or supporting sex trafficking', the work on deplatforming of sex explores the banning, shadowbanning, demonetizing, and suppressing of sexual expression on a variety of platforms, most notably Tumblr and Craigslist since 2018 (Lingel, 2021; Pilipets and Paasonen, 2022; Reynolds, 2021; Tiidenberg, 2021). Broadly, the consensus among internet researchers and sex work activists is that the vague wording of FOSTA/SESTA made censoring sexual expression the path of least resistance for platform companies (Blunt et al., 2021; Bronstein, 2021). The law has thus harmed various communities (sex workers, LGBTQ+ internet users, artists, activists, sexual subcultural communities, academics studying them) in numerous ways (Blunt and Wolf, 2020; Engelberg and Needham, 2019; Musto et al., 2021). According to the US Government Accountability Office, FOSTA/SESTA has not been widely employed (Goodwin et al., 2021), and the bills' effectiveness in fighting sex trafficking has been questioned to the point of reintroducing the SAFE SEX Workers Study Act in March 2022 (H.R.6928).

Yet, the deplatforming of sex is not new. Rather, we argue, it is part of a 60-year campaign against 'obscenity' by conservative lobbying groups like the National Center on Sexual Exploitation (NCOSE, formerly Morality in Media (MIM) between 1968 and 2015, and Operation Yorkville (OY) between 1962 and 1968),[1] who have for decades systematically targeted intermediaries (booksellers, libraries, postal mail, telephone companies, financial services, and more recently the internet broadly and specific platforms more narrowly) as the solution to what they frame as an 'epidemic of obscenity'.

Outside of the FOSTA/SESTA related discussions, 'deplatforming' is a term primarily used to discuss content and community moderation, in particular, the power platform companies have to remove groups and individuals (e.g., Alex Jones or Milo Yiannopoulos) who engage in online hate speech and spread disinformation (Rogers, 2020). The term highlights the practical aspects of an actor being removed from a social media platform as well as points to losing their platform from which to speak and, thus, at least some of their power (Tiidenberg and van der Nagel, 2020, p. 51). Within the conversations around the deplatforming of sex, however, the focus lies more with the power of legislation, moral panics, and public opinion to incentivize platform companies to silence whole areas of discourse. We argue that NCOSE, in particular, has systematically attempted to deplatform sexual expression to control public discourse by centering it on the idea of harmful obscenity. To do this, they have interfered in internet governance in both direct and indirect ways that are important for internet scholars to understand.

In the following, we show how NCOSE acted as moral entrepreneurs, lobbying for the creation of obscenity legislation and its 'rigorous enforcement' in the United States. They worked toward the deplatforming of sexual expression initially in bookstores and later in cable and telecom channels and the internet. They undertook a decades-long crusade of inserting their language into multiple pieces of legislation crucial for internet governance: first, the Communication Decency Act (CDA), then the Child Online Protection Act (COPA), and finally, the already mentioned SESTA and FOSTA. We show how NCOSE adjusted their discourse to link pornography to addiction and pedophilia, and later, after failures of their preferred parts of CDA and the entirety of COPA, shifting from the anti-pornography rhetoric to the language of trafficking and exploitation, which eventually

led to what they have celebrated as the victory in FOSTA/SESTA. While NCOSE in its various incarnations is not, by any means, wholly responsible for changes in internet policy, their archive of press releases, statements, and other documents represent a singular thread in which to investigate how the ideas of morality, obscenity, and harm have been weaponized for internet governance. This analysis demonstrates the importance of a longer-term view in internet governance scholarship. It helps determine relevant, albeit potentially surprising, stakeholders and to trace the trajectories of the discourses of riskiness and harm put forth by moral entrepreneurs. These may become a source of regulation put forth as justifiable decades later.

## Panics, discourse, and moral entrepreneurs

For Stuart Hall (1985), an ideological struggle is part of the general social struggle for hegemony. Positions advocated for by NCOSE and other conservative lobbying groups, however, 'only become effective if they do, in the end, connect with a particular constellation of social forces' (Hall, 1986: p. 42). What we trace in our analysis, then, is not just a chronology of NCOSE's ideas and policies that shape platform governance but a conjuncture of forces that both exercise power and take advantage of contemporary moments. We argue that through Hall's (1988, p. 138) lens, NCOSE can be understood as an 'organized ideological force' that 'actively intervenes' in 'popular ideologies', in particular in times of crisis. Those crises, of course, can be amplified by those same organized ideological forces. Further concepts useful for our analysis, thus, are those of moral panics and moral entrepreneurs.

The notion of moral panic is most often attributed to Stanley Cohen (1972), whose work was also picked up by Stuart Hall. Hall, writing with co-authors of a 1970s nationwide panic about a mugging, suggested that moral panics are 'one of the key ideological forms in which a historical crisis is experienced and fought out' (Hall et al., 1978: p. 221). Distilling a definition from decades of earlier work, Goode and Ben-Yehuda describe moral panics as 'outbreaks of moral concern over a supposed threat from an agent of corruption that is out of proportion to its actual danger or potential harm' (2013, p. 26). They note that this 'concern' is expressed by various actors of moral panics, most importantly the media; the public; the politicians and lawmakers; and moral entrepreneurs. Moral entrepreneurs 'organize, recruit, proselytize, assemble, demonstrate, and lobby on behalf of their cause against the putative threat' (Goode and Ben-Yehuda, 2009: p. 67). Moral entrepreneurs define and combat perceived social threats by trying to shape 'public discourse, the law, and public policy' (Krinsky, 2013: p. 5). But it is when lawmakers and moral entrepreneurs join forces that they become capable of launching 'crusades, which occasionally turn into panics, to make sure that certain rules take hold and are enforced' (Goode and Ben-Yehuda, 2009: p. 67). This attention to moral entrepreneurs and how they partner up with other actors highlights that the formation of moral panics need not necessarily follow an organic path, but can be a result of manipulations not only driven by moral concerns, but also strategic ones (for analysis of economic interests and intra-industry competition that has driven moral panics see McKenna 2020, Petley 2011).

In this paper, we are particularly interested in how NCOSE – acting as a moral entrepreneur – attempts to shape law and public policy through both direct action as well as developing discourse about law and public policy. We explore the shifts within NCOSE's discourse, what they frame as the social threat, what they position as a solution, and who they construct as the main moralized subjects and objects. We define 'discourse' as 'a group of statements in any domain which provides a language for talking about a topic and a way of producing a particular kind of knowledge about that topic' (Hall, 1992: p. 292). Moral panics are fed by specific discourses and discursive strategies: one such is reliance on 'strong theory'. Paasonen et al. (2020, p. 46) note that strong theories 'offer

and necessitate unambiguous results' and are 'firm in their premises and their commitment'. With 'strong theory', moral entrepreneurs 'know what needs to be proved' beforehand, and 'there is no possibility that a hypothesis will ever be disproved' because 'evidence that doesn't seem to support the hypothesis will be dismissed, ignored, or interpreted in such a way that it can be argued to support the hypothesis' (Paasonen et al., 2020: p. 47). Media-effects theories, in particular their earlier iterations like the 'magic bullet' or 'hypodermic needle,' which presume a linear transition from media content to altered persons or behavior, are one type of strong theory popular among moral entrepreneurs, particularly those concerned with the intersection of media, technology, and sexual expression.

Topics pertaining to sexuality, in particular, 'come under the purview of the law when they become objects of social concern and political uproar. Each sex scare or morality campaign deposits new regulations as a kind of fossil record of its passage. The legal sediment is thickest – and sex law has its greatest potency – in areas involving obscenity, money, minors, and homosexuality' (Rubin, 1984, p. 158). Here, we rely on the notion of a 'trifecta of anxieties', suggested by Tiidenberg and van der Nagel. The trifecta is an assemblage of historical worries that moral panics around technology, media, and sex often build on and emerge out of. Technology and media panics center on anxiety regarding the impact of new technologies, media forms, and content on young people, who, based on the strong media-effects theory, are hapless, easily addicted, and in need of protection (Tiidenberg and van der Nagel, 2020). Sex panics, Tiidenberg and van der Nagel (2020, p. 32) argue, focus on 'anything from "unprecedented" sexualization of children to "epidemic levels" of abortion, teen pregnancies, masturbation, or sexually transmitted disease (STD) outbreaks, linking the above to pornography, homosexual men's behavior, or pedophiles in mystical and illogical ways'. The rhetoric of addiction is consistently centered in sex, technology, and media moral panics that call for restrictions of media or expression (cf Clarkson and Kopaczewski (2013) for a discussion of pornography addiction rhetoric and free speech; Szablewicz (2010) for a discussion of the strategic linking of internet addiction, pornographic and violent content and censoring the internet in China and Cover (2006) for an analysis of strategic use of gaming addiction discourses to propose censoring policies). These panics often overlap – technologies and media are linked to dangerous sexual behavior or addiction to pornography, and media panics often focus on pedophiles or the grooming of children for sex (Tiidenberg and van der Nagel, 2020). The concept of the 'trifecta of anxieties' invites questions at the intersection of sex and public life, public life and the internet, and the internet and sex, all of which are relevant for analyzing NCOSE discourses and their strategic deployment.

## Methods

Our approach combines media historiography, policy analysis, and archival thematic and discourse analysis to explore the coverage of events between 1962 and 2022. We worked in a layered, iterative manner loosely following the tenets of 'conjunctural. analysis' (Hall et al., 1978) as operationalized by Jamie Hakim (2019) – making sense of the conservative internet governance lobby as a response to the specific mix of social contradictions that constitute the historical period (conjuncture) in which it has emerged. To do so, we started with the NCOSE website's archive of press releases (*n*= 719 between 1996 and 2022), the titles we analyzed for recurring rhetoric and thematic patterns. We supplemented this analysis with a meta-analysis of earlier press releases cited in academic papers and news sources for context (specifically academic papers in law journals on CDA, news coverage of OY and MIM, and various investigative obscenity-related committees). These two steps mapped out some of the temporal shifts of the NCOSE discourse. This was followed by a readthrough of the

press releases, blog posts, and news articles on the NCOSE website for COPA (*n*=11, 1998–2009), CDA (*n*=108, 1998–2022), and FOSTA/SESTA (*n*=76, 2017–2022) for recurring themes (e.g., speakers, issues framed as problems, suggested solutions, actors framed as perpetrators, calls for action and tools/templates created for audiences to pressure legislators, etc.). Finally, we conducted a discourse analysis of 29 selected texts: all 11 texts on COPA and 18 on FOSTA/SESTA, with a focus on actors framed as perpetrators; the framing of the role of NCOSE; paraphrasing of legislation and its aims; tactics of legitimizing claims; rhetorical work done to classify and define problems, including rhetorical links created between pornography, the internet, child exploitation, sex trafficking, sex work; citation and appropriation of language from timely social campaigns, political events (presidential elections) and shifts within the platform ecosystem. In this analysis, we also identified moments of sensationalization, obfuscation (e.g., rhetorical bundling and ignoring complex arguments), and strategic misrepresentation of facts.

We start by discussing how in their early years, NCOSE framed some key legal cases, which reverberate through their campaign for decades to come, underpinning their strategy for deplatforming sex. We then continue by exploring three moments of active intervention into internet governance by NCOSE – their work around CDA, COPA, and SESTA/FOSTA. For the latter two, we also go into a more granular analysis of the rhetorical gymnastics undertaken across NCOSEs press materials to show how the moral entrepreneur moved from 'all porn is illegal', to 'porn creates child exploitation' within their COPA intervention and from there to a framing of sex trafficking, standing with survivors and against Big Tech in their SESTA/FOSTA intervention.

## Early years, the beginnings of a strategy

To understand NCOSE as a moral entrepreneur (Goode and Ben-Yehuda, 2009), it is important to remember that while it was founded by three clergymen in 1962, the organization has, from the very beginning, been shaped by lawyers and guided by a keen focus on influencing legislation. As Goode and Ben-Yehuda (2009) have argued, it is when moral entrepreneurs and lawmakers join forces that morals become rules and get enforced. From its inception, NCOSE focused on combating obscenity, initially via calls to 'rigorously enforce obscenity laws'. A closer look at how NCOSE framed some of the legal cases centered on refining the parameters of obscenity laws and testing the courts' willingness to uphold them allows us to trace the emergence of NCOSE's strategy for deplatforming sex.

In 1969, in Stanley v. Georgia, it was established that people could read and look at whatever they wished (including obscene materials) in the privacy of their own homes. Noting that the first and fourteenth amendments protected this privacy, Judge Thurgood Marshall argued that 'a State has no business telling a man, sitting alone in his own house, what books he may read or what films he may watch' (Stanley v. Georgia, 1969). This ruling upheld personal possession but also suggested that states wishing to regulate obscenity should focus on production and distribution, a direction that NCOSE incorporated into their strategy and has stayed true to until 2022.

In 1973 Miller v. California did convict a distributor of pornography under obscenity charges. Importantly for our analysis, this case established a three-part test for obscenity. According to the test, whether or not something is obscene depends on the following:

(1) 'Whether the average person, applying contemporary community standards, would find that the work taken as a whole, appeals to the prurient interest;
(2) whether the work depicts or describes, in a patently offensive way, sexual conduct specifically defined by the applicable state law;

(3)  and whether the work, taken as a whole, lacks serious literary, artistic, political, or scientific value' (Miller v. California, 1973).

This case pervades NCOSE rhetoric for the next 50 years. In particular, the notion of 'community standards' led to many rhetorical gymnastics.

Across MIM (Morality in Media, NCOSEs previous name between 1968 and 2015)'s public communication, a clear stance is evident: all pornography is considered obscene and thus interpreted as illegal. As courts often failed to interpret laws in MIM's way, one of MIM's early areas of active intervention was educating those who make and uphold laws. In 1970, the US President's Commission on Obscenity and Pornography delivered a report that called to end 'all legal restraints on the distribution of sexually explicit materials to consenting adults' (Holles, 1974). The report was followed by a minority report by some of the commission members, among them Father Hill, the founder of NCOSE (then OY), who was assisted in writing the minority report by lawyer Paul McGeady, later MIM's general counsel. The minority draft described the majority report's findings as 'scanty, manipulated, and fraudulent' (Holles, 1974). The majority report was disowned by then-Attorney General, the Congress, and President Nixon, who rejected its 'morally bankrupt conclusions' (Vile, 2009). However, MIM did not stop at that; they also set up a National Legal Data Center (NLDC), which a 1974 New York Times article describes as a 'thinly concealed arm of Father Hill's Morality in Media Crusade'. The NLDC tracked obscenity cases and conducted 'training seminars for prosecutors, the police, and other law enforcement officials' and 'helped them in the courtroom' (Holles, 1974). The Center received $350,000 in congressional earmarks between 1973 and 1975, closed its doors in 1975 due to lack of funding, and re-opened a year later in 1976 as the 'National Obscenity Law Center' (NOLC), both part of MIM and headed by McGready (Dalianis, 1998). In 1996, McGready noted that NOLC provided 'services to approximately 800 prosecutors, 50 law libraries, and 50 other groups and individuals about the complexities of obscenity law' (McGready, 1996: p. 733). NCOSE's current 'legislative policy' continues to seek to 'educate Congress and state legislatures, so policymakers produce legislation' that aligns with their mission (NCOSE, n.d.). Beyond pedagogy, MIM attempted to persuade the highest lawmakers directly, particularly via a 1983 private session with Ronald Reagan, where pornography, cable television, and danger to children were discussed. This marked a specific shift in media focus by MIM from film and print to broadcast.

### Active Intervention: CDA

As the 1990s ushered in new intermediaries for distributing content and information, MIM's and other conservative stakeholders' gaze shifted to the internet. A series of legal cases that defined the limits on the immunity that intermediaries retain 'for legal claims arising out of the words and images created by others' (Kossef, 2019, p. 10) were fought, including some that focused specifically on online obscenity. The conflicting interests between different stakeholders paved the way for the Communications Decency Act (CDA) of 1996.

MIM was 'deeply involved in the issue of Internet pornography' and 'active supporters of the 1996 Communications Decency Act' (Lane, 2001: p. 100). The CDA was sponsored by Senator Exon, who framed the need for it via concerns that the 'information superhighway' is a 'red light district', and the proposed law is a way to protect 'children and families' from 'cruising' and 'inappropriate communications' (Cannon, 1996, p. 53). The initial version of the CDA received a lot of criticism from the tech industry and free speech activists, at which point four defenses were added. Those, however, were objected to by conservative organizations, including MIM.

Finally, with multiple amendments, CDA was added to the Senate's version of the telecommunications bill of 1995. A year later, it was passed and signed into law by President Clinton. However, Robert Peters, then-president of MIM, lamented that 'many of Morality in Media's suggestions ultimately were not adopted' (Lane, 2001: p. 100) and the sections of the CDA explicitly focused on regulating obscenity came under immediate fire. In 1997, Reno v. ACLU struck down parts of the CDA as violating the first amendment (much like Stanley v. Georgia but for the Internet). Justice Stevens wrote in the decision that while what children access needs to be restricted, suitability for children as a measure of what is allowed online is an unacceptable 'burden on adult speech' (Reno v. ACLU, 1997). In 1997, the Supreme Court held CDA unconstitutional, although legal battles continued for years. One of the few sections of the CDA that remained was Section 230 – broadly considered one of the most critical pieces of internet governance legislation. It exempts internet intermediaries from liability for what users post, stating that 'no provider or user of an interactive computer service shall be treated as the publisher or speaker of any information provided by another information content provider' (Section 230, 1996). This, as we will show shortly, became a new battleground for MIM, which led to a shift from the goal of 'rigorously upholding obscenity law' to the need for 'obscenity law for the internet'.

## Active intervention: COPA

MIM and other conservative groups pushed back on the stripping of CDA from the parts that would function as obscenity law for the internet and inserted themselves in preparing the federal Child Online Protection Act (COPA). In MIM press materials focused on COPA (published between 1998 and 2009), the act is initially celebrated as a victory in the war on obscenity. It is evident that MIM commented on an early draft into which their additions were incorporated. The press materials indicate that MIM believed their additions, in particular of specific legal language, would save COPA from the fate of CDA. In a 1998 newsletter, MIM wrote: 'MIM believes that COPA, unlike the Communications Decency Act (CDA) of 1996 (which was struck down by the U.S. Supreme Court), can withstand a constitutional challenge in part because of the changes we suggested (…). The new law also includes a proposal that MIM put forth after the Supreme Court invalidated the CDA in 1997. This proposal was that Congress establish a "Blue Ribbon Commission" to make recommendations on how to reduce minors' access to Internet pornography' (NCOSE, 1.11.1998). This 'Blue Ribbon' commission was set up as the Commission on Online Child Protection (which MIM's above-mentioned legal council Paul McGeady was on). Its goal was to 'conduct a study to identify technological or other methods that will help reduce access by minors to material that is harmful to minors' (NCOSE 20.10.2000). They delivered their final findings in 2000.

COPA passed, but was struck down three times in 2000, 2003, and 2007, leading to a permanent injunction by the Supreme Court in 2010. Despite MIM's belief in their addition of: 'a scienter (knowledge of criminal activity) requirement, improving the definition of "engaged in the business" using language in Federal obscenity law, improving the definition of "harmful to minors" using language from New York State law' (NCOSE 1.11.1998) COPA was deemed to violate the First Amendment of the U.S. Constitution. Instead, parental use of filtering technologies was positioned as sufficient to protect minors. This was a direct failure for NCOSE. McGeady and the Commission on Online Child Protection explicitly argued that laws that rely on requiring filters by parents, school officials or libraries are "a weak, ineffective answer to the overall problem of children's access to harmful material" recommending instead "vigorous enforcement of the federal laws against Internet obscenity" (NCOSE 20.10.2000).

Even after its failures, MIM continued to elevate COPA as a law that would have helped 'win the war on obscenity' and 'protect children'. The decade of COPA discourse often positioned the Justice Department, the FBI, Congress, and the FCC as perpetrators, suggesting that all of these institutions failed America when they 'adamantly refused to enforce the existing laws against Internet obscenity' (NCOSE 20.10.2000). MIM went as far as to explicitly argue that enforcement of obscenity laws is more important than focusing on 'sexual exploitation of children crimes' (NCOSE 04.08.2010), indicating that for MIM, like many other moral entrepreneurs, protecting children serves as a rhetorically persuasive excuse for a blanket ban on obscenity.

In what follows, we explore two dominant and related themes within NCOSE's COPA discourse: first, 'all porn is hardcore porn, thus obscene, thus illegal', and second, 'porn creates child exploitation'. Both are scaffolded by a strong theory rhetoric of media effects (Paasonen et al., 2020). We focus on NCOSE's rhetorical gymnastics (creation of linkages, misrepresentation, obfuscation, and sensationalization to legitimize NCOSE's version of problems and solutions).

### *Rhetorical gymnastics: From 'all porn is illegal' to 'porn is a gateway to child exploitation'*

For decades, NCOSE has implied that all pornography equates to hardcore pornography and, most importantly, that hardcore pornography is obscene and, thus, under obscenity laws – were those only upheld more rigorously – illegal. They make these claims far more explicitly in their COPA discourse. Then-president Robert Peters argued that "today, most adult pornography distributed commercially, whether online or elsewhere, is 'hardcore'" (NCOSE, 25.09.2009). Often these discussions come with sensational lists of what online pornography entails, where 'adultery', 'unsafe sex', and 'group sex' are presented alongside 'sex with animals, sex with excrement, sex with siblings, sex with she-males, male-on-male rape, and the degradation, rape, and torture of women' (NCOSE, 12.09.2007). These lists – the language used (including the slur for transgender people) and the categorization and comparisons enacted – and accompanying claims that most commercial websites distribute hardcore pornography (NCOSE, 28.01.2009) and that there are ads for child porn on commercial online porn websites (NCOSE, 28.04.2008) are tactics of misrepresentation and sensationalization intended to sow disgust and panic.

Further, the argument of all online pornography being illegal is made in two particular ways, both articulated in relation to Miller. First, MIM continually argues that pornography violates the third test in Miller, claiming that most pornography has no artistic or cultural value. However, the first test of Miller (community standards) puts MIM in a difficult position. On the one hand, the organization is interested in arguing that the spread of pornography has reached epidemic levels, a trope common in media, sex, and technology panics (Tiidenberg and van der Nagel, 2020), and thus needs urgent solutions. Yet, MIM needs to articulate that this epidemic does not signal community acceptance, lest it meet the first test of Miller. In COPA discourse, we see MIM undertaking significant rhetorical gymnastics to do this work. 'Just because a person experiments with hardcore adult pornography for some time (or on occasion) succumbs to the temptation to view it', MIM writes: 'does not mean he or she approves of what is viewed, especially when hardcore adult pornographers promote their products aggressively' (NCOSE, 25.09.2009). Further, NCOSE relies on the rhetoric of a strong theory of media effects, particularly the notion of addiction, another trope often used in the intersecting sex, media, and technology panics (Tiidenberg and van der Nagel, 2020; Clarkson and Kopaczewski, 2013; Szablewicz, 2010; Cover, 2006). MIM/NCOSE uses the term 'addicted' or 'hooked' in nearly every COPA-themed text we analyzed, arguing that 'much if not most hardcore adult pornography is consumed by a relatively small percentage of individuals who are addicted to it' (NCOSE, 25.09.2009).

As moral entrepreneurs often do (Goode and Ben Yehuda, 2013; Rubin, 1984), MIM also created explicit rhetorical linkages in COPA between pornography and harm to children. The notable rhetorical strands where MIM narrates this causal link pertain to (1) what is depicted in porn, (2) porn as a gateway to child abuse, (3) porn as a tool for training/grooming children as sex workers, (4) porn as a template from which adults AND children learn sexual violence, and (5) porn as an industry that creates demand for prostitutes and thus fuels trafficking, which also leads to trafficking of children. MIM's linking of porn to pedophilia rode the coattails of an ongoing moral panic around child abuse. Boston Globe's Pulitzer prize-winning 'Spotlight Investigation: Abuse in the Catholic Church', (2002) helped to spark a wave of investigations throughout the world, occupying the public consciousness for decades.

In its COPA coverage, MIM argues that porn relies on depictions of 'barely legal' women to promote a visual economy of 'child porn' (NCOSE 12.09.2007). Rhetorical obfuscation confuses actual child porn, which MIM claims pornsites to advertise, with what MIM occasionally admits to be 'pseudo child porn', for example, 'hardcore depictions of sex with persons who look like children' (NCOSE 25.09.2009). This, in turn, is linked to porn having an appetite-creating function. MIM relies on the rhetoric of a 'gateway drug' and the accompanying reference to addiction often used in moral panics to argue that for 'many perpetrators, there is a progression from viewing adult pornography to viewing child pornography' (NCOSE 28.04.2008). 'Men arrested on sexual exploitation of children charges', have ended up where they are because ads of 'young teenagers and even young children, posing in the nude, having sex with each other, or being molested by adults' were popping up on their computer screens and after the initial 'shock wore off', they 'couldn't get enough. Like thousands of other men (they were) hooked' (NCOSE 28.04.2008). Online porn is also situated as a tool that perpetrators of child sexual exploitation utilize to 'entice, arouse, desensitize and instruct' (NCOSE 28.04.2008) their victims. Further, and increasingly outlandishly, porn is argued to harm children by representing a template of sexual relationships that 'destroys marriages, and children raised in one-parent households are more likely to be sexually exploited' (texts in 2007, 2008, 2009), instructs 'Johns' to 'act out what they view in adult pornography with child prostitutes', (texts in 2008, 2009 and 2010), and leads children to 'imitate behavior they view in adult pornography with other children' (NCOSE 25.09.2009). Finally, 'addiction to pornography' is cast as something that 'helps maintain or increase the demand for women and children who are trafficked into prostitution' (texts published in 2007 and 2008). This shift of attention to trafficking becomes central in the next phase of NCOSE's active intervention into legislation – their work toward FOSTA/SESTA.

## Active intervention: SESTA and FOSTA

In 2015, the political climate in the United States was rapidly changing, and MIM repositioned itself, changing both its name and rhetoric. They rebranded in 2015 as the National Center on Sexual Exploitation (NCOSE). NCOSE seemed to have decided to tackle obscenity by 'fighting' sexual exploitation and trafficking. The linking of pornography to sexual exploitation and trafficking already evident in the COPA coverage became more prominent in 2015 and 2016. In 2015, NCOSE organized a symposium at the US Capitol called 'Pornography: A Public Health Crisis', which included the tagline 'How Porn Fuels Sex Trafficking, Child Exploitation & Sexual Violence' (NCOSE, 13.07.2015). Also in 2015, Senator Portman and the Senate Permanent Subcommittee on Investigations started work to determine links between child trafficking and Backpage.com (Koff, 2016), a classified advertising website. NCOSE added Backpage.com to its Dirty Dozen List, claiming it 'serves as a virtual auction block where sex buyers can shop for human beings for sex'.

While direct interactions between Portman and NCOSE have not been reported, we observed a steady trickle of Portman's work against Backpage being 'applauded' in NCOSE texts (NCOSE 17.03.2016).

Portman's work on Backpage created a direct link between the inability of courts to punish sex traffickers and CDA230. This rhetorical linkage spawned the *Stop Enabling Sex Traffickers Act* (SESTA) and its incorporation into the *Allow States and Victims to Fight Online Sex Trafficking Act* (FOSTA), both of which NCOSE worked openly and diligently toward. Across NCOSE's FOSTA/SESTA texts between 2017 and 2022, sex trafficking takes center stage as the predominant problem, with the internet more broadly and CDA230 specifically being framed as the biggest hurdle in legislative efforts to combat it. With the shift toward the rhetoric of exploitation and trafficking comes also an explicit anti-internet stance. Both ride broader waves of public sentiment and anxiety – intensified conspiracy theories about widespread pedophilia among the political elites (e.g. Pizzagate in 2016) and the Cambridge Analytica scandal in 2018, which primed the audience primed to distrust 'Big Tech'. According to NCOSE 'The Internet' the reason for epidemic levels of 'sexual exploitation of women and children' (NCOSE, 19.07.2018), and NCOSE are 'confronted with a relentless stream of technology-related issues exponentially compounding efforts to combat sex trafficking' (NCOSE, 10.01.2020). Amending CDA is cast as 'the most important, most urgent legal issue', and CDA is regularly called 'outdated', 'archaic', and actively harmful (repeated across texts in 2017, 2018). Specific perpetrators shift from Backpage.com to OnlyFans and Twitter.

In the following, relying on the discourse analysis of the selected NCOSE texts on FOSTA/SESTA, we briefly explore NCOSE's rhetorical gymnastics involved in their anti-internet discourse.

### Rhetorical gymnastics: Big tech versus survivors

To shape the internet into a monster suited for slaying in a moral panic, NCOSE articulates 'Big Tech' as the public enemy during these times. Audiences are explicitly called to join NCOSE 'in the battle against Big Tech on sex trafficking' (NCOSE, 20.09.2018). To more persuasively frame Big Tech as a villain, NCOSE rewrites the history of CDA and articulates a new victim.

Even though NCOSE lobbied in support of CDA, its only legally upheld remainder – Section 230 – is now cast as something that allowed the internet to 'become a major vehicle for making obscene material easily accessible to children' (NCOSE, 12.03.2018). NCOSE's materials incorrectly claim that 'although Congress intended for Section 230 to protect companies which try to filter content, but don't catch everything, that protection was expanded by federal judges to provide a website operator with full immunity, even if it knowingly engaged in criminal conduct!' (NCOSE, 18.07.2018) and that CDA protects the 'kingpins of sex trafficking' because it protects 'websites even if they knowingly participated in the crime of sex trafficking' (NCOSE, 23.02.2018). This is an explicit misrepresentation of the fact that sex trafficking and child pornography violate federal law and thus 'exempt from Section 230's immunity' anyway (Kosseff, 2019: p. 246).

While in previous, more explicitly anti-pornography discourse, children, the American family, and even poor porn-addicted men were portrayed as victims, the FOSTA/SESTA era discourse shifts to 'victims of sex trafficking' and 'survivors'. This coincides with the #metoo movement, which NCOSE used to bolster its rhetoric. NCOSE increasingly utilizes the language of 'listening to survivors' and 'believing victims'. Template tweets include FOSTA/SESTA-specific hashtags (#FOSTA, #SESTA, #AmendCDA230) but cynically astroturf (Leaver et al., 2019) hashtags from feminist, anti-sexist, and activist networked publics to address different imagined audiences. Thus #metoo #listentosurvivors or #IAmJaneDoe is often used alongside the FOSTA/SESTA hashtags. NCOSE constructs a moral conflict of taking sides between the corporate interests of Big Tech

versus the victims. For example, in a template tweet the audience is invited to thank the Senate Maj. Leader 'for standing with #SexTrafficking victims rather than #BigTech in this David and Goliath battle!' (NCOSE, 28.02.2018) and 'Big Tech' is described as being worried about the 'potentially devastating filtering costs' instead of the 'actual devastating emotional, psychological, and physical costs' of sex trafficking to victims (NCOSE, 29.09.2017).

In a particularly disingenuous turn of rhetoric, NCOSE's Lisa Thompson writes: 'If there is a single legislative test of the strength of our national resolve to deliver on the promise of #MeToo, then surely it is the battle over passage of the much needed FOSTA/SESTA legislative package that would amend the Communications Decency Act to fight online sex trafficking', and later in the same text: 'Members of the U.S. Senate this is your moment to decide: does the spirit of #MeToo that has swept our country include victims of the sexual exploitation and sex trafficking or not' (NCOSE, 12.03.2018).

Informed by the setbacks of COPA and CDA, NCOSE's FOSTA/SESTA discourse is explicitly preoccupied with legal language (NCOSE, 23.02.2018). Calls to only pass SESTA and later FOSTA with specific language (NCOSE 26.02.2018) later merged with alarmist coverage on NAFTA (North American Free Trade Agreement) and USMCA (United States-Mexico-Canada Agreement). 'Big Tech' – is argued to 'stealthily incorporate old Section 230-like language' into new legislation, thus exporting 'protections for online sex trafficking websites across the North American continent and beyond', which will make 'sex trafficking (…) the U.S.'s biggest export' (NCOSE, 17.08.2018). Emboldened by what they consider a huge FOSTA/SESTA success, NCOSE continues to push for 'next steps'. The Eliminating Abusive & Rampant Neglect of Interactive Technologies (EARN IT) act is argued to 'develop recommended best practices for providers of interactive computer services regarding the prevention of online child exploitation' and positioned as the necessary next step and 'best piece of accountability in the tech space since the passage of FOSTA/SESTA in 2018' (NCOSE, 5.3.2020).

## Conclusion

Over time, NCOSE's 'war on obscenity' has evolved from calls to more rigorously uphold existing obscenity laws to attempts at directing legislators' interpretation of those laws via pedagogical intervention to more direct intervention in legislation. Over 60 years, NCOSE has acted as a moral entrepreneur, lobbying against the putative threat (Goode and Ben-Yehuda, 2009) of widespread obscenity. While it is impossible for us to claim the extent to which this concern is genuine and to which extent this is NCOSE acting as an 'organized ideological force' (Hall, 1988) set on controlling public discourse (primarily by expelling from it all sexual expression), we have shown how they have organized, recruited and proselytized (Goode and Ben-Yehuda, 2009) in ways not only intended to rile up the public, but targeted at, or at least eminently intelligible to the legislators (Krinsky, 2013).

The CDA represented NCOSE's first step in trying to explicitly shape internet governance. Despite CDA passing in a form NCOSE was dissatisfied with, this represented a shifting focus from merely 'upholding obscenity law' to creating 'obscenity law for the internet'. After CDA, NCOSEs next active intervention in legislation pertained to COPA. In that coverage, we illustrate NCOSE's framing of pornography as the predominant social threat through narratives of the addicted publics (men, children) as victims, and online pornsites as perpetrators, evoking the trifecta of anxieties (Tiidenberg and van der Nagel, 2020) typical in sex, media, and technology panics (Cohen, 1972). Within NCOSE's COPA coverage exists a clear, strong media-effects theory (Paasonen et al., 2020) narrative that not only frames all pornography as illegal but also performs elaborate rhetorical

gymnastics pertaining to the epidemic levels of, yet general public rejection of obscene content. NCOSE constructs moralized subjects who are disgusted by pornography but powerless against its pull, so 'pseudo' child pornography leads to a need for actual child porn, which was portrayed as directly leading to child sexual exploitation. This pivot toward exploitation took center stage in NCOSE's campaign for FOSTA/SESTA, coinciding temporally with human trafficking and pedophilia-related conspiracy theories in populist US political discourse (e.g. Pizzagate, QAnon). In this conjuncture (Hall, 1986), 'the internet', 'big tech', and specifically 'CDA230' become primary villains in NCOSE discourse, and a new victim – survivors of trafficking – is introduced. In a move echoing and updating prior moments of conservatives and feminists uniting in their disgust for porn (West, 1987), NCOSE appropriates the timely #metoo language to push their agenda, now via deplatforming all sex (Moldrem, 2006) from the internet. We argue that NCOSE weaponizes historical concerns pertaining to the intersection of sex, technologies, and public behavior (Tiidenberg and van der Nagel, 2020) to gain hegemonic power (Hall, 1985) over public expression in order to strengthen conservative ideologies. In so doing, inserting themselves into internet governance discourse and starting to advocate for more rigid policing of intermediaries, getting rid of the shield from liability provided by CDA230, and advocating for stricter limits of free expression seems both accidental and inevitable.

NCOSE's FOSTA/SESTA coverage seems to imply a retrospective self-reflection on NCOSE's part of what NCOSE frames as failures of CDA and COPA, and the success of FOSTA/SESTA is uniformly attributed to legal language. The CDA, initially something NCOSE supported and had hoped for in their war against obscenity, becomes retrospectively viewed as a harmful, archaic piece of legislation because of its permissive language when attributing liability to internet intermediaries. Having finally managed to make intermediaries liable for what users post in FOSTA/SESTA, NCOSE now keeps a paranoid eye on all new legislation that pertains to internet governance, trying to avoid 'big tech' 'sneaking in' CDA230-like language. While many scholars, politicians, and activists agree that CDA230 might need amending, FOSTA/SESTA was both unnecessary, given that sex trafficking and child pornography are already illegal and therefore not protected under CDA230, and harmful, because of its vague wording and anti-sex-worker sentiment, which invited regulatory overreach (Blunt et al., 2021). NCOSE's earlier arguments that enforcement of obscenity laws should take precedence over focusing on actual crimes of child exploitation invite skepticism regarding their expressed goals of protecting victims and survivors of trafficking. Now, NCOSE has come to incorporate an explicitly hostile stance toward values of freedom of information, expression, and speech that remain foundational to the basic logic of the internet since its inception.

This paper situates contemporary Internet governance in historical trajectories and political, ideological and pragmatic interests of variously motivated actors. It highlights the need for internet governance scholarship to take a more systematic and long-term view, sometimes so long as to precede the internet, to pinpoint the stakeholders we need to keep an eye on in order to be able to analyze the governance complex in its entirety. It reminds us to trace the trajectories of the imaginaries of riskiness and harmfulness, as they become attached to types of expression and content, and to take sex, as well as other morally overburdened areas seriously as battlegrounds for internet and technology governance. At different conjunctures, possibly decades later, a version of regulation or moderation will emerge as justifiable, reasonable, or logical from these imaginaries. The history and connections presented here are ongoing, and efforts undertaken by moral entrepreneurs continue to affect the evolution of governance on the internet.

What we have gathered here is not just a history of a particular organization, but insight into larger structures of power that influence internet governance policy. Bringing conjunctural (Hall et al., 1978; Hakim, 2019) sensibilities into the study of internet governance highlights the explicit

role of conservative lobbying groups like NCOSE, even if they have seemingly been focusing on adjacent issues of morality and obscenity. Long-standing tactics of these moral entrepreneurs, particularly the rhetorical gymnastics that position their movement alongside ongoing social issues (both fueling and aligning with moral panics), remain key to addressing how policies form and continue to shape internet governance. This is not the first, only, nor the last space where these battles will be fought over internet governance, and we hope taking this approach to understanding, and contextualization will assist in better understandings, better interventions, and a freer and more participatory internet.

### Acknowledgements

This article was made possible through the Baltic Film, Media and Arts School's MEDIT fellowship.

### Declaration of conflicting interests

The author(s) declared no potential conflicts of interest with respect to the research, authorship, and/or publication of this article.

### Funding

The author(s) received no financial support for the research, authorship, and/or publication of this article.

### ORCID iD

Zachary J McDowell https://orcid.org/0000-0001-9666-7587

### Notes

1. For clarity, we will refer to the organization by its current name – NCOSE when generalizing, and by the name used at the time for time-specific arguments.

### References

Blunt D and Wolf A (2020) Erased: the impact of FOSTA-SESTA and the removal of Backpage on sex workers. *Anti-Trafficking Review* (14): 117–121. Available at: https://www.antitraffickingreview.org/index.php/atrjournal/article/view/448/364.

Blunt D, Duguay S, Gillespie T, et al. (2021) Deplatforming sex: a roundtable conversation. *Porn Studies* 8(4): 420–438.

Bronstein C (2021) Deplatforming sexual speech in the age of FOSTA/SESTA. *Porn Studies* 8(4): 367–380.

Cannon R (1996) The legislative history of Senator Exon's communications decency act: regulating barbarians on the information superhighway. *Federal Communications Law Journal* 49: 51.

Clarkson J and Kopaczewski S (2013) Pornography addiction and the medicalization of free speech. *Journal of Communication Inquiry* 37(2): 128–148. DOI: 10.1177/0196859913482330

Cohen S (1972) *Folk Devils and Moral Panics*. London: MacGibbon and Kee.

Cover R (2006) Gaming (Ad)diction: discourse, identity, time and play in the production of the gamer addiction myth. *Game Studies* 6. Available at: https://gamestudies.org/0601/articles/cover.

Dalianis KA (1998) *Anti-indecency Groups and the Federal Communications Commission: A Study in the Politics of Broadcast Regulation*. Florida: University of Florida. [Unpublished Doctoral Dissertation].

Engelberg J and Needham G (2019) Purging the queer archive: tumblr's counterhegemonic pornographies. *Porn Studies* 6(3): 350–354.

Goode E and Ben-Yehuda N (2009) *Moral Panics: The Social Construction of Deviance*. 2nd edition. Malden, MA: Wiley-Blackwell. Available at: https://doi.org/10.1002/9781444307924.

Goode E and Ben-Yehuda N (2013) The genealogy and trajectory of the moral panic concept. In: C Krinsky (ed). *The Ashgate Research Companion to Moral Panics*. NY, New York: Routledge, 23–37.

Goodwin GL, Cruz JP, Jensen JR, et al. (2021) *Sex Trafficking: Online Platforms and Federal Prosecutions (GAO Report No. 21-385)*. USA: United States Government Accountability Office. Available at: https://www.gao.gov/assets/gao-21-385.pdf.

Hakim J (2019) The rise of chemsex: queering collective intimacy in neoliberal London. *Cultural Studies* 33(2): 249–275.

Hall S (1985) *Master's Session*. Honolulu, Hawaii: International Communication Association.

Hall S (1986) The problem of ideology-Marxism without guarantees. *Journal of Communication Inquiry* 10(2): 28–44. DOI: 10.1177/019685998601000203

Hall S (1988) *The Hard Road to Renewal: Thatcherism and the Crisis of the Left*. London: Verso.

Hall S (1992) The West and the rest. In: S Hall and B Gieben (eds). *Formations of Modernity*. Cambridge: Polity Press.

Hall S, Critcher C, Jefferson T, et al. (1978) *Policing the Crisis: Mugging, the State and Law and Order*. NY, New York: The Macmillian Press.

Holles E (1974, December 28). Lawyers and scholars score antipornography group. *The New York Times*. https://www.nytimes.com/1974/12/28/archives/lawyers-and-scholars-score-antipornography-groupf-by-everett-r.html

Koff S (2016, August 6). Backpage.com must turn over documents to Sen. Rob Portman's subcommittee as part of child sex trafficking investigation. Cleveland.com. https://www.cleveland.com/open/2016/08/sen_rob_portman_gets_legal_rul.html

Kosseff J (2019) *The Twenty-Six Words that Created the Internet*. Ithaca, NY: Cornell University Press.

Krinsky C (2013) Introduction: the moral panic concept. In: C Krinsky (ed). *The Ashgate Research Companion to Moral Panics*. NY, New York: Routledge, 23–36.

Lane F (2001) *Obscene Profits: The Entrepreneurs of Pornography in the Cyber Age*. 1st edition. NY, New York: Routledge Books.

Leaver T, Highfield T, and Abidin C (2019) *Instagram: Visual Social Media Cultures*. Cambridge: Polity Press.

Lingel J (2021) *The Gentrification of the Internet: How to Reclaim Our Digital Freedom*. California: Univ of California Press.

McGready PJ (1996) The Communications Decency Act of 1996: keeping on-line providers on the hook. *Journal of Civil Rights and Economic Development* 11(3): 20.

McKenna M (2020) *Nasty Business: The Marketing and Distribution of the Video Nasties*. Edinburgh: Edinburgh University Press.

Miller V (1973). California, 413 U.S. 15 https://supreme.justia.com/cases/federal/us/413/15/

Moldrem S (2006). *Tumblr's Decision to Deplatform Sex Will Harm Sexually Marginalized People*. WUSSY Mag. Retrieved February 20, 2023, from https://www.wussymag.com/all/tumblrs-decision-to-deplatform-sex-will-harm-sexually-marginalized-people

Musto J, Fehrenbacher AE, Hoefinger H, et al. (2021) Anti-Trafficking in the time of FOSTA/SESTA: networked moral gentrification and sexual humanitarian creep. *Social Sciences* 10(2): 2. DOI: 10.3390/socsci10020058.

Paasonen S, Attwood F, McKee A, et al. (2020) *Objectification: On the Difference between Sex and Sexism*. NY, New York: Routledge.

Peteley J (2011) *Film and Video Censorship in Modern Britain*. Edinburgh: Edinburgh University Press.

Pilipets E and Paasonen S (2022) Nipples, memes, and algorithmic failure: NSFW critique of Tumblr censorship. *New Media and Society* 24(6): 1459–1480.

Reno V (1997) ACLU, 521 US 844. https://www.oyez.org/cases/1996/96-511

Reynolds C (2021) "Craigslist is nothing more than an internet brothel": sex work and sex trafficking in U.S. Newspaper coverage of craigslist sex forums. *The Journal of Sex Research* 58(6): 681–693.

Rogers R (2020) Deplatforming: following extreme internet celebrities to telegram and alternative social media. *European Journal of Communication* 35(3): 213–229.

Rubin G (1984/2006) *Thinking sex: notes for a radical theory of the politics of sexuality.* R Parker and P Aggleton (eds). Culture, Society and Sexuality: Routledge.

Section 230 (1996) 47 U.S.C. § 230. https://www.govinfo.gov/content/pkg/USCODE-2021-title47/pdf/USCODE-2021-title47-chap5-subchapII-partI-sec230.pdf

Stanley V (1969) Georgia. 394 US 557. https://www.oyez.org/cases/1968/293

Szablewicz M (2010) The ill effects of "opium for the spirit": a critical cultural analysis of China's Internet addiction moral panic. *Chinese Journal of Communication* 3(4): 453–470. DOI: 10.1080/17544750.2010.516579

Tiidenberg K (2021) Sex, power and platform governance. *Porn Studies* 8(4): 381–393. Available at: https://doi.org/10.1080/23268743.2021.1974312.

Tiidenberg K and van der Nagel E (2020) *Sex and Social Media*. Emerald Publishing.

Vile JR (2009) Commission on obscenity and pornography. In: JR Vile and DL Hudson (eds). *First Amendment Encyclopedia*. Tennesee, USA: Middle Tennessee University. Available at: https://www.mtsu.edu/first-amendment/article/1178/commission-on-obscenity-and-pornography.

West R (1987) The feminist-conservative anti-pornography alliance and the 1986 Attorney General's Commission on Pornography report. *American Bar Foundation Research Journal* 12(4): 681–711.

## Author biographies

**Zachary J McDowell** is an Assistant Professor in the Department of Communication at the University of Illinois, Chicago. His research focuses on access and advocacy in digitally mediated peer production spaces. In particular, Zach's research focuses on digital literacy, self-efficacy, and how digitally mediated tools, particularly Wikipedia, shape these areas of inquiry. He is the editor of the platinum open-access journal *communication +1*, as well as the author of 'Wikipedia and the Representation of Reality' (co-authored by Matthew Vetter). He is currently writing two books, *Wikipedia and Beyond: Open Education for an Equitable Future* (along with Matthew Vetter), as well as *The War on Culture: Media, Mashups and Remix Archeology* (both due 2025).

**Katrin Tiidenberg** is Professor of Participatory Culture at the Baltic Film, Media and Arts School of Tallinn University, Estonia. She is the author of multiple books on social media, digital visual cultures, and digital research methods, including most recently 'Tumblr' (2021, co-authored by Natalie Ann Hendry and Crystal Abidin) and 'Sex and Social Media' (2020, co-authored by Emily van der Nagel), 'Selfies, why we love (and hate) them'. As well as the co-editor of award-winning 'Making sense of the Datafied World: a Methodological Guide' (2020, in Estonian, co-edited with Anu Masso and Andra Siibak) and 'Metaphors of Internet: Ways of Being in the Age of Ubiquity' (2020, co-edited with Annette Markham). She is currently wrapping up a research project on platformization of sexuality and starting a new project on visual digital trust (TRAVIS). Her research interests span social media, digital cultures, networked visuality, internet governance, and self-care. More info at: https://katrin-tiidenberg.com/