**UNITED STATES DISTRICT COURT
DISTRICT OF SOUTH CAROLINA
SPARTANBURG DIVISION**

| | | |
|---|---|---|
| JANE DOES 1-9, ) | | |
|         Plaintiffs, ) | CA No.: 7:20-cv-00947-DCC | |
| vs. ) | | |
| ) | | |
| COLLINS MURPHY, et. al ) | | |
| ) | | |
|         Defendants ) | | |
| _____) | | |
| JANE DOE ) | | |
|         Plaintiff ) | | |
| vs. ) | CA No.: 7:21-cv-03193-DCC | |
| ) | | |
| LIMESTONE UNIVERSITY, et. al ) | | |
|         Defendants. ) | | |

**PLAINTIFFS' SUPPLEMENTAL RESPONSE BRIEF ADDRESSING
*M.P. v. META PLATFORMS INC.*, 127 F.4TH 516 (4TH CIR. 2024),
AND IN OPPOSITION TO DEFENDANTS MG FREESITES' & MINDGEEK S.A.R.L'S
AND THE HAMMY DEFENDANTS' MOTIONS FOR SUMMARY JUDGMENT**

Plaintiffs Jane Does 1-9 and Jane Doe (hereinafter, the "Does") respectfully submit the following supplemental brief addressing *M.P. by and through Pinkney v. Meta Platforms Inc.*, 127 F.4th 516 (4th Cir. 2025), and in further opposition to Defendants MG Freesites' & MindGeek S.A.R.L.'s and the Hammy Defendants'[1] motions for summary judgment.

# I. ARGUMENT

## A.  *M.P.* is not analogous to the Does' case for several reasons.

First, the sex trafficking and other causes of action the Does raise are markedly different from the state law claims, and entire legal theory, that M.P. brought against Facebook. While the court in *M.P.* conducted a Section 230 analysis, it was not a Section 230 analysis considering TVPRA claims, for which FOSTA presents a codified carve-out. Further, the Defendants' internal content curation system is *not* a fully automated, neutral algorithm, like the Facebook system described in *M.P. See* 127 F.4th 516. Instead, the Defendants—through their employed content curators (actual people making conscious decisions)—*created new illegal content* by adding, removing, and modifying categories, by making thumbnails for each video, and by adding, removing, and modifying tags. Plaintiff's allegations do not involve claims about the functionality of an algorithm, but rather how the Defendants directly contributed to the creation of the offending content in an individualized manner. As discussed in the Does' principal briefs in opposition to summary judgment, the immunity granted by Section 230(c) of the Communications Decency Act does not apply to an interactive computer service that is *also* "an 'information content provider,' which is defined as someone who is 'responsible, in whole *or in part*, for the creation or development of' the offending content." *Fair Housing Council of San Fernando Valley v. Roommates.com, LLC*, 521 F.3d 1157, 1162 (9th Cir. 2008) (quoting 47 U.S.C. § 230(f)(3))

---

[1] The Does' use of the term "Hammy Defendants" in this brief means Defendants Hammy Media, Ltd., Wisebits IP, Ltd., and Trafficstars, Ltd.

(emphasis added). "Thus, content providers cannot use Section 230(c) immunity to escape liability for the unlawfulness of the content they create." *Doe v. MG Freesites, LTD*, 2024 WL 5339485, at *8 (N.D. Ala. Dec. 19, 2024).

Unlike *M.P.*, *Doe*, involving illegal content created by MindGeek, is almost precisely analogous to this matter. *See Id*. Although *Doe* involved illegal content of a then-minor, this case involves illegal content of barely-adult-aged women in which the Defendants *knew or, at a minimum, should have known* the videos were nonconsensual—and, thus, illegal—but uploaded the content to their websites anyway, posted advertisements on the same pages for profit, created tags for the videos, changed tags for the videos, and created unique thumbnails for the videos. None of the aforementioned were at issue in *M.P.*, and the majority's opinion is not analogous. The Defendants are not entitled to Section 230 immunity.

    1.    **M.P.** *did not involve illegal content, like the Does' case.*

The majority opinion in *M.P.* is distinguishable in several key areas. First, *M.P.* did not involve illegal content created by the Defendants, as is the case here. *E.g.*, 127 F.4th at 521-22 (explaining that offensive—but not illegal—hate speech and extremist groups were at issue). The allegations in *M.P.* centered on how Facebook's algorithm fed radicalized content to a user, which encouraged that user to act with violence, whereas here, the allegations center on how the Defendant's employees engaged in illegal activity by creating illegal content. Although grossly understaffed, the Defendants in *Doe* and here employed people to not only curate but also *to create* content on the backend of their curation system. *E.g.*, *Id.* at *2. And illegal content was uploaded and created by the Defendants, due to a poor, manmade system, unlike the defendants in *M.P.*: "Prior to 2020, moderators would simply review content to determine whether they think the individuals depicted are over 18." *Id.* Even up to June 2020, the Defendants' employees

> "were not always enforcing strict [content curation] rules as the decision

> was that the team had to focus on speed and numbers instead." Moderators further wrote in emails: "Our team, considering its 20 different tasks, was focused on speed, numbers, and multitasking, which has proven now that it is not effective. We have been understaffed always negotiating how many people to get and are receiving less personnel tha[n] what we actually needed to follow the right procedures and avoid mistakes."

*Id.* at *4 (quoting reference omitted).

Here, as to the MindGeek Defendants, multiple times, the Defendants' content-curation system shows that the Does' videos were flagged with comments including: "potentially features a minor," "violent or harmful acts," "otherwise inappropriate or objectionable," "[t]aken illegally and some not over 18," "video of real hidden camera from a locker room," "video obtained without consent," and "this appears to be a planted camera in a real locker room without these woman's [sic] consent." Yet, the Defendants uploaded the illegal content anyway. *E.g.*, Pls.' Resp. to [MindGeek] Defs.' Mot. for Summ. J. 8-9, Feb. 10, 2025 (ECF No. 488). The Hammy Defendants knew or should have known the videos were nonconsensual and, thus, illegal and did the same.[2] Because this case does not involve issues with an algorithm recommending content, but rather content that was itself created by the platform through its employees, *M.P.* and the instant case are distinguishable.

### 2. *M.P. did not involve a complex content-curation system like that of the Defendants, nor did it involve the creation of illegal content, as here.*

Second, *M.P.* described her claim as "solely dealing with Facebook's [automated] algorithm[.]" *M.P.*, 127 F.4th at 524.[3] But in this matter, the Defendants cannot claim Section 230(c) immunity because their backend content-curation system went *far beyond* a simple, automated

---

[2] Hammy has been largely unresponsive in written discovery, claiming information regarding its curation system at the relevant time has been destroyed or no longer exists.
[3] The *M.P.* majority made plain to emphasize that Facebook's "editorial decision making" through its algorithm was automated. *E.g. Id.* at 526.

algorithm "arranging and sorting content," which the *M.P.* majority considered a publishing function. *See id.* at 526. Instead, the Defendants and their curators *created content* by making tags and thumbnails for each video, by adding, removing, and modifying tags, by enhancing their videos with similar advertisements, and by making conscious decisions to upload plainly nonconsensual, illegal content to their porn websites. As well-reasoned by the sister court in *Doe*—based on the *exact* same curation systems in play here—the "Defendants create new [illegal, nonconsensual content] by creating thumbnails that advertise [hidden or spy camera, amateur, and lesbian] videos to users, which is done for every video on the sites." *See* 2024 WL 5339485, at *9; *see also* Pls.' Resp. to [MindGeek] Defs.' Mot. for Summ. J. 4 (evidencing that these tags were created for the Does' videos). By doing this, the "Defendants are responsible at the very least for the [nonconsensual content] it created, stored, and distributed of [the Does] via its thumbnail creation." *See Doe*, 2024 WL 5339485, at *9. By creating their own thumbnail content of the Does' videos, the Defendants' websites are "'undoubtedly the 'information content provider' as to [that content] and can claim no immunity for posting [it] on its websites.'" *See id.* (quoting *Roommates*, 521 F.3d at 1164).

Also, the Defendants "contribute to the content's illegality by creating tags and categories associated with [hidden, nonconsensual spycams], and by adding removing, and modifying tags, categories, and sometimes titles, of videos." *See Id.* And unlike a company like Facebook that "automates its editorial decision-making" with just simply an algorithm, *see M.P.*, 127 F.4th at 526, the Court here is aware—based on discovery—and the court in *Doe* properly concluded that "[e]very video on Defendants' sites can be found by searching tags. [And t]here is an *entire team* devoted to checking submitted videos to ensure they have the correct tags and to add any tags or categories that are relevant to help promote the videos," *see Doe*, 2024 WL 5339485, at *9 (emphasis added).

5

Further, as in *Doe*, here, the Does videos uploaded at least to the MindGeek platforms were done so by a member of the Model Payment Program, or "ModelHub Program," *e.g.*, Pls.' Resp. to [MindGeek] Defs.' Mot. for Summ. J. 4-6, and as such, the Defendants "required uploaders . . . to follow detailed instructions, including how to tag videos and use keywords in titles. . . . Such instruction, advice, and ongoing tailoring of content by Defendants means that they 'developed' this content on their sites," *Doe*, 2024 WL 5339485, at *9 (quoting *Roommates*, 521 F.3d at 1167).

The Defendants' acts are not "traditional editorial functions" protected by Section 230(c), *M.P.*, 127 F.4th at 526, but, rather, acts of an "information content provider" materially contributing to the "information relevant to liability," *Id.* at 531 (Rushing, J., concurring in part and dissenting in part) (citing 47 U.S.C. § 230(f)(3) (2024), and *Henderson v. Source for Public Data, L.P.*, 53 F.4th 110, 128 (4th Cir. 2022)). And the Fourth Circuit's "precedent leaves ample room for liability when interactive computer services are making recommendations, as opposed to merely hosting or arranging third-party content." *Id.*

> 3. ***M.P.** is distinguishable because it did not address the significance of tracking revenue tied to tags, nor did it address the significance of providing training materials to uploaders as to how best to tag content to drive traffic and profit.*

Third, *M.P.* is distinguishable because the Defendants here track money and keywords that attract the most money, whereas that information was lacking in *M.P. See Doe*, 2024 WL 5339485, at *2. "As part of their monetization structure, Defendants track how much money each category and tag on Pornhub earns them," *Id.*, and they do so "down to the dollar amount per month and per day for the most popular tags," *Id.* at *9. The Defendants also provided instructions to uploaders as to how best to tailor and tag content to cause more traffic and revenue. *Id.* The Defendants did so, at least in part, "to help uploaders advertise" their hidden, nonconsensual spycam videos—to materially contribute to the content's dissemination. *See Id.* "[W]here a company materially contributes to a message's unlawful content, that company stops being a mere

'intermediary' for another party's message. Instead, the company is adding new content to the message that harms the plaintiff." *Henderson*, 53 F.4th at 128.

> 4. **M.P. *is distinguishable because it was dismissed on a Rule 12 motion without the benefit of discovery, and the dissenting opinion's analysis is more applicable to the Does' case here.***

Finally, *M.P.* was an appeal concerning a Rule 12 motion, and the plaintiff was not afforded the benefit of discovery, whereas in this case, the window for discovery has closed. Moreover, the dissenting opinion in *M.P.* is even more applicable to the Does' case. *See* 127 F.4th at 531-32. "Facebook's recommendations of groups, people, and events involve platform-produced text that explicitly communicates to the user," *which "qualifies as 'information' created by Facebook itself."* *Id.* at 531 (quoting 47 U.S.C. § 230(f)(3); emphasis added). When Facebook creates "such information and disseminates it on its platform, [it] is the 'information content provider.'" *Id.* (quoting same). Facebook is "not 'also immune when it conducts statistical analyses of that information and delivers a message based on those analyses,' like a recommendation to join a particular group. That message is Facebook's own and is not encompassed within the traditional editorial functions that Section 230 immunizes." *Id.* at 532 (quoting *Force v. Facebook, Inc.*, 934 F.3d 53, 83 (2d Cir. 2019) (Katzmann, J., concurring in part and dissenting in part)).

Again, the Fourth Circuit's "precedent leaves ample room for liability when interactive computer services are making recommendations, as opposed to merely hosting or arranging third-party content." *Id.* at 531. The Defendants in this matter are not merely "making recommendations." *See Id.* They are *creating and altering tags and creating their own content in thumbnails*, and that content is their own as an "information content provider," *see, e.g.*, 47 U.S.C. § 230(f)(3). The Defendants are also materially contributing to the content by tracking keywords that attract the most views and earn the most revenue and providing detailed instructions and recommendations to uploaders as to how best to tailor and tag content to drive more traffic and increase revenue. *See,*

7

*e.g.*, *Henderson*, 53 F.4th at 128 ("[W]here a company materially contributes to a message's unlawful content, that company stops being a mere 'intermediary' for another party's message. Instead, the company is adding new content to the message that harms the plaintiff."). "[T]he legal landscape surrounding algorithms used by internet platforms is still developing, which further undercuts the conclusion that Defendants are entitled to immunity as a matter of law." *Doe*, 2024 WL 5339485, at *11. The Court should deny the Defendants' motions for summary judgment.

## II. CONCLUSION

For the reasons argued above and in the Does' principal briefs in opposition to summary judgment, the Court should deny the Defendants' motions.

Respectfully submitted,

**BELL LEGAL GROUP, LLC**

*/s/ J. Edward Bell, III*
J. Edward Bell, III (#1280)
Gabrielle A. Sulpizio (#12715)
Auguste Fout (#14364)
219 North Ridge Street
Georgetown, SC 29440
Telephone: (843) 546-2408
jeb@edbelllaw.com

*Counsel for Plaintiffs*

**DOLT, THOMPSON, SHEPHERD & CONWAY, PSC**

Tyler S. Thompson (admitted *Pro Hac Vice*)
Liz J. Shepherd (admitted *Pro Hac Vice*)
Chad O. Propst (admitted *Pro Hac Vice*)
13800 Lake Point Circle
Louisville, KY 40223
Telephone: (502) 244-7772
tthompson@kytrial.com
lshepherd@kytrial.com
cpropst@kytrial.com

*Counsel for Plaintiffs*

**NATIONAL CENTER ON SEXUAL EXPLOITATION**

Danielle Bianculli Pinter (admitted *Pro Hac Vice*)
Peter Gentala (admitted *Pro Hac Vice*)
1201 F Street NW
Washington, D.C. 20004
dpinter@ncoselaw.org
pgentala@ncoselaw.org

*Counsel for Plaintiffs*

March 21, 2025
Georgetown, South Carolina