IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF SOUTH CAROLINA
SPARTANBURG DIVISION

| | | |
|---|---|---|
| Jane Does 1–9, | ) | C.A. No. 7:20-cv-00947-DCC |
| | ) | |
| Plaintiffs, | ) | |
| | ) | |
| v. | ) | |
| | ) | |
| Collins Murphy, Limestone College, Hammy Media Ltd., MG Freesites Ltd., Sharon Hammonds, Brenda F. Watkins, Mindgeek S.A.R.L., TrafficStars LTD., Wisebits IP LTD., | ) ) ) ) ) ) | |
| | ) | |
| Defendants | ) | |
| _____ | ) | |
| Jane Doe, | ) | |
| | ) | C/A No. 7:21-cv-03193-DCC |
| Plaintiff, | ) | |
| | ) | |
| v. | ) | **OPINION AND ORDER** |
| | ) | |
| Limestone University, Collins Murphy, MG Freesites Ltd., Hammy Media Ltd., Sharon Hammonds, Brenda F. Watkins, Mindgeek S.A.R.L., TrafficStars LTD., Wisebits IP LTD., | ) ) ) ) ) | |
| | ) | |
| Defendants. | ) | |
| _____ | | |

This matter is before the Court on Defendants MG Freesites Ltd ("MindGeek") and

MindGeek S.A.R.L.'s (together, the "MindGeek Defendants") Motion for Summary

Judgment, Defendant TrafficStars LTD's ("TrafficStars") Motion for Summary Judgment,

Defendant Wisebits IP LTD's ("Wisebits") Motion for Summary Judgment, and Defendant

Hammy Media, Ltd's ("Hammy") Motion for Summary Judgment.[1]  ECF Nos. 475, 477,

---

[1] For ease of reference, the Court will cite to the docket entry numbers in C.A. No. 7:20-cv-00947-DCC.  The Court notes that the corresponding Motions for Summary

478, 479. Plaintiffs Jane Does 1–9 and Jane Doe (collectively, "Plaintiffs") filed Responses in Opposition to the MindGeek Defendants, TrafficStars, Wisebits, and Hammy's (collectively, the "Moving Defendants") Motions. ECF Nos. 488, 489, 492, 493. The Moving Defendants replied in support of their Motions. ECF Nos. 578, 580.[2]

## I. BACKGROUND

In 2012, a hidden camera was placed in the visiting women's locker room at Limestone College ("Limestone"). ECF Nos. 475-1 at 7; 477-1 at 3; 488 at 2–3. This hidden camera was allegedly placed in the locker room by Defendant Collin Murphy, who was employed by Limestone at the time.[3] ECF Nos. 475-1 at 7; 477-1 at 3; 478-1 at 3; 488 at 2. On October 5, 2012, Plaintiffs Jane Does 1–9, members of a female collegiate field hockey team, traveled to Limestone for a competition. ECF Nos. 475-1 at 7; 477-1 at 3; 478-1 at 3; 479-1 at 2–3; 488 at 2–3. Unbeknownst to Plaintiffs Jane Does 1–9, and without their consent, they were secretly recorded while they were in various stages of undress. ECF Nos. 475-1 at 7; 477-1 at 2; 478-1 at 3; 479-1 at 4; 488 at 3. In the fall of 2013, another women's field hockey team traveled to Limestone for a competition. ECF Nos. 488 at 3. Jane Doe was a member of the team and accompanied the team to Limestone. *Id.* Unbeknownst to Jane Doe, she was also secretly recorded in various stages of undress, and the filming was conducted without her knowledge or consent. *Id.*

---

Judgment, Responses, and Replies have also been filed in C/A No. 7:21-cv-03193-DCC. *See* C/A No. 7:21-cv-03193-DCC, ECF Nos. 286, 289, 290, 291.

[2] Defendants Hammy, TrafficStars, and Wisebits (collectively, the "Hammy Media Defendants") filed a joint Reply. ECF No. 480.

[3] Murphy has not denied the allegation that he placed a hidden camera in the locker room but has asserted his Fifth Amendment right against self-incrimination and refused to testify. *See* ECF No. 195 at 1–2.

**A. Discovery of Recordings Uploaded to Pornographic Websites**

In October 2019, approximately six years after Plaintiffs were recorded changing in the locker room at Limestone, the recordings of Plaintiffs (the "Videos")[4] were discovered on the pornographic websites, xHamster.com and Pornhub.com. ECF Nos. 475-1 at 8; 477-1 at 4; 478-1 at 4; 488 at 7; 492 at 9. Eight recordings, in total, were uploaded to Pornhub.com. ECF Nos. 475-1 at 8; 488 at 7. On August 8, 2019, the user account "CWDistribution" uploaded six videos of the recordings to the Pornhub.com. ECF Nos. 475-1 at 8; 488 at 7. On August 30, 2019, and September 4, 2019, the user account "LordFauger18" uploaded two more videos of the locker room recording. ECF Nos. 475-1 at 8; 488 at 8. On October 17, 2019, the MindGeek Defendants received a search warrant from the Gaffney Police Department regarding the six videos uploaded by CWDistribution. ECF Nos. 475-1 at 9; 475-2 at 4, 41–44; 488 at 10. The same day, the MindGeek Defendants removed the identified videos from Pornhub.com and removed CWDistribution's account. ECF Nos. 475-1 at 9; 475-4 at 14; 488 at 10. On October 21, 2019, the MindGeek Defendants received another search warrant, this time regarding the two videos uploaded by LordFauger18. ECF Nos. 475-1 at 9; 475-2 at 46–49; 488 at 10. The next day, the MindGeek Defendants removed both videos and LordFauger18's account. ECF Nos. 475-1 at 9; 488 at 10.[5]

---

[4] The Court recognizes that the Amended Complaints reference multiple uploaded recordings of Plaintiffs, but for ease of reference the Court refers generally to both the individual and collective recordings at issue in this action as the "Videos."

[5] Plaintiffs also argue that a user with the account name "axiom21" uploaded Videos of the Plaintiffs to Pornhub.com in 2015. *See* ECF No. 488 at 7. MindGeek asserts that "axiom21" did not post videos depicting Plaintiffs. ECF No. 578 at 6. Plaintiffs make no other arguments specifically as to "axiom21" nor do they cite to any specific evidence tying the person who recorded Plaintiffs without their consent to "axiom21." *See*

In 2019, the recordings of Plaintiffs were also uploaded to xHamster.com by a user with the username "cwdistribution."[6]  ECF Nos. 479-1 at 6; 492 at 7–8.  In November of 2019, Hammy was contacted by Brian Blanton, a Detective with the Gaffney Police Department.  ECF Nos. 479-1 at 6; 492 at 9; 519.  Detective Blanton then requested that he be provided access to the Videos so that they could be downloaded for evidence and, following such downloading, that the Videos be taken down. ECF Nos. 479-1 at 6; 519.  Hammy complied with each of these requests.  ECF No. 479-1 at 6.[7]

Prior to the recordings being posted on the xHamster.com or Pornhub.com websites, images that appear to have been taken from the recordings were posted anonymously on the website "4chan" in 2016.  ECF Nos. 475-1 at 8–9; 475-2 at 4; 482-16 at 12–13.  By 2019, the Videos appeared on more than a dozen other websites.  ECF Nos. 475-1 at 9; 479-1 at 4; 492 at 9.

## B.  Operations of Pornhub.com in 2019

In 2019, MindGeek operated a portfolio of websites that hosted adult-oriented content, including Pornhub.com.  ECF Nos 475-1 at 3; 488 at 3.  At the time, Defendant MindGeek S.A.R.L. was the corporate parent of MindGeek.  ECF Nos 475-1 at 3; 488 at 2.  Any member of the public could upload content to Pornhub.com for others to view.

---

ECF No. 488.  Accordingly, for all the reasons outlined below, the Court finds Section 230 bars all of Plaintiffs' claims against MindGeek based upon uploads to its website by axiom21, to the extent these uploads may have featured Plaintiffs in the context of these Videos.

[6] The Court collectively refers to LordFauger18 and CWDistribution from the MindGeek uploads and cwdistribution from the Hammy uploads as the "Uploaders."

[7] Plaintiffs assert that the Videos were re-published to Hammy, so they dispute whether Hammy complied with the requests.  ECF No. 492 at 9, 22.  However, Plaintiffs do not dispute that, at least initially, Hammy removed the Videos.  *Id.*

ECF Nos 475-1 at 3–4; 488 at 4. To upload content to Pornhub.com, members of the public had to create an account with Pornhub.com and agree to the Terms of Service ("TOS"). ECF Nos. 475-1 at 4; 488 at 4. The TOS expressly prohibited the upload of content that "violate[d] any law (including without limitation laws related to torts, contracts, patents, trademarks, trade secrets, copyrights, defamation, obscenity, pornography, rights of publicity or other rights) or encourage[d] or provide[d] instructions to another to do so"; content "for which [the user had] not maintained written documentation sufficient to confirm that all subjects of [its] posts [were], in fact, over 18 years of age (or older in any other location in which 18 [was not the minimum age of majority)"; and content that was "obscene, illegal, unlawful, defamatory, libelous, harassing, hateful, racially or ethnically offensive, or encourage[d] conduct that would be considered a criminal offense, [gave] rise to civil liability, violate[d] any law, or [was] otherwise inappropriate." ECF Nos 475-1 at 3; 488 at 4–5.

As part of the upload process for Pornhub.com, categories and tags were added to content uploaded to the website. ECF No. 475-1 at 5; 488 at 5. The Parties dispute whether users selected categories and tags for their content or MindGeek determined these categories and tags, especially with respect to the Videos. *See* ECF Nos 475-1 at 5; 488 at 8–9. It is undisputed, however, that MindGeek added the "amateur," "lesbian," and "fetish" tags to two of the Videos uploaded to their website and that MindGeek removed some categories from the Videos. *See* ECF Nos. 488 at 9; 578 at 14. During the upload process, users were also to upload their own custom "thumbnails" or select from thumbnails generated by MindGeek, which were displayed for preview purposes on Pornhub.com. ECF Nos 475-1 at 5–6; 488 at 6. Once users uploaded their content and

the requisite identifiers (i.e., categories, tags, title, thumbnails) were applied to the content, the MindGeek Defendants used a combination of human reviewers and automated tools to moderate the content.  ECF Nos 475-1 at 5–6; 488 at 6.

Amateur content creators participating in the MindGeek Defendants' "Model Payment Program" ("MPP") could monetize their content on Pornhub.com. See ECF Nos 475-1 at 4–5; 488 at 4–5.  In 2019, to participate in the MPP, members of the public not only had to create an account with Pornhub.com and agree to the TOS but also were required to submit two forms of identification via Pornhub.com for verification purposes. *Id*.  Participants in the MPP were eligible to receive a portion of the advertising revenue generated in connection with their content but would not be paid unless the amount payable exceeded a $100 threshold.  *Id*.  LordFauger18 participated in the MPP, but he never received payment from the MindGeek Defendants in connection with the Videos at issue in this lawsuit or any other content.  *Id*.  There is no evidence that cwdistribution participated in the MPP.  *Id.*

## C.  The Operations of xHamster.com

Hammy owns and operates the website xHamster.com.  ECF Nos. 479-1 at 4. xHamster.com is free for visitors to use and is supported entirely by third-party advertising.  ECF Nos. 479-1 at 4; 492 at 3.  TrafficStars is an online advertising company that operates as a platform connecting advertisers and publishers, and facilitates the placement of ads on websites, including the xHamster.com website.  ECF Nos. 477-1 at 4; 493 at 1–2.  TrafficStars utilized categories and tags on Hammy's website to place specific advertisements next to related content based on these categories and tags but otherwise was not aware of the specific content that appeared on the pages where its

advertisements were placed. ECF Nos. 477-1 at 5; 493 at 2, 7. TrafficStars's advertisements appear next to all content on xHamster.com, including the Videos of Plaintiffs. *Id.* Wisebits is a holding company that held and licensed Hammy's intellectual property, including its trademark and logo. ECF Nos. 478-1 at 4; 489 at 2. Wisebits receives proceeds from the use of that intellectual property, including royalties from Hammy when these trademarks are used on xHamster.com, and Wisebits has put forth evidence that these proceeds constitute the entirety of their revenue. ECF Nos. 478-1 at 5; 489 at 2.

Similar to Pornhub.com, any member of the public could upload content to xHamster.com for others to view. ECF Nos. 479-1 at 4; 492 at 5. This content uploaded to xHamster.com includes pornographic videos that are grouped into categories. ECF Nos. 479-1 at 4–5; 492 at 4. In 2019, categories like "spy cam" and "hidden cams" were available. ECF Nos. 479-1 at 5; 492 at 4. Hammy also provides a set of pre-populated, specifically curated, popular words to associate the uploaders videos and Hammy's ads. ECF Nos. 479-1 at 4; 492 at 5. Each video must be tagged with these words. ECF Nos. 479-1 at 4–5; 492 at 5. Again, Plaintiffs and Hammy dispute whether users or Hammy selected the applicable tags and categories for the Videos. *See* ECF Nos. 479-1; 492. Before any video went live on the website, it also needed a thumbnail, which would be displayed on the Hammy's websites. ECF Nos. 479-1 at 5; 492 at 6. If a user did not select a thumbnail, Hammy would select an image from the uploaded content to be used as a thumbnail. ECF Nos. 479-1 at 5; 492 at 5–6. Once content is uploaded, Hammy's moderation team would review the content through their internal software before it was posted to the website. ECF Nos. 479-1 at 5; 492 at 5.

**D. Procedural History**

On March 4, 2020, Plaintiffs Jane Does 1–9 initiated this action, and on September 30, 2021, Plaintiff Jane Doe initiated a separate action. *See* ECF No. 1; *see also* C/A No. 7:21-cv-03193-DCC, ECF No. 1 (Sept. 30, 2021). The two actions have been consolidated for discovery and trial. *See* ECF Nos. 269, 559. On June 3, 2022, Plaintiffs Jane Does 1–9 filed the operative Fifth Amended Complaint (the "Amended Complaint"),[8] asserting the following claims, as relevant to the pending Motions before the Court: (1) violation of the Trafficking Victims Protection Reauthorization Act ("TVPRA") against Murphy, the MindGeek Defendants, and the Hammy Media Defendants[9]; (2) "conducting the affairs of an enterprise through a pattern of racketeering activity" in violation of the Racketeer Influenced and Corrupt Organizations Act ("RICO") against Murphy, the MindGeek Defendants, and the Hammy Media Defendants; (3) "negligent monitoring" against the MindGeek Defendants and the Hammy Media Defendants; (4) "false light" against the MindGeek Defendants and the Hammy Media Defendants; and (5) "civil conspiracy" against the MindGeek Defendants and the Hammy Media Defendants. ECF No. 193 at 21–27, 32–35.[10] On August 9, 2022, Plaintiff Jane Doe filed the operative

---

[8] The Court notes that its reference to the "Amended Complaint" encompasses both the Fifth Amended Complaint in C/A No. 7:20-cv-00947-DCC and the Third Amended Complaint in C/A No. 7:21-cv-03193-DCC.

[9] The "Hammy Media Defendants" includes Hammy, TrafficStars, and Wisebits.

[10] Plaintiffs state in their Response to the Motions for Summary Judgment that they wish to abandon their RICO claim. *See* ECF Nos. 488 at 11; 489 at 19; 492 at 10; 493 at 11. Accordingly, Plaintiffs' RICO claim is dismissed and the Motions for Summary Judgment as to this claim are denied as moot.

Third Amended Complaint with the same claims. *See* C/A No. 7:21-cv-03193-DCC, ECF No. 91 (Aug. 9, 2022).

On January 10, 2025, the Moving Defendants filed their Motions for Summary Judgment. ECF Nos. 475, 477, 478, 479. On February 10, 2025, Plaintiffs filed their Responses in Opposition. ECF Nos. 488, 489, 492, 493. On February 21, 2025, a hearing was held before this Court concerning multiple discovery motions. ECF No. 559. At that hearing, the Court noted the recently decided Fourth Circuit case, *M.P. by & through Pinckney v. Meta Platforms Inc.*, 127 F.4th 516 (4th Cir. 2025), and directed the Parties to submit supplemental briefing concerning whether this decision had any legal impacts on the pending Motions for Summary Judgment.[11] *Id.* On March 17, the Moving Defendant filed their Replies, and on March 21, 2025, Plaintiffs submitted their supplemental response brief. ECF Nos. 578, 580, 581, 582. A hearing on the Motions for Summary Judgment was held before the Court on June 18, 2025. ECF No. 593. These Motions are now ripe for review.[12]

## II. APPLICABLE LAW

### A. Summary Judgment Standard

---

[11] At the hearing on February 21, 2025, the Court granted several pending discovery motions and directed the Parties to file "a motion together with the proposed supplemental briefing within 30 days" if any information was obtained by the Parties from this additional discovery that was material to the pending Motions for Summary Judgment. ECF No. 559. No such motions were filed by any of the Parties.

[12] The Court notes that the Moving Defendants have also filed multiple Motions to Exclude. *See* ECF Nos. 589, 611, 612, 613. Because these Motions need not be decided to evaluate the pending Motions for Summary Judgment, the Court does not address the merits of these Motions at this time.

Rule 56 states, as to a party who has moved for summary judgment, "[t]he court shall grant summary judgment if the movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(a).  A fact is "material" if proof of its existence or non-existence would affect disposition of the case under applicable law.  *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248 (1986).  An issue of material fact is "genuine" if the evidence offered is such that a reasonable jury might return a verdict for the non-movant.  *Id.* at 257.  When determining whether a genuine issue has been raised, the court must construe all inferences and ambiguities against the movant and in favor of the non-moving party.  *United States v. Diebold, Inc.*, 369 U.S. 654, 655 (1962).

The party seeking summary judgment shoulders the initial burden of demonstrating to the court that there is no genuine issue of material fact.  *Celotex Corp. v. Catrett*, 477 U.S. 317, 323 (1986).  The moving party may do this in one of two ways: by negating an essential element of the non-movant's case or by showing that there is no evidence to prove a fact necessary to the non-movant's case.  *See Adickes v. S.H. Kress & Co.*, 398 U.S. 144 (1970); *Celotex*, 477 U.S. 317.

Once the movant has made this threshold demonstration, the non-moving party, to survive the motion for summary judgment, may not rest on the allegations averred in his pleadings.  *Id.* at 324.  Rather, the non-moving party must demonstrate specific, material facts exist that give rise to a genuine issue.  *Id.*  Under this standard, the existence of a mere scintilla of evidence in support of the non-movant's position is insufficient to withstand the summary judgment motion.  *Anderson,* 477 U.S. at 252. Likewise, conclusory allegations or denials, without more, are insufficient to preclude

granting the summary judgment motion. *Ross v. Commc'ns Satellite Corp.*, 759 F.2d 355, 365 (4th Cir.1985), *overruled on other grounds*, 490 U.S. 228 (1989). "Only disputes over facts that might affect the outcome of the suit under the governing law will properly preclude the entry of summary judgment. Factual disputes that are irrelevant or unnecessary will not be counted." *Anderson*, 477 U.S. at 248. Further, Rule 56 provides in pertinent part:

> A party asserting that a fact cannot be or is genuinely disputed must support the assertion by:
>
> > (A) citing to particular parts of materials in the record, including depositions, documents, electronically stored information, affidavits or declarations, stipulations (including those made for purposes of the motion only), admissions, interrogatory answers, or other materials; or
> >
> > (B) showing that the materials cited do not establish the absence or presence of a genuine dispute, or that an adverse party cannot produce admissible evidence to support the fact.

Fed. R. Civ. P. 56(c)(1). Accordingly, when Rule 56(c) has shifted the burden of proof to the non-movant, he must produce evidence of a factual dispute on every element essential to his action that he bears the burden of adducing at a trial on the merits.

## III. DISCUSSION

### A. Personal Jurisdiction

Several of the defendants, including MindGeek S.A.R.L., Hammy, TrafficStars, and Wisebits, have challenged whether the Court may exercise personal jurisdiction over them. *See* ECF Nos. 475-1 at 34; 477-1 at 7–22; 478-1 at 7–21; 479-1 at 9–11. Plaintiffs contend that the Court does have personal jurisdiction over each of these Defendants,

except for Defendant MindGeek S.A.R.L.[13]  *See* ECF Nos. 488; 489 at 5–15; 492 at 10–18; 493 at 12–23.

1.  Legal Standard

A federal court may exercise personal jurisdiction over a defendant in the manner provided by state law. Fed. R. Civ. P. 4(k)(1)(A). Thus, "for a district court to validly assert personal jurisdiction over a non-resident defendant, two conditions must be satisfied. First, the exercise of jurisdiction must be authorized by the long-arm statute of the forum state, and, second, the exercise of personal jurisdiction must also comport with Fourteenth Amendment due process requirements." *Christian Sci. Bd. of Dirs*, 259 F.3d at 215 (citing *Stover v. O'Connell Assocs., Inc.*, 84 F.3d 132, 134 (4th Cir. 1996)).

South Carolina's long-arm statute provides as follows:

> A court may exercise personal jurisdiction over a person who acts directly or by an agent as to a cause of action arising from the person's: (1) transacting any business in this State; (2) contracting to supply services or things in the State; (3) commission of a tortious act in whole or in part in this State;

---

[13] Plaintiffs do not respond to the MindGeek Defendants' argument concerning the exercise of personal jurisdiction over MindGeek S.A R.L.  *See* ECF No. 488.  Accordingly, the Court finds that Plaintiffs have effectively abandoned their contention that the Court may exercise personal jurisdiction over MindGeek S.A R.L.  *See Herbert v. McCall*, No. CV 4:23-6242-JD-KDW, 2024 WL 4276995, at *3 (D.S.C. Aug. 9, 2024), *report and recommendation adopted*, 2024 WL 4556896 (D.S.C. Oct. 23, 2024) (finding that by not responding to a defendant's jurisdictional challenges, the plaintiff had abandoned its claims against the defendant and conceded that the Court lacked jurisdiction over the defendant).  Nevertheless, after careful review and consideration of the allegations in the Amended Complaint and evidence before the Court as well as the MindGeek Defendants' arguments in their Motion for Summary Judgment, the Court finds Defendants' arguments regarding personal jurisdiction over MindGeek S.A R.L. are meritorious.  There is no evidence to support that MindGeek S.A R.L. purposely availed itself to the state of South Carolina and an exercise of personal jurisdiction over them would not comport with the Fourteenth Amendment's due process requirements.  *See Christian Sci. Bd. of Dirs. of First Church of Christ, Sci. v. Nolan*, 259 F.3d 209, 215 (4th Cir. 2001).  Accordingly, the MindGeek Defendants' Motion for Summary Judgment is granted as to the claims against MindGeek S.A R.L.

> (4) causing tortious injury or death in this State by an act or omission outside this State if he regularly does or solicits business, or engages in any other persistent course of conduct, or derives substantial revenue from goods used or consumed or services rendered in this State; (5) having an interest in, using, or possessing real property in this State; (6) contracting to insure any person, property, or risk located within this State at the time of contracting; (7) entry into a contract to be performed in whole or in part by either party in this State; or (8) production, manufacture, or distribution of goods with the reasonable expectation that those goods are to be used or consumed in this State and are so used or consumed.

S.C. Code Ann. § 36-2-803(A). "South Carolina's long-arm statute has been interpreted to reach the outer bounds permitted by the Due Process Clause." *ESAB Group, Inc. v. Centricut, Inc.*, 126 F.3d 617, 623 (4th Cir. 1997) (citations omitted). "Consequently, 'the statutory inquiry necessarily merges with the constitutional inquiry, and the two inquiries essentially become one.'" *Id.* (quoting *Stover*, 84 F.3d at 135–36). The central constitutional question the Court must address is whether the defendant has established "minimum contacts with [South Carolina] such that the maintenance of the suit does not offend 'traditional notions of fair play and substantial justice.'" *Int'l Shoe Co. v. Washington*, 326 U.S. 310, 316 (1945) (quoting *Milliken v. Meyer*, 311 U.S. 457, 463 (1940)).

Viewed through this constitutional lens, personal jurisdiction may arise through specific jurisdiction, which is based on the conduct alleged in the lawsuit, or through general jurisdiction. *CFA Inst. v. Inst. of Chartered Fin. Analysts of India*, 551 F.3d 285, 292 n.15 (4th Cir. 2009). Under general jurisdiction, a defendant's contacts or activities in the forum state do not provide the basis for the suit. *Id.* Instead, when a defendant has "continuous and systematic" contacts with the forum state, the defendant "may be

sued in [the forum] state for any reason, regardless of where the relevant conduct occurred." *Id.* (citations omitted). When the defendant is a corporation, "general jurisdiction requires affiliations 'so continuous and systematic as to render [the foreign corporation] essentially at home in the forum State,' *i.e.*, comparable to a domestic enterprise in that State." *Daimler AG v. Bauman*, 571 U.S. 117, 159 n.11 (2014) (quoting *Goodyear Dunlop Tires Operations, S.A. v. Brown*, 564 U.S. 915, 919 (2011)).

In contrast, under specific jurisdiction, a defendant may be sued in this Court if the litigation results from alleged injuries that arose out of or related to their contacts with South Carolina and those contacts were sufficient. *Helicopteros Nacionales de Colombia, S.A. v. Hall*, 466 U.S. 408, 414 (1984). To determine whether specific jurisdiction exists, courts employ a "minimum contacts" analysis that examines: "(1) the extent to which the defendant purposefully avail[ed] itself of the privilege of conducting activities in the State; (2) whether the plaintiff['s] claims arise out of those activities directed at the State; and (3) whether the exercise of personal jurisdiction would be constitutionally reasonable." *ALS Scan, Inc. v. Dig. Serv. Consultants, Inc.*, 293 F.3d 707, 712 (4th Cir. 2002) (internal quotations omitted). This analysis focuses on the relationship between the defendant, the forum, and the litigation; therefore, the Supreme Court has emphasized "[t]wo related aspects of this necessary relationship." *Walden v. Fiore*, 571 U.S. 277, 284 (2014). "First, the relationship must arise out of contacts that the defendant *himself* creates with the forum State." *Id.* (internal quotation omitted) (quoting *Burger King Corp. v. Rudzewicz*, 471 U.S. 462, 475 (1985). "Second, [the] minimum contacts analysis looks to the defendant's contacts with the forum State itself, not the defendant's contacts with persons who reside there." *Id.* (internal quotation omitted) (citing *Int'l Shoe Co.*, 326 U.S. at 319).

In the context of an internet defendant, the interactivity of a website is also "a jurisdictionally relevant fact" when the defendant's electronic contacts are at issue. *Fidrych v. Marriott Int'l, Inc.*, 952 F.3d 124, 141 (4th Cir. 2020). In *ALS Scan*, the Fourth Circuit considered "when it can be deemed that an out-of-state citizen, through electronic contacts, has conceptually entered the State via the Internet for jurisdictional purposes" and adopted the approach set out in *Zippo Manufacturing Co. v. Zippo Dot Com, Inc.*, 952 F. Supp. 1119 (W.D. Pa. 1997). *See* 293 F.3d at 713. The *Zippo* court concluded that "the likelihood that personal jurisdiction can be constitutionally exercised is directly proportionate to the nature and quality of commercial activity that an entity conducts over the Internet." 952 F. Supp. at 1124. Recognizing a "sliding scale" for defining when electronic contacts with a state are sufficient, the *Zippo* court elaborated:

> At one end of the spectrum are situations where a defendant clearly does business over the Internet. If the defendant enters into contracts with residents of a foreign jurisdiction that involve the knowing and repeated transmission of computer files over the Internet, personal jurisdiction is proper. At the opposite end are situations where a defendant has simply posted information on an Internet Web site which is accessible to users in foreign jurisdictions. A passive Web site that does little more than make information available to those who are interested in it is not grounds for the exercise [of] personal jurisdiction. The middle ground is occupied by interactive Web sites where a user can exchange information with the host computer. In these cases, the exercise of jurisdiction is determined by examining the level of interactivity and commercial nature of the exchange of information that occurs on the Web site.

*Id.* at 1124 (citations omitted). In "[a]dopting and adapting the *Zippo* model" in *ALS Scan*, the Fourth Circuit held as follows:

> [W]e conclude that a State may, consistent with due process, exercise judicial power over a person outside of the State when that person (1) directs electronic activity into the State,

> (2) with the manifested intent of engaging in business or other interactions within the State, and (3) that activity creates, in a person within the State, a potential case of action cognizable in the State's courts.

293 F.3d at 714.

The Fourth Circuit has subsequently noted that "[t]he internet we know today is very different from the internet of 1997, when *Zippo* was decided[,] and on today's internet, [i]t is an extraordinarily rare website that is *not* interactive at some level." *Fidrych*, 952 F.3d at 141 n.5 (emphasis in original) (internal citations and quotation marks omitted). Accordingly, the Fourth Circuit cautioned that "if we attach too much significance on the mere fact of interactivity, we risk losing sight of the key issue in a specific jurisdiction case—whether the defendant has *purposefully directed* [its] activities at residents of the forum." *Id.* at 142 (emphasis in original) (citation and internal quotation marks omitted); *see UMG Recordings, Inc. v. Kurbanov*, 963 F.3d 344, 352–53 (4th Cir. 2020) ("Regardless of where on the sliding scale a defendant's web-based activity may fall, however, [w]ith respect to specific jurisdiction, the touchstone remains that an out-of-state person have engaged in some activity purposefully directed toward the forum state . . . creating a substantial connection with the forum state.") (citation and internal quotation marks omitted). The Court now turns to whether it may exercise personal jurisdiction over Hammy, TrafficStars, and Wisebits.

2.  Hammy

Neither Hammy nor Plaintiffs contend that this Court has general jurisdiction over Hammy. *See* ECF No. 479, 492. Accordingly, the Court turns its analysis as to whether specific jurisdiction exists. Hammy contends there is no basis for the exercise of personal jurisdiction over it because the only basis for such jurisdiction is that Hammy owns and

operates a website, xHamster.com that is accessible and popular within the United States, which is insufficient alone to subject it to personal jurisdiction in South Carolina. ECF No. 479-1 at 9–11. Hammy argues that exercise of personal jurisdiction over it in this action would not comport with the requirements of due process. *Id.* at 11. Plaintiffs argue that this Court can and should exercise personal jurisdiction over Hammy because it has purposely availed itself of the privilege of conducting business in South Carolina, the Plaintiffs' claims arise out of those contacts, and the exercise of personal jurisdiction complies with due process. ECF No. 489 at 10–18.

In analyzing the first prong, the extent to which the defendant purposefully availed itself of the privilege of conducting activities in South Carolina, the Court finds Hammy's contacts with the state of South Carolina to be similar to those of the defendant in *UMG Recordings, Inc. v. Kurbanov*, 963 F.3d 344 (4th Cir. 2020), with the state of Virginia. In *UMG Recordings*, the defendant operated an online stream ripping service from Russia. 963 F.3d 348. The websites at issue in *UMG Records*, were free to use and visitors did not have to create an account or register to use the service and only needed to agree to the Terms of Use prior to downloading any audio files. *Id.* All the revenue for the websites was generated from advertisements. *Id.* The defendant in *UMG Recordings* did not sell advertising directly to advertisers, but instead used advertising brokers, most of whom were based in Ukraine but at least two were based in the United States. *Id.* At least some of these advertising brokers and advertisers would use geolocation or geo-targeting to display specific advertisements to specific blocks of countries, states, or even cities. *Id.* While the defendant had no control in the placement or selection of advertisements,

the privacy policies on the websites explained users' data may be collected to provide targeted advertising. *Id.*

The Fourth Circuit found "there [were] more than sufficient facts . . . to conclude that [the defendant] ha[d] purposefully availed himself of the privilege of conducting business in Virigina." *Id*. at 353. The court found that visitors to the website had a commercial relationship with the defendant, even though he did not directly charge them for the use of his website. *Id*. Because the website had visitors agree to certain contractual terms, such as collecting their IP addresses and country of origin, which were then used to direct targeted advertising by the third-party advertising brokers, the court determined that a commercial relationship existed between them. *Id.* Based on the volume of visitors from the state of Virginia, that these visitors accessed the websites and downloaded generated files, and visitors from Virginia also assented to the use of their IP address for targeted advertisements, defendant had purposefully availed himself to the state of Virginia. *Id.*

Likewise, here, there is ample of evidence that Hammy targeted the state of South Carolina. While Hammy is a Cyprus company and does not have an office in the United States, Hammy operates an interactive online platform, xHamster.com, which is accessible in every state including South Carolina. South Carolina residents can download and view videos from xHamster.com and purchase products and services that are advertised on xHamster.com. Hammy also allows users in the state of South Carolina to upload content onto xHamster.com after signing and agreeing to the Terms and Conditions outlined by Hammy. Further, Hammy contracted with advertising brokers, like TrafficStars, to place targeted advertisements using geolocation data in the state of South

18

Carolina and received payment from the ads targeting South Carolina residents.  As noted above, targeted advertising is compelling evidence of a party's purposeful availment to the state.  *Kurbanov*, 963 F.3d at 353.  Hammy knew xHamster.com was used in South Carolina but made no efforts to stop or limit access in South Carolina and profited from data collections from South Carolina.  Based on this conduct, the Court finds that Hammy has purposefully availed itself of the privilege of conducting activities in the state of South Carolina.

Turning to the second prong, whether Plaintiffs' claims arise out of the activities directed at the forum, the Court also finds that this prong has been satisfied.  "The analysis here is generally not complicated.  Where activity in the forum state is 'the genesis of [the] dispute,' this prong is easily satisfied."  *Tire Eng'g & Distribution, LLC v. Shandong Linglong Rubber Co.*, 682 F.3d 292, 303 (4th Cir. 2012) (citing *CFA Inst.*, 551 F.3d at 295).  A plaintiff's claims arise out of activities directed at the forum state if "substantial correspondence and collaboration between the parties, one of which is based in the forum state, forms an important part of the claim."  *See id.* at 295–96.  The Court finds Plaintiffs' claims arise out of activities directed at South Carolina.  Hammy made a globally accessible website, xHamster.com, which was accessible in the state of South Carolina; videos of the Plaintiffs, which were taken in South Carolina, were uploaded to and downloaded from xHamster.com; and South Carolina visitors used xHamster.com. Again, Hammy knew xHamster.com was serving South Carolina visitors and took no actions to limit or block access, all while profiting from data harvested from the same visitors.  In other words, Hammy engaged in commercial activity that gave rise to the claims against it by selling South Carolinians' information to the brokers for purposes of

targeted advertisements that appeared on their website, including alongside the Videos at issue in this action, and by profiting from that sale. Specifically, this commercial activity underlies, at the very least, Plaintiffs' claims for civil conspiracy. *See* ECF No. 193 at 34–35. Thus, the Court finds these facts to adequately establish an "affiliation between [South Carolina] and the underlying controversy." *See Bristol-Myers Squibb Co. v. Superior Court*, 582 U.S. 255, 262 (2017).

Finally, the Court finds the third prong, whether the exercise of personal jurisdiction would be constitutionally reasonable, has also been satisfied. The Due Process Clause guards against subjecting a person's liberty interest "to the binding judgments of a forum with which he has established no meaningful 'contacts, ties, or relations.'" *Burger King Corp.*, 471 U.S. at 471–72 (1985) (quoting *Int'l Shoe Co.*, 326 U.S. at 319). Some claims may arise from a defendant's purposeful availment but still be unreasonable under the Due Process Clause. *Id.* at 477–78 ("[M]inimum requirements inherent in the concept of 'fair play and substantial justice' may defeat the reasonableness of jurisdiction even if the defendant has purposefully engaged in forum activities.") (quoting *World-Wide Volkswagen Corp. v. Woodson*, 444 U.S. 286, 292 (1980)). To defeat jurisdiction on the grounds of unreasonableness, a defendant must present "a compelling case that the presence of some other considerations would render jurisdiction unreasonable." *Burger King Corp.*, 471 U.S. at 477. A court may consider the following factors:

> (1) the burden on the defendant of litigating in the forum;
>
> (2) the interest of the forum state in adjudicating the dispute;
>
> (3) the plaintiff's interest in obtaining convenient and effective relief;
> (4) the shared interest of the states in obtaining efficient resolution of disputes; and

> (5) the interests of the states in furthering substantive social policies.

*Consulting Eng'rs Corp. v. Geometric Ltd.*, 561 F.3d 273, 279 (4th Cir. 2009) (citing *Burger King Corp.*, 471 U.S. at 477).

While Hammy asserts that it is a Cypriot company, the Court finds no compelling arguments or evidence that it would be unduly burdensome for it to litigate in this forum. *See* ECF No. 479-1 at 7. Hammy has secured counsel in the United States to represent its interest and, based upon the many filings by defense counsel in this action, Hammy appears to maintain satisfactory communication with its counsel and there is nothing to indicate that its counsel could not adequately represent its interests in the United States going forward. Further, South Carolina and the United States have a strong interest in adjudicating the claims at issue in this action. As the Court found, Hammy has availed itself of the privilege of doing business in the state of South Carolina by allowing for the collection of personal geolocation data to be used for targeted advertisements on its website. Moreover, Plaintiffs bring several causes of action against Hammy under South Carolina law, so South Carolina has a strong interest in adjudicating these matters. On balance, the factors discussed above favor the Court finding that jurisdiction in this venue in constitutionally reasonable. Further, Hammy has failed to present compelling reasons that litigating this action in this forum would unduly burden it. Accordingly, the Court finds Hammy is subject to the jurisdiction of this Court in this matter.

### 3. TrafficStars

TrafficStars argues that it has no connections with South Carolina that would permit an exercise of personal jurisdiction over it in this forum. ECF No. 477 at 8.

TrafficStars contends that although it has advertisements directed towards South Carolina that were placed alongside videos on Hammy's website, these contacts with the state of South Carolina are insufficient to establish purposeful availment because there is no connection between the forum and the specific claims at issue in this action. ECF No. 477 at 12–13 (citing *Bristol-Myers Squibb Co.*, 582 U.S. at 257). Plaintiffs contend this Court can and should exercise personal jurisdiction over TrafficStars because it has purposefully engaged in business activities in the United States., and specifically in South Carolina, and the Plaintiffs' claims arise directly from these interactions, making the exercise of jurisdiction both constitutional and reasonable. ECF No. 453 at 12–23. The Court agrees with Plaintiffs.

As the Court outlined above in its analysis of personal jurisdiction over Hammy, the use of geolocation data to direct targeted advertisements at residents of the state is enough to establish the first prong of the Court's analysis: purposeful availment of the privilege of conducting activities in South Carolina. Turning to whether Plaintiffs' claims against TrafficStars arise out of the activities directed at the forum, the Court also finds that this prong has been satisfied. Here again, the Court finds Plaintiffs' claims against TrafficStars arise out of activities directed at South Carolina. TrafficStars contracted to have their advertisements placed on Hammy's website, xHamster.com, and TrafficStars's advertisements appeared alongside the Videos of Plaintiffs, which were taken in South Carolina and uploaded to and downloaded from xHamster.com. Thus, the Court finds these facts to adequately establish an "affiliation between [South Carolina] and the underlying controversy." *See Bristol–Myers Squibb Co.*, 582 U.S. at 262.

Finally, the Court finds the third prong, whether the exercise of personal jurisdiction would be constitutionally reasonable, has also been satisfied. After considering the relevant factors, the Court finds no compelling arguments or evidence that it would be unduly burdensome for TrafficStars to litigate in this forum. Like Hammy, TrafficStars has secured counsel in the United States and appears to maintain satisfactory communication with such counsel. Further, for the same reasons outlined above, South Carolina and the United States have a strong interest in adjudicating the claims at issue in this action. TrafficStars has likewise failed to present any other compelling reasons that litigating this action in this forum would unduly burden it. Accordingly, the Court finds TrafficStars is subject to the jurisdiction of this Court in this matter

4. Wisebits

Wisebits contends it has no connections with South Carolina that would permit an exercise of personal jurisdiction over it in this forum. ECF No. 478 at 8. According to Wisebits, it is nothing more than a holding company for certain intellectual property held by Hammy and its holding of such intellectual property cannot be said to be aimed at South Carolina or the United States.

Plaintiffs contend that the Court should nevertheless exercise personal jurisdiction over Wisebits because it has personal jurisdiction over Hammy and TrafficStars. ECF No. 489 at 5. Plaintiffs assert that because Wisebits was a co-conspirator with Hammy and TrafficStars, Wisebits should also be subject to this Court's personal jurisdiction based on Hammy and TrafficStars contacts with the state of South Carolina. *Id.* at 5–9. Alternatively, Plaintiff argues that Hammy, TrafficStars, and Wisebits are so closely connected that they should be treated as a single business enterprise "to prevent further

bad faith, abuse, fraud, and injustice, and to avoid continued evasion of South Carolina's 'peeping tom' and aggravated voyeurism laws." *Id.* at 5–6.

The Court is not convinced that Wisebits' contacts with the state are enough to justify this Court's exercise of personal jurisdiction over it. Even Plaintiffs seem to concede their argument for the exercise of personal jurisdiction over Wisebits is a stretch based on Wisebits's contacts with the state of South Carolina alone. *See* ECF No. 596 at 77. Unlike Hammy and TrafficStars, Wisebits did not collect data from South Carolina consumers to target advertisements at South Carolinians nor was it in a contractual relationship to directly receive the profits of the geolocation advertisements. Rather, the undisputed facts show that Wisebits acted only as the holding company for Hammy's intellectual property. This is insufficient alone to justify the exercise of personal jurisdiction over Wisebits. Accordingly, the Court finds no basis for specific jurisdiction because there is no evidence that Wisebits, by its own actions, purposefully availed itself to the state of South Carolina. *Magic Toyota, Inc. v. Se. Toyota Distributors, Inc.*, 784 F. Supp. 306, 313 (D.S.C. 1992), *abrogated on other grounds as recognized in Brown v. Kerkhoff*, 504 F. Supp. 2d 464, 492 n.24 (S.D. Iowa 2007) ("When analyzing this case to determine whether Due Process requires that this Court extend personal jurisdiction over the Individual Defendants, the Court must consider each defendant separately, not collectively.")

Turning to Plaintiffs' arguments concerning the exercise of "conspiracy jurisdiction," the Court is also unconvinced that the exercise of personal jurisdiction under this theory is warranted in this action. The Fourth Circuit recognizes the conspiracy theory of jurisdiction, under which the contacts of co-conspirators in the state are imputed to the

out-of-state conspirators. To establish personal jurisdiction based on conspiracy jurisdiction, Plaintiff must present evidence that (1) a conspiracy existed; (2) the defendants participated in the conspiracy; and (3) the co-conspirator's activities in furtherance of the conspiracy had sufficient contacts with the state to subject that conspirator to jurisdiction in the state. *See Unspam Techs., Inc. v. Chernuk*, 716 F.3d 322, 329 (4th Cir. 2013).

In essence, to determine if the exercise of personal jurisdiction is proper under a theory of conspiracy jurisdiction, the Court must analyze the viability of Plaintiffs' conspiracy claim. Plaintiffs have abandoned their RICO claim against Wisebits, so the Court turns to Plaintiffs' remaining civil conspiracy claim. *See* ECF No. 489 at 19. A claim for civil conspiracy requires, among other things, an agreement between two or more persons to accomplish an unlawful act.[14] Plaintiffs contend that their "evidence demonstrates that Hammy, TrafficStars, and Wisebits conspired to profit by encouraging third parties to upload illegal videos of nonconsenting females to xHamster.com, in violation of South Carolina's 'peeping tom' and aggravated voyeurism laws." ECF No. 489 at 11 (citing S.C. Code Ann. § 16-17-470). Plaintiffs assert Wisebits along with Hammy and TrafficStars "actively s[ought] out 'hidden camera' content and generat[ed] revenue from it" and "incentivized violators of this law by creating a dedicated platform for

___

[14] The Court notes that Plaintiffs and the Moving Defendants disagree about which state's law should apply in the Court's analysis of civil conspiracy. However, the Court notes these essential elements are common to all relevant jurisdictions, so the Court does not address the Parties' choice of law argument. *See Paradis v. Charleston Cnty. Sch. Dist.*, 861 S.E.2d 774, 780 (S.C. 2021); *Brunswick TKTKonnect, LLC v. Kavanaugh*, 661 F. Supp. 3d 698, 715 (W.D. Ky. 2023); *Consol. Generator-Nevada v. Cummins Engine Co.*, 1311, 971 P.2d 1251, 1256 (Nev. 1998); *Tri v. J.TT*., 162 S.W. 3d 552, 556 (Tex. 2005).

displaying hidden camera videos." *Id.* at 19.  Wisebits submits that there is no evidence that Wisebits agreed or combined with any of the other Defendants, or any other person, to commit these, or any other, unlawful acts.  ECF No. 479-1 at 31.  Thus, according to Wisebits, Plaintiffs have failed to provide evidence that establishes an essential element of their conspiracy claim.  *Id.* at 32.

First, the Court reiterates that summary judgment is warranted if the non-moving party fails to provide evidence that establishes an essential element of the case.  *Coleman v. United States*, 369 F. App'x. 459, 461 (4th Cir. 2010).  If the non-moving party fails to do so, "there can be no genuine issue as to any material fact," because the failure to prove an essential element of the case "necessarily renders all other facts immaterial." *Id.* (quoting *Celotex,* 477 U.S. at 323).

Here the only evidence in the record concerning Wisebits' "agreements" with other Defendants is that it held and licensed certain intellectual property for Hammy, including xHamster.com's trademark.  ECF Nos. 301 at 2.  It is undisputed that Wisebits receives proceeds from the use of that intellectual property, including royalties from Hammy when these trademarks are used on xHamster.com, and Wisebits has put forth evidence that these proceeds constitute the entirety of their revenue.  ECF Nos.  Plaintiffs contend that by providing the hosting platform that facilitated the posting, and alleged promotions, of the Videos and by allowing the use of it trademarks and logo of the Videos, Wisebits "materially contributed to the illegal content and actively participated in the conspiracy."[15]

---

[15] Plaintiffs assert that the xHamster trademark and Hammy's logo are present on the Videos.  ECF No. 489 at 2 (citing Pl.'s Ex. 3).  Plaintiffs' citation, though, is to metadata and does not support its contention that the trademark and logo were present.  *See id.* However, even if the evidence conclusively showed the logo and trademark were present,

However, even viewing the evidence in the light most favorable to Plaintiffs, notably missing is any evidence that Wisebits agreed to *accomplish an unlawful act*—encouraging third parties to upload illegal Videos.

The evidence shows that Wisebits agreement was simply to provide the intellectual property needed to operate the platform—xHamster.com—generally.  The intellectual property held and licensed by Wisebits was utilized indiscriminately by Hammy, not just for the Videos in question here, and there is no evidence that Wisebits agreed that this intellectual property should be used for an unlawful purpose related to the Videos.  That Wisebits generated revenue through this general agreement to license intellectual property does not establish that Wisebits agreed "to actively seek[] out 'hidden camera' content and generat[e] revenue from it" or "incentivize[] violators of [the] law by creating a dedicated platform for displaying hidden camera videos."  ECF No. 489 at 19.  To succeed on a civil conspiracy claim, the agreement must pertain to the unlawful acts. Because Plaintiffs have failed to present evidence that Wisebits agreed to have its intellectual property used for the allegedly unlawful purposes, rather than used generally for the operation of the website platform, Plaintiffs have not presented evidence of an essential element of its conspiracy claim.  Because Plaintiffs have not presented evidence showing the existence of a conspiracy, the Court finds there is no basis to exercise personal jurisdiction over Wisebits based on the theory of conspiracy jurisdiction.

Turning to Plaintiffs' argument that the Court should exercise personal jurisdiction over Wisebits because it is a single business enterprise with Hammy and TrafficStars,

---

it would not alter the Court's analysis or conclusion that the placement of such trademarks and logos would not amount to an agreement to accomplish an unlawful act.

this argument also fails. Under the single business enterprise theory, the court can establish personal jurisdiction over an entity through a theory of corporate veil piercing.[16] *Duong v. N. Am. Transportation Servs. LLC*, No. 2:17-CV-01089-DCN, 2019 WL 13109647, at *13 (D.S.C. Sept. 25, 2019). A court may refuse to recognize multiple businesses as separate and instead consider them as one entity when the businesses "have unified their . . . operations and resources to achieve a common business purpose and where adherence to the fiction of separate corporate identities would defeat justice." *Pertuis*, 817 S.E.2d at 279. The application of the single business enterprise theory should not be applied "without substantial reflection." *See Stoneledge at Lake Keowee Owners' Ass'n, Inc. v. IMK Dev. Co., LLC*, 866 S.E.2d 542, 551 (S.C. 2021) ("Like other methods of invading the corporate form, invocation of the single business enterprise theory should be reserved for drastic situations and is the rare exception, not the rule.").

---

[16] While Plaintiffs and Wisebits contest which state's law is applicable to other claims in this action, both Plaintiffs and Wisebits cite to South Carolina law in their analysis of whether the Court should exercise personal jurisdiction over Wisebits based on the single business enterprise theory. *See* ECF Nos. 478-1 at 14–21; 489 at 13–15. The Court agrees that South Carolina law, rather than that of another jurisdiction, applies to its determination of applicability of the single business enterprise theory. "In a federal question case that incorporates a state law issue . . . a district court applies the choice-of-law rules of the state in which it sits unless a compelling federal interest directs otherwise." *Baker v. Antwerpen Motorcars Ltd.*, 807 F. Supp. 2d 386, 389 n.13 (D. Md. 2011); *see also DeWitt v. Hutchins*, 309 F. Supp. 2d 743, 751 (M.D.N.C. 2004). In corporate law cases, South Carolina courts typically decide choice of law issues according to the internal affairs doctrine, which means looking to the laws of the state of incorporation. *Pertuis v. Front Roe Rests., Inc.*, 817 S.E.2d 273, 277–78 (S.C. 2018). However, there is an exception to this general rule in cases such as this one when the court is deciding whether various corporate "entities actually operate as a single business enterprise[] and thus should be treated as a single entity." *Id.* at 278. In such instances, South Carolina law applies. *Id.*

To demonstrate the related single business enterprise theory, a party "must show both (1) the intertwining of the operations of the entities and (2) evidence of 'bad faith, abuse, fraud, wrongdoing, or injustice resulting from the blurring of the entities' legal distinctions.'" *Stoneledge*, 866 S.E.2d at 551 (quoting *Pertuis.*, 817 S.E.2d at, 280–81). This theory operates to pierce the corporate veil of companies that are merely related, as opposed to piercing the corporate veil of a parent company through a subsidiary company.  However, this theory requires more than a showing that various businesses are intertwined.   There must also be "further evidence of bad faith, abuse, fraud, wrongdoing, or injustice resulting from the blurring of the entities' legal distinctions." *Id.* at 281.   The Supreme Court of South Carolina has made clear that the injustice requirement under the single business enterprise theory analysis necessitates something more than "a subjective perception of unfairness." *Pertuis*, 817 S.E.2d at 280 (quoting *SSP Partners v. Gladstrong Invs. (USA) Corp.*, 275 S.W.3d 444, 455 (Tex. 2008)).  The evidence of bad faith, abuse, fraud, wrongdoing, of injustice must be "the kinds of abuse, specifically identified, that the corporate structure should not shield—fraud, evasion of existing obligations, circumvention of statutes, monopolization, criminal conduct, and the like." *Id.*

Plaintiffs argue that Hammy, TrafficStars, and Wisebits are so deeply interconnected that they function as a single business enterprise and that "Wisebits is attempting to exploit the corporate forms to shield itself from liability for the wrongful and criminal actions of Hammy and TrafficStars, while benefiting—through licensing payments—from the very revenue generated by these unlawful activities, including the display of the Plaintiffs in 2019."  ECF No. 489 at 15.  Wisebits contends there is no

evidence that Hammy or TrafficStars exercised control over Wisebits to make them a single business enterprise and further there is no evidence of bad faith, abuse, fraud, wrongdoing, or injustice resulting from the blurring of the entities' legal distinctions. ECF No. 479-1 at 16.

Even if the Court were to find Plaintiffs presented evidence sufficient to show the operations of Wisebits, TrafficStars, and Hammy were intertwined, Plaintiffs have failed to prove "bad faith, abuse, fraud, wrongdoing, or injustice resulting from the blurring of the entities' legal distinctions" sufficient to trigger the application of a single business enterprise. The evidence in the record indicates that Wisebits, as the holding company for Hammy's intellectual property, earned revenues from the licensing of this intellectual property, which was present on the Videos featuring Plaintiffs. Viewing the facts in favor of Plaintiffs, as the non-moving party, and with the requisite hesitancy to invade the liability limitations imposed by the corporate form, the Court finds the conduct of Wisebits, Hammy, and TrafficStars "fall[s] short of indicating that defendants' corporate structure allowed them to perpetuate their allegedly unlawful . . . practices." *Guldenzoph v. Indigo Rd. Hosp. Grp.*, No. 2:23-CV-05339-DCN, 2024 WL 2848462, at *7 (D.S.C. June 4, 2024). At most, the only "injustice" Plaintiffs identifies is that the Videos of the Plaintiffs were wrongfully posted to Hammy's website in 2019, but nevertheless Wisebits accepted revenue generated from the use of intellectual property on those Videos and that now Wisebits may avoid liability because of its corporate structure. *See* ECF No. 489. First, South Carolina law "make[s] clear that liability limitations are a feature, not a defect, of South Carolina corporate law." *Guldenzoph*, 2024 WL 2848462, at *7 (citing *Pertuis*, 817 S.E.2d at 280; *Stoneledge*, 866 S.E.2d at 551 & n.6; *Colleton Cnty. Taxpayers Ass'n*, 638

S.E.2d at 692). "[C]orporations are often formed for the purpose of shielding shareholders from individual liability[,]" and "there is nothing remotely nefarious in doing that." *Stoneledge*, 866 S.E.2d at 549 (citing *Pertuis*, 817 S.E.2d at 280). As such, Wisebits mere ability to avoid liability is not identified as the type of injustice that is necessary under the single business enterprise theory.

Furthermore, the Supreme Court of South Carolina rejected a similar theory of profit sharing as being sufficient to establish a "single business enterprise." *Stoneledge*, 866 S.E.2d at 551. Specifically, the Supreme Court of South Carolina held that a plaintiff failed to sufficiently show "bad faith, abuse, fraud, wrongdoing, or injustice resulting from the blurring of the entities' legal distinctions" on behalf of the defendants where the parties "had at least constructive knowledge of the pervasive construction defects that plagued the project, but was nevertheless directly involved in [the other entities'] marketing and sale of the units" and the entities' profits "were entirely dependent on [the sale of] the units, their operations were clearly in pursuit of a common business purpose, albeit to the detriment of the [plaintiffs]." *Id.* Likewise, under the facts of this case, the Court refuses to disregard the corporate form by amalgamating Wisebits, Hammy, and TrafficStars under the "single business enterprise theory" and accordingly declines to exercise of personal jurisdiction based on this theory. Because the Court finds it lacks personal jurisdiction over Wisebits, Wisebits's Motion for Summary Judgment is granted.

**B. Section 230**

The Moving Defendants argue that the Court should grant them Summary Judgment based on immunity under § 230 of the Communications Decency Act ("Section 230"). *See* ECF Nos. 475-1 at 11–23; 477-1 at 22–23; 478-1 at 22; 479-1 at 11–20.

Plaintiffs claim that a material question of fact exists as to whether Defendants are entitled to immunity.  *See* ECF Nos. 488 at 11–25; 489 at 16–18; 492 at 18–30; 493 at 16–18.

Section 230 "establishes immunity for providers of interactive computer services that provide an online platform allegedly used by third[ ]parties to facilitate wrongful conduct."  *J.R. v. Mancino*, No. 2:23-CV-02519-BHH, 2024 WL 3048368, at *3 (D.S.C. May 31, 2024) (citation omitted), *report and recommendation adopted*, 2024 WL 3047553 (D.S.C. June 18, 2024).  Section 230 provides, in relevant part, that "[n]o provider or user of an interactive computer service shall be treated as the publisher or speaker of any information provided by another information content provider."  47 U.S.C. § 230(c)(1). The statute defines the term "interactive computer service" as "any information service, system, or access software provider that provides or enables computer access by multiple users to a computer server, including specifically a service or system that provides access to the Internet . . . ." 47 U.S.C. § 230(f)(2).

Section 230 mandates that "[n]o cause of action may be brought and no liability may be imposed under any State or local law that is inconsistent with this section."  47 U.S.C. § 230(e)(3).  Courts in this Circuit and throughout the country have wrestled with the scope and application of the immunity mandated under this provision of Section 230. *See, e.g.*, *M.P. by & through Pinckney v. Meta Platforms, Inc.*, 692 F. Supp. 3d 534, 538 (D.S.C. 2023), *aff'd*, 127 F.4th 516 (4th Cir. 2025) ("[T]his Court does not address the scope and application of Section 230 on a blank slate.  Indeed, there is a quarter of a century of case law since the adoption of Section 230 in 1996.").  In fact, the Fourth Circuit was one of the first courts to address the scope of Section 230 in *Zeran v. America Online, Inc.*, 129 F.3d 327 (4th Cir. 1997).  As the Fourth Circuit explained in *Zeran*, Section 230

creates a "federal immunity to any cause of action that would make service providers liable for information originating with a third-party user of the service." *Id.* at 330. "Thus, lawsuits seeking to hold a service provider liable for its exercise of a publisher's traditional functions—such as deciding whether to publish, withdraw postpone, or alter content—are barred." *Id.*

Indeed, "Congress [through Section 230 has] established a general rule that providers of interactive computer services are liable only for speech that is properly attributable to them." *Nemet Chevrolet, Ltd. v. Consumeraffairs.com, Inc.,* 591 F.3d 250, 254 (4th Cir. 2009) (citing *Universal Commc'n Sys., Inc. v. Lycos, Inc.*, 478 F.3d 413, 419 (1st Cir. 2007)). As such, "plaintiffs may hold liable the person who creates or develops unlawful content, but not the interactive computer service provider who merely enables that content to be posted online." *Id.* (citing *Doe v. MySpace, Inc.*, 528 F.3d 413, 419 (5th Cir. 2008); *Chicago Lawyers' Comm. for Civil Rights Under Law, Inc. v. Craigslist, Inc.*, 519 F.3d 666, 672 (7th Cir. 2008); *Zeran*, 129 F.3d at 330–31). Further, "the majority of federal courts have interpreted [Section 230] to establish broad 'federal immunity to any cause of action that would make service providers liable for information originating with a third-party user of a service.'" *Mancino*, 2024 WL 3048368, at *3 (quoting *Directory Assistants, Inc. v. Supermedia, LLC*, 884 F. Supp. 2d 446, 450 (E.D. Va. 2012)).

To establish that it is entitled to protection under Section 230, a defendant must show that: (1) it is a "'provider or user of an interactive computer service'"; (2) the plaintiff's claims hold it "responsible 'as the publisher or speaker of any information'"; and (3) the relevant information was "'provided by another information content provider.'" *Henderson v. Source for Pub. Data, L.P.*, 53 F.4th 110, 119 (4th Cir. 2022) (quoting *Nemet Chevrolet,*

*Ltd.*, 591 F.3d at 254; 47 U.S.C. § 230(c)(1)). Here, Plaintiffs do not dispute the Moving Defendants are interactive computer service providers under Section 230. *See* ECF Nos. 488, 489, 492, 493. Instead, Plaintiffs contend that the Moving Defendants are also information content providers and, therefore, cannot qualify for Section 230 immunity. *See id.* The Court addresses Section 230's applicability as to each of the Moving Defendants below.

    1. *MindGeek and Hammy*

    The arguments for and against the application of Section 230 for MindGeek and Hammy are almost identical, so the Court addresses these arguments simultaneously. *See* ECF Nos. 475, 479, 488, 492. Both MindGeek and Hammy assert that they are entitled to summary judgment on all of Plaintiffs' claims based on Section 230 immunity. ECF No. 475-1 at 2, 11–23; 479-1 at 10–20. Plaintiffs contend that neither MindGeek nor Hammy is entitled to Section 230 immunity, or at least a question of fact exists as to its entitlement to immunity, for three reasons: (1) MindGeek and Hammy materially contributed to the Videos such that it should be considered a "internet content provider" rather than merely a "interactive computer service"; (2) the exception to Section 230 set forth in the Allow States and Victims to Fight Online Sex Trafficking Act, 47 U.S.C. § 230(e)(5)(A), ("FOSTA") applies to MindGeek and Hammy based on their violations of the TVPRA; and (3) Plaintiffs' civil conspiracy claim does not treat MindGeek or Hammy as a publisher, so Section 230 does not apply to them. ECF Nos. 488 at 11–25; 492 at 18–29.[17] The Court addresses each of these arguments in turn.

---

[17] Plaintiffs also assert that "Hammy has no immunity for the right of publicity claim because each Plaintiff's right of publicity is an intellectual property right." ECF No. 492 at 29. Plaintiffs do not flesh out this argument in their brief and instead incorporate by

a. Material Contribution

As outlined above, the third and final requirement for establishing entitlement to Section 230 immunity is that the information at issue in Plaintiffs' claim be "provided by *another* information content provider." *Henderson v. Source for Pub. Data, L.P.*, 53 F.4th 110, 126 (4th Cir. 2022) (citing 47 U.S.C. § 230(c)(1)) (emphasis added). Thus, if MindGeek or Hammy itself is the "information content provider" for the Videos in question, it cannot claim entitlement to immunity under Section 230. *Id.* An entity is an "information content provider" if it is "responsible, in whole or in part, for the creation or development" of the information at issue. *Id.* at 127. In *Henderson*, the Fourth Circuit addressed the appropriate test for determining whether an interactive computer service provider or user

---

reference their argument raised in their Response in Opposition to Wisebits's Motion for Summary Judgment. *Id.* Incorporation by reference is highly disfavored by this Court as it is often viewed as an attempt to circumvent the Court's rules on page limits. *See, e.g.*, *South Carolina v. United States*, 232 F. Supp. 3d 785, 795 (D.S.C. 2017) ("[A]llowing incorporation by reference in such circumstances would defeat the page limitation imposed by the Local Rules"); *Washington v. Fed. Bureau of Prisons*, No. 5:16-CV-03913-BHH-KDW, 2019 WL 2125246, at *2 (D.S.C. Jan. 3, 2019), *report and recommendation adopted*, 2019 WL 1349516 (D.S.C. Mar. 26, 2019) (disregarding the defendants' incorporation by reference because the attempted incorporation improper, especially where defendants had already exceeded the permissible page limitations and allowing incorporation would unnecessarily complicate an already complex motion (citation omitted)). This is especially true here where the Court already extended Plaintiffs' page limitations for this brief. *See* ECF No. 487. The Court is inclined to not consider this argument at all but nevertheless finds this argument to be completely without merit as Plaintiffs have not stated a claim for "right of publicity" against Hammy in their Amended Complaint. *See* ECF No. 193. Plaintiffs may not amend their pleadings by response brief. *Smith v. Demory*, C.A. No. 9:19-cv-1771-HMH-MHC, 2020 WL 8413565, at *7 (D.S.C. Dec. 15, 2020) ("[I]t is well-established that a plaintiff cannot amend the complaint by alleging new claims in his response to a motion for summary judgment) (citing *S. Walk at Broadlands Homeowner's Ass'n v. OpenBand at Broadlands*, 713 F.3d 175, 184–85 (4th Cir. 2013)). Accordingly, there is no claim for "right of publicity" against Hammy pending before the Court and as such the Court need not consider the applicability of Section 230 to this claim.

is responsible for the creation or development of the information at issue, explaining that a party becomes an "information content provider" when it "directly and 'materially' contributed to what made the content itself 'unlawful.'" *Id.* (citing *Force v. Facebook*, 934 F.3d 53, 68 (2d Cir. 2019); *Fair Hous. Council of San Fernando Valley v. Roommates.Com, LLC*, 521 F.3d 1157, 1168 (9th Cir. 2008); *Jones v. Dirty World Ent. Recordings LLC*, 755 F.3d 398, 413 (6th Cir. 2014)).  The Fourth Circuit relied on the principle that liability for an interactive computer service user or provider must turn on "something more than . . . its traditional editorial function" and explained that the "material contribution" test outlined in other circuits fit within the "something more" standard already established in the Fourth Circuit.  *Id.* (citing *Nemet*, 591 F.3d at 258; *Zeran*, 129 F.3d at 330).

Accordingly, the Fourth Circuit held "an interactive computer service is not responsible for developing the unlawful information unless they have gone beyond the exercise of traditional editorial functions and materially contributed to what made the content unlawful."  *Id.* at 128.  Put differently, Section 230(c)(1) immunity applies if a defendant "has materially contributed *only* to parts of the disseminated information that *do not* make the disseminated information unlawful (if § 230(c)(1) is otherwise applicable)."  *Id.* (emphasis added).  "Section 230(c)(1)'s third requirement d[oes] not turn on whether the defendant materially contributed to *some* part of the total information disseminated—i.e., the entire post—but on whether the defendant materially contributed to the [*unlawful*] aspect of the information."  *Id.* at 128 (citing *Jones*, 755 F.3d 398; *La Liberte v. Reid*, 966 F.3d 79, 89 (2d Cir. 2020)) (emphasis added)).  Thus, in analyzing whether Section 230 immunity applies at the motion for summary judgment stage, the

Court must determine whether a genuine dispute as to any material facts exists concerning MindGeek or Hammy's contribution to the illegality of the Videos uploaded to its website in 2019. As explained in detail below, even construing all inferences in Plaintiffs' favor, the Court finds there is no genuine issue of material fact as to whether MindGeek or Hammy's contributions to the Videos transformed them from a platform provider to a content provider.

It is undisputed that the Videos originated from a third party and that neither MindGeek nor Hammy was involved in the initial creation or development of the Videos. However, Plaintiffs contend MindGeek took on the role of "information content provider" when it materially contributed to the Videos upon their upload to its website by creating thumbnails from the Videos, creating tags for the Videos, removing and/or adding categories to the Videos, providing a written playbook to uploaders, creating rules for advertisement placement that affected what advertisements appeared alongside the Videos, and using non-neutral algorithms to direct traffic to the Videos. ECF No. 488 at 15. Plaintiffs further contend that Hammy, by much the same token, took on the role of "information content provider" when it created new content when it created thumbnails from the Videos of Plaintiffs; provided tags and categories for uploaders to choose from; provided users guidelines on how to optimize their videos for higher views and revenue; created specific rules for advertisement placement on its websites to ensure views and traffic; solicited illegal content; created new copies of the Videos and changed the associated metadata prior to republishing; surrounded the Plaintiffs videos with advertisements based upon categories and tags; and required subscribers to provide the information as a condition of accessing its service. ECF No. 492 at 21. Accordingly,

Plaintiffs assert that neither MindGeek nor Hammy is entitled to immunity under Section 230.  *See* ECF Nos. 488 at 15; 492 at 21.

The Parties dispute to what extent each of these actions amounts to content creation or material contribution to content creation.  *See* ECF Nos. 578, 580.  Both MindGeek and Hammy contend that they have not materially contributed to the Videos and that any alleged "contributions" were made in their publisher roles.  *See id.*  Both MindGeek and Hammy argue that their actions regarding the Videos were the same standard, content neutral steps it performs for all videos displayed on its website, which falls short of the "material contribution" required to be considered an "information content provider" under Section 230.  *See id.*  Additionally, MindGeek and Hammy assert that because its actions regarding the Videos did not contribute to the unlawfulness of their content and it simply provided a platform through which a third party was able to upload the Videos, it is well within the bounds of the immunity anticipated under Section 230.  *See id.*

The Court agrees with MindGeek and Hammy.  While Plaintiffs have presented some evidence that MindGeek "contributed to some part of the total information disseminated," none of this evidence is sufficient to raise a question of material fact as to "whether [MindGeek or Hammy] materially contributed to the [unlawful] aspect of the videos."  *See Henderson*, 53 F.4th at 127–28.  The Court addresses each of Plaintiffs' contentions concerning MindGeek and Hammy's contributions below.

i.  Creation of Thumbnails, Categories, and Tags[18]

---

[18] Plaintiffs also argue that Hammy played a role in "the creation of the [V]ideos' illegality by updating the metadata associated with the [V]ideos."  ECF No. 492 at 21, 25. Plaintiffs go on to contend that Hammy created this new metadata by "creating

First, as to thumbnail creation, Plaintiffs argue that when MindGeek and Hammy created thumbnails from stills of the Videos, they created new content, taking them outside the purview of Section 230's intended immunity.  ECF Nos. 488 at 15–16; 492 at 21–23.  The Court disagrees.  It is undisputed that thumbnails are created for all videos that appear on MindGeek and Hammy's websites, whether the uploader of the video creates one or MindGeek or Hammy generates one for the video.  Thumbnails are simply stills taken from the originally uploaded content to aid in visually toggling to certain portions of the video and to provide a still as a "cover" image when the video is not in play.  While Plaintiff contends the creation alone of the thumbnail is sufficient because the content of the Videos themselves was illegal, this argument ignores the Fourth Circuit's requirement that MindGeek and Hammy's conduct must go beyond the exercise of traditional editorial functions and materially contribute to what *made the content unlawful* in the first place.  *See Henderson*, 53 F.4th at 127–28.  There is no evidence in the record that MindGeek or Hammy suggested or modified the thumbnails associated with the Videos in a way that would have contributed to their unlawful or nonconsensual nature.

The Court finds, under the facts and circumstances of this action, the creation of thumbnails is a standard publishing function of both MindGeek and Hammy's website and is content neutral.  In the Court's view, the creation of a thumbnail is not unlike a publisher's selection of a picture from those submitted by the writing's author, which will

---

thumbnails, tags, titles, and/or categories" associated with the Videos.  *Id.* at 25.  As the Court addresses herein, in the context of this case, the creation of thumbnail, tags, and categories is insufficient to show that Hammy materially contributed to the unlawful nature of the Videos.

then appear alongside a writing in a publication.  To assert that by publishing the picture, provided to the publisher by a third party, alongside that third party's article somehow makes it the publisher's content, rather than the original author's, is nonsensical. Likewise, in this context, even if MindGeek and Hammy did select the thumbnails to appear with the Videos, MindGeek and Hammy acted in its editorial role as a publisher in doing so.  It does not sway the Court that MindGeek and Hammy may create and choose "better" images as thumbnails than those selected by the original uploader to promote the content on its website.  Again, this conduct falls squarely within the editorial function as publisher.  Moreover, the undisputed evidence reflects that MindGeek and Hammy required thumbnails to be created for all the content of their website, which further supports the Court's conclusion that the creation of the thumbnails from the Videos was purely a neutral, editorial function.

Plaintiff relies on *Doe v. MG Freesites, LTD*, No. 7:21-CV-00220, 2024 WL 5339485 (N.D. Ala. Dec. 19, 2024), *motion to certify appeal denied sub nom. Doe # 1 v. MG Freesites, LTD*, 2025 WL 1314179 (N.D. Ala. May 6, 2025) (the "Alabama case") for the contention that the creation of thumbnails is a material contribution outside of Section 230 immunity because, in this context in particular, the creation of thumbnails "constituted a duplication of the abuse images of Plaintiffs," which were illegally obtained in the first instance.  ECF No. 488 at 15–16; 492 at 20–23.  However, the Court finds the Alabama case to be readily distinguishable.  The Alabama case involved the publication of Child Sex Abuse Material ("CSAM") on MindGeek's website.  *See* 2024 WL 5339485, at *1. Like in this case, MindGeek created thumbnails to coincide with the videos featuring CSAM.  *Id*. at *2.  The Alabama court found that the creation of thumbnails featuring

CSAM was outside the protection of Section 230 because by creating thumbnails featuring CSAM, MindGeek was responsible for the CSAM it created. *Id.* at *9.

Plaintiff contends the Court should similarly treat the thumbnails created here as "new illegal content" because voyeurism is illegal under South Carolina law and when MindGeek and Hammy created new thumbnails from Plaintiffs' voyeur videos it likewise created new illegal content. ECF Nos. 488 at 16; 492 at 22–23. However, the treatment of CSAM and voyeurism is highly distinguishable. The mere duplication, or even artificial creation, of CSAM is *always* illegal regardless of whether the individual duplicating the imagery knew the original video was nonconsensual. While staged voyeuristic videos can be, and have been according to MindGeek, legally and consensually created, the same is not true for CSAM. CSAM is always illegally created, obtained, and duplicated. In this action, however, it is undisputed that the Videos at issue did not contain CSAM. While the Plaintiffs featured in the Videos were young, none of them were underage at the time the Videos were created. Accordingly, the Court does not find the Alabama case's reasoning concerning the creation of thumbnails to be applicable in this case.

Similarly, Plaintiff argues that MindGeek and Hammy contributed to the illegality of Plaintiffs' videos by changing tags and categories in a manner exceeding the "traditional editorial function." ECF Nos. 488 at 16–22; 492 at 24–25. Plaintiff contends MindGeek and Hammy actively collaborated with uploaders on the selection of categories and tags for the Videos uploaded to its websites. *Id.* Plaintiffs argue MindGeek and Hammy's conduct concerning and treatment of tags and categories invited, and even encouraged, users to post nonconsensual videos like the ones of Plaintiffs. *Id.*

MindGeek asserts, especially with respect to the Videos at issue here, that for the most part uploaders selected and/or provided the categories, tags, titles, and thumbnails that appeared alongside their videos without any input from anyone at MindGeek. ECF No. 475-1 at 9, 14. However, MindGeek concedes that it did change the categories on two of the Videos to "amateur," "fetish," and/or "lesbian." ECF No. 578 at 5, 14. Hammy also maintains that the individuals who upload content to its website are the ones who select categories, tags, and titles. ECF No. 479-1 at 12. Regardless of who selected the categories, tags, and titles, both MindGeek and Hammy contend that these changes are not enough to prove that they materially contributed to the unlawful nature of the Videos at issue in this action. ECF Nos. 475-1 at 14; 479-1 at 12–13.

The Court finds that MindGeek and Hammy's use of tags and categories in these circumstances comes nowhere near the material contribution to unlawful content required to transform their status to that of liable information content providers. First, merely allowing a third party to create or select certain illicit tags and categories is insufficient to bring MindGeek and Hammy outside the protection of Section 230. As provided above, material contribution means being responsible for what made the displayed content unlawful. *Henderson*, 53 F.4th at 127–28. Providing "neutral tools" to aid in the display of and search for content does not amount to "development" or "creation" of new content. *See Jones*, 755 F.3d at 41011 (citing *Roommates*, 521 F.3d at 1169).

The Ninth Circuit addressed a similar question in *Roommates*, 521 F.3d 1157. The *Roommates* court found the website in that case was not entitled to Section 230 because it required users to submit protected characteristics and then hid certain listings based on those submissions. *Id.* at 1169–70. But the court reasoned that "a dating website that

42

requires users to enter their sex, race, religion and marital status through drop-down menus, and that provides means for users to search along the same lines, retains its [Section 230] immunity insofar as it does not contribute to any alleged illegality." *Id.* at 1169. In other words, requiring selection from a drop-down menu that provides for what would otherwise be neutral descriptors of content is not sufficient, with more, to materially contribute to the development of what makes the content illegal. *See id.* In *Roommates*, the "something more" that took the website's actions from mere publishing functions to material contributions of the contents' illegality was its use of these otherwise neutral descriptors for illegal and discriminatory purposes, e.g., hiding certain housing listing based on these characteristics. *Id.* at 1169–70.

Moreover, the Ninth Circuit rejected the argument that the website in *Roommates* developed the illegal content displayed in the "additional comments section," even where the website allegedly encouraged the submission of discriminatory preferences, because "[t]he fact that [the website] encourages subscribers to provide *something* in response to the prompt is not enough to make it a 'develop[er]' of the information." *Id.* at 1173–75 (second alteration in original). Because the website did not tell subscribers what kind of information they should or must include and did not encourage or enhance any discriminatory content created by users, the court held that the operation of the additional comments section did not materially contribute to the alleged unlawfulness of the content displayed on the website's comments section. *Id.*

Similarly, here, MindGeek and Hammy undisputedly required the selection of categories and tags on uploaded videos and allowed its users to select certain tags, including illicit ones such as "voyeur" and "spy." However, like the example of the dating

website provided by the Ninth Circuit in *Roommates*, the "something more" is missing in this action. Plaintiffs have presented evidence that the tags and categories for users to choose from, including "voyeur" and "hidden camera," were available at the time the Videos were uploaded on both MindGeek and Hammy's websites. However, Plaintiffs have presented no evidence that the Uploaders were made to choose these specific categories or tags. Even the undisputed evidence Plaintiffs produced shows that the categories selected by MindGeek—"amateur," "lesbian," and "fetish"—were not indicative of illegal or nonconsensual content in the Videos. ECF No. 488 at 9. The categories undisputedly selected by MindGeek do not indicate that the Videos contained illegal or nonconsensual content at all. Moreover, the categories present before MindGeek's alterations were not indicative of the illegal or nonconsensual content of the Videos either. ECF No. 488 at 9 (explaining that prior to the changes by MindGeek, one of the Videos had been categorized by the Uploader as s "Teen (18+), Small Tits"). Even if MindGeek and Hammy selected all the categories and tags, facts that are largely disputed by the Parties, the Court still finds this would be insufficient under these circumstances as providing or changing certain tags or categories alone did not *materially contribute* to what made these Videos illegal in the first place. *See Jones*, 755 F.3d at 410 ("A material contribution to the alleged illegality of the content does not mean merely taking action that is necessary to the display of allegedly illegal content. Rather, it means being responsible for what makes the displayed content allegedly unlawful.").

Second, even if MindGeek and Hammy changed the categories and tags pertaining to Plaintiffs' videos to drive more traffic to these videos and therefore implicitly encouraged posting of similar content, as Plaintiffs argue, the Court still finds that this

does not make MindGeek the information content provider under these circumstances. The Sixth Circuit addressed a similar issue in *Jones*, 755 F.3d 398.  In *Jones*, the district court held that Dirty World, an online tabloid, was not entitled to Section 230 immunity because the website operator added his own commentary to third parties' content and therefore became a "creator" or "developer" of that content by "intentionally encourag[ing] illegal or actionable third-party postings" and/or "ratifying or adopting the posts."  *Id.* at 406.  The Sixth Circuit reversed, explaining that "[t]he district court misapprehended . . . what constitutes 'development' in § 230(f)(3) from what does not."  As set out in *Jones*, there is "crucial distinction between, on the one hand, taking actions (traditional to publishers) that are necessary to the display of unwelcome and actionable content and, on the other hand, responsibility for what makes the displayed content illegal or actionable."  *Id.* at 414.  The *Jones* court flatly rejected "an encouragement test" because it would "inflate the meaning of 'development to the point of eclipsing immunity" under Section 230 because "[m]any websites not only allow but also actively invite and encourage users to post particular types of content.  Some of this content will be unwelcome to others."  *Id.*  The Sixth Circuit further rejected "an adoption or ratification theory" as sufficient to show "material contribution" because it abuses the "concept of responsibility" and "[a] website operator cannot be responsible for what makes another party's statement actionable by commenting on that statement *post hoc.*"  *Id.*

This Court likewise finds that holding a website is not entitled to Section 230 immunity because it selected and edited content for display by changing the tags or categories to more popular tags, thereby increasing its viewership and implicitly encouraging the posting of similar content, would effectively short circuit the broad

immunity created under the rule and chill speech on the internet in exactly the way that Congress intended to avoid by passing Section 230. Here, MindGeek and Hammy applied the same, content-neutral publishing functions that it did to all other videos uploaded to its website, and Plaintiffs have presented nothing more than a scintilla of evidence, if any evidence at all, that MindGeek or Hammy did so in a way that contributed to the content displayed in the Videos. Plaintiffs have fallen far short of demonstrating that MindGeek or Hammy have materially contributed to their illegality.

Finally, Plaintiffs contend that by having a separate webpage dedicated to voyeuristic content, based on these categories and tags, MindGeek and Hammy directly solicited the same type of illegal content at issue in this case. ECF Nos. 488 at 17, 21–22; 492 at 24. Even if the existence of this page were supported by evidence, Plaintiffs' argument, however, again overlooks that the illegal nature of the Videos here was that they were recorded without the consent of Plaintiffs and that, to show that Defendants materially contributed to the content, there must be evidence that Defendants materially contributed to the recording of these Videos without Plaintiffs' consent. There is no evidence that anyone recorded these Videos because he was enticed or solicited by the Moving Defendants to do so, nor is there evidence that the Uploaders coordinated with the person who secretly recorded Plaintiffs in anyway and thus that he was indirectly solicited and enticed by Defendants to record these Videos. Likewise, there is also no evidence that the availability of tags or categories such as "voyeur," "hidden camera," or "locker room" encouraged anyone to record these Videos. Accordingly, the Court finds that the evidence of MindGeek and Hammy's use of tags and categories on the Videos

is insufficient to find that they materially contributed to them and become "internet content providers."

ii. Provision of Guidelines or "Playbook" for Users

Plaintiffs' reliance on the written playbook developed by MindGeek and the guidelines utilized by Hammy is also unpersuasive to establish MindGeek or Hammy was actually the internet content provider in this context. Plaintiffs assert that MindGeek and Hammy actively taught, and implicitly solicited, users of their websites to use certain tags and categories correlated with illegal content, such as "voyeur," through MindGeek's playbook and Hammy's guidelines.

MindGeek contends that Plaintiffs mischaracterize the availability of the "Pornhub Playbook" to the Uploaders and indicates that the Playbook was only available through the "Content Partner" program, of which, as Plaintiffs concede, neither of the Uploaders were participants. *See* ECF No. 488 at 15. Indeed, a review of the Playbook provided by Plaintiffs reveals that "Content Partner Program" appears on every other page and Plaintiffs have provided no contrary evidence indicating that this Playbook was available to users outside of this program. Moreover, there is no evidence to demonstrate that this Playbook was available to and used by the Uploaders of the Videos in question. Even if the Playbook were available to the Uploaders, the guidance offered by the Playbook does not amount to a "material contribution" by MindGeek so as to convert it to an internet content provider as opposed to merely the publisher of other third-party content providers. Similarly, Hammy argues that its steps taken to ensure that the content on its website was seen by more people does not defeat Section 230 immunity. ECF No. 580 at 18.

Many websites provide guidance on posting, but a website's active role in curating and editing content by providing guidance does not necessarily take it outside of the broad Section 230 immunity unless the assistance in the development of this content is what makes the content unlawful in the first place. Neutral assistance such as the Playbook by MindGeek and guidelines by Hammy was equally available on the website and there is no evidence that it specifically targeted bad actors, much less that it contributed to the unlawful nature of their uploaded content. Moreover, there is no evidence specifically as to the Videos at issue in this action that any of the Uploaders utilized the Playbook or guidelines. Additionally, as discussed herein, the unlawful nature of the Videos was that they were recorded without Plaintiffs' consent, and there is no evidence that Murphy or anyone else was solicited, encouraged, or even reviewed the Playbook or guidelines when choosing to record Plaintiffs without their consent. Accordingly, the Court finds the existence of the Playbook and guidelines does not under these circumstances make MindGeek or Hammy "internet content providers."

### iii.  Advertisement Placement

Plaintiffs' arguments about the placement of advertisements around the Videos based on the added tags and categories likewise fails to create a genuine issue of material fact. MindGeek contends that the advertisements placed alongside the Videos were content neutral and even if advertisements were created based on data related to content, this does not equate to materially contributing to the illegality of the content. ECF No. 578 at 15. Similarly, Hammy contends that "advertisements do not change the substance of the uploaded content." ECF No. 580 at 15 (quotation omitted). The Court agrees. It is undisputed that advertisements appear around all videos present on

MindGeek and Hammy's websites.  Plaintiffs' contention that the advertisements placed alongside the Videos somehow "altered the [V]ideos depicting Plaintiffs" is unpersuasive. MindGeek and Hammy's advertisement placement did not change the *content* of the Videos, nor did it contribute to what made the Videos illegal in the first place.

### iv.  Algorithms

This next argument it seems was only raised as to MindGeek, but the Court considers its analysis applicable to both MindGeek and Hammy to the extent Plaintiffs sought to raise it as to Hammy.  ECF Nos. 488, 492.  The Fourth Circuit has recently addressed whether a website's use of algorithms constitute a "material contribution" that would take a website's actions outside the scope of Section 230 immunity.  *See Meta*, 127 F.4th 516.  In *Meta*, the plaintiff alleged that Facebook's algorithms fed Dylann Roof content that "nurtured, encouraged, and ultimately served to solidify and affirm" his racist, violent views and recommended extremist groups to him that he then joined.  *Id.* at 521–22.  Roof ultimately murdered nine innocent people in race-motivated hate crime, and the plaintiff argued that Facebook was at least partially responsible.  *Id.* at 522.  The Fourth Circuit considered whether the plaintiff's claims, which attacked the way Facebook's algorithms sorted, arranged, and distributed third-party content, were barred by Section 230.  *Id.* at 523.  The Fourth Circuit found that the claims were barred because the claims sought to hold Facebook liable as a publisher of that third-party content.  *See id.*  The court reasoned that the plaintiff's claims ultimately "s[ought] to hold Facebook liable for disseminating 'improper content' on its website."  *Id.* at 525 (citing *Henderson*, 53 F.4th at 120–21).  The Fourth Circuit explained that the plaintiff's claims concerning the design of Facebook's algorithms could not be separated from its publishing function because the

plaintiff "cannot show that Facebook's algorithm was designed in a manner that was unreasonably dangerous for viewers' use without also demonstrating that the algorithm prioritizes the dissemination of one type of content over another." *Id.* "Indeed, without directing third-party content to users, Facebook would have little, if any, substantive content." *Id.* The ultimate issue for the plaintiff in *Meta* was "the fact that Facebook allows racist, harmful content to appear on its platform and directs that content to likely receptive users to maximize Facebook's profits." *Id.* The Fourth Circuit explained Facebook's use of algorithms to achieve engagement, and ultimately profit from that engagement, did not change the underlying nature of the act it performed in allowing the publication of certain content, and "[d]ecisions about whether and how to display certain information provided by third parties are traditional editorial functions of publishers, notwithstanding the various methods they use in performing that task." *Id.* at 526. For these reasons and based on the broad immunity provided by Section 230, the Fourth Circuit affirmed the district court's dismissal of the plaintiff's claims.

Here, Plaintiffs initially argued that MindGeek's use of "non-neutral algorithms" to "ensure trending keywords, titles, and categories were utilized" on the Videos were actions, in conjunction with the others outlined above, that took it outside the protection of Section 230 because these actions amounted to material contributions to the illegality of the Videos. ECF No. 488 at 15. However, in their supplemental briefing addressing *Meta*, Plaintiffs fail to directly address MindGeek or Hammy's use of algorithms or how *Meta* might impact the Court's analysis of Plaintiffs' algorithms arguments. *See* ECF No. 581. Instead, Plaintiffs contend that *Meta* is distinguishable and not applicable in this action because MindGeek's internal content curation system is not a fully automated,

neutral algorithm. ECF No. 581 at 2. In Plaintiffs' view, because MindGeek took a more hands-on approach to the publication process by creating and altering tags or categories and creating their own content in thumbnails, it is not entitled to Section 230 immunity. *Id.* This is just a rehashing of the arguments that the Court has already addressed above and does not address how MindGeek's algorithm usage did or did not contribute to the Videos' illegality. Plaintiffs have not provided evidence to support their assertion that MindGeek's algorithms are "non-neutral" and further, even if they had, they do not explain or provide any evidence as to *how* the supposedly non-neutral algorithms materially contributed to the illegality of the Videos. Even generously construing Plaintiffs' arguments concerning MindGeek's desire to use tags, categories, and thumbnails to increase views and engagement as being tied to its use of algorithms, the Fourth Circuit found that a website "does not cease to be a publisher" by "us[ing] an algorithm" to "increase[] consumer engagement." *Meta*, 127 F.4th at 526. Accordingly, the Court finds that MindGeek's use of algorithms did not materially contribute to the unlawfulness of the Videos and, thus, has not taken it outside the scope of Section 230 immunity. Similarly, to the extent that any such arguments are raised against Hammy, the Court finds Hammy's use of algorithms did not take it outside of Section 230 immunity. For the foregoing reasons, the Court finds that neither MindGeek nor Hammy materially contributed to illegality of the Videos and therefore neither acted as an "information content provider" for the Videos.

### v. The Translation of Videos to Other Languages

Finally, Plaintiffs contend Hammy created new illegal content when translating the Videos from English to other languages. ECF No. 492 at 22. Hammy does not respond

to this argument.  *See* ECF No. 580.  Plaintiffs cite no authority, and the Court can find no caselaw where a court has considered whether translation of a video amounts to material contribution to the illegality of its content.  The Court finds, however, that for many of the same reasons outlined above, translation in this context did not materially contribute to the illegality of the Videos.  As stated, the illegal nature of the Videos was that they were recorded without Plaintiffs' consent.  Translating the Videos to another language would have no impact on this underlying illegality.  Accordingly, the Court finds that Hammy's translation of the Videos from English to other languages does not take it outside of Section 230 immunity.

b.  Plaintiffs' Claims treat MindGeek and Hammy as a Publisher

The Court now turns to whether Plaintiffs' claims seek to hold MindGeek and Hammy responsible as a "publisher or speaker" of the third-party content.  A claim treats a defendant "as the publisher or speaker of any information" when it (1) makes the defendant liable for publishing certain information to third parties, and (2) seeks to impose liability based on that information's improper content.  *Henderson*, 53 F.4th at 120–21.  Plaintiffs' claims all arise out of MindGeek and Hammy allowing third-party content providers to post the Videos at issue on their websites, Pornhub.com and xHamster.com.  In other words, Plaintiffs contend MindGeek and Hammy are liable because they decided to publish the Videos on their websites.   The decision to allow third-party content, including decisions in editing and preparing such content for publication on the website, is the quintessential function of a "publisher" under Section 230.  *See Zeran*, 129 F.3d at 330 ("[A] publisher's traditional editorial functions" include "deciding whether to publish, withdraw, [ ] or alter content[.]").  Section 230 prohibits Plaintiffs from holding MindGeek

or Hammy—as the mere platforms for the Videos uploaded by third parties—liable for the content of those Videos.

The Court finds that Plaintiffs' claims regarding the initial upload of the Videos in 2019, or earlier, are barred by Section 230 because (1) MindGeek and Hammy are both undisputedly an interactive computer service; (2) third-party Uploaders provided the Videos to MindGeek and Hammy and, as outlined above, neither MindGeek nor Hammy have materially contributed to their illegality to make them an information content provider as to these Videos; and (3) Plaintiffs' claims, particularly their tort law claims, treat MindGeek and Hammy as a publisher.[19]

### c. FOSTA and TVPRA

Plaintiffs contend that even if the Court finds that MindGeek or Hammy acted in their roles as publishers for the Videos, its sex trafficking claims are not barred because they fall under the FOSTA provision.  ECF Nos. 488 at 22–23; 492 at 25–28.  In 2018, Congress amended Section 230 by passing FOSTA, noting that Section 230 was not "intended to provide legal protection to websites that . . . facilitate traffickers in advertising the sale of unlawful sex acts with sex trafficking victims."  Pub. L. No. 115-164, 132 Stat. 1253.  Among other things, FOSTA provides that Section 230 immunity does not apply to certain sex trafficking claims, and states, in relevant part, "[n]othing in [section 230] . . . shall be construed to impair or limit . . . any claim in a civil action brought under section 1595 of title 18, if the conduct underlying the claim constitutes a violation of section 1591 of that title."  47 U.S.C. § 230(e)(5)(A).

---

[19] The Court addresses Plaintiffs' specific arguments that it does not seek to treat MindGeek or Hammy as publisher on their TVPRA and civil conspiracy claims below.

FOSTA incorporates two sections of the TVPRA.  The first, § 1595, creates a civil cause of action for violations of federal trafficking laws generally.  18 U.S.C. § 1595(a).  It permits trafficking victims to sue the perpetrators of their trafficking as well as anyone who "knowingly benefits . . . from participation in a venture which that person knew or should have known" was engaged in sex trafficking.  *Id.*  The second, 18 U.S.C. § 1591, is a federal criminal sex trafficking statute, which addresses, and criminalizes "sex trafficking of children or by force, fraud, or coercion."  18 U.S.C. § 1591.[20]  Like section 1595, section 1591 covers both perpetrators and beneficiaries of trafficking. 18 U.S.C. § 1591(a).  Notably, "FOSTA did not abrogate [Section 230] immunity for *all* claims arising from sex trafficking; FOSTA permits civil liability for websites *only if* the conduct underlying the claim constitutes a violation of section 1591."  *See Doe v. Kik Interactive, Inc.,* 482 F. Supp. 3d 1242, 1251 (S.D. Fla. 2020).

In this instance, Plaintiffs argue that the FOSTA exception applies to make MindGeek and Hammy liable under the TVPRA because they were beneficiaries of trafficking.  ECF Nos. 488 at 22–23; 492 at 25–28.  The Fourth Circuit has not yet considered the requirements for civil liability against a beneficiary of sex trafficking.  *See Doe (L.M.) v. 42 Hotel Raleigh, LLC*, 717 F. Supp. 3d 464, 468 (E.D.N.C. 2024).  However, other circuit and district courts, including at least two within this circuit, have followed or are consistent with the Eleventh Circuit's framing of the elements. *See, e.g.*,

---

[20] As noted above, it is undisputed that none of the Plaintiffs featured in the Videos were underage, so this is not an instance involving child sex trafficking.  Thus, for FOSTA to be applicable in this action, the "sex trafficking" at issue must have been achieved by "means of force, threats of force, fraud, coercion described in subsection (e)(2), or any combination of such means will be used to cause the person to engage in a commercial sex act."  18 U.S.C. § 1591(a).

*42 Hotel Raleigh*, 717 F. Supp. 3d at 468; *Doe v. Wyndham Hotels & Resorts, Inc.*, No. 2:24-CV-204, 2025 WL 725268 (E.D. Va. Mar. 6, 2025); *see also G.G. v. Salesforce.com, Inc.*, 76 F.4th 544, 553 (7th Cir. 2023); *A.B. v. Hilton Worldwide Holdings Inc.*, 484 F. Supp. 3d 921, 935–39 (D. Or. 2020); *M.A. v. Wyndham Hotels & Resorts, Inc.*, 425 F. Supp. 3d 959, 964 (S.D. Ohio 2019). The Eleventh Circuit, in *Doe #1 v. Red Roof Inns, Inc.*, 21 F.4th 714 (11th Cir. 2021) set out four elements for demonstrating venture or beneficiary liability by showing that the defendant

> (1) knowingly benefited (2) from taking part in a common undertaking or enterprise involving risk and potential profit, (3) that the undertaking or enterprise violated the TVPRA as to the plaintiff, and (4) that the defendant had constructive or actual knowledge that the undertaking or enterprise violated the TVPRA as to the plaintiff.

*Id.* at 719.

Plaintiffs contend that MindGeek and Hammy knew that the Videos were obtained fraudulently, without Plaintiffs' consent, and yet MindGeek and Hammy still allowed the Videos to be posted on its website and profited from them. ECF Nos. 488 at 22–23; 492 at 25–28. Plaintiffs rely on expert testimony that a "reasonable person" would have, or should have, recognized that the content featured in the Videos was not obtained consensually. *Id.* Plaintiffs also point to metadata that purportedly shows that MindGeek employees flagged the content as potentially depicting nonconsensual recordings prior to being contacted by law enforcement. ECF No. 488 at 8, 23.

MindGeek asserts that Plaintiffs' claims to the FOSTA exception to Section 230 immunity fails because there is no evidence demonstrating that it had knowledge of Murphy or his schemes to record Plaintiffs surreptitiously while they changed in the locker room. ECF No. 475-1 at 22–23. Moreover, MindGeek posits the metadata relied upon

by Plaintiffs reflects that two of the Videos were flagged by users of Pornhub.com after the Videos were published and shortly before the Videos were removed from the website. *Id.* MindGeek contends this timeline does not support the proposition that MindGeek knew the content in the Videos was illegal upon their upload and, rather, demonstrates that its review system was working as intended to remove nonconsensual content. *Id.* Likewise, Hammy argues that FOSTA is inapplicable because it did not have actual knowledge of the underlying illegal conduct. ECF No. 479-1 at 16–20.

The Court finds FOSTA is not applicable in this case because there is no evidence that Plaintiffs were trafficked within the meaning of § 1591 of the TVPRA. Under § 1591, a person is culpable of being a beneficiary of trafficking when that individual "knowingly . . . benefits . . . from participation in a venture which has engaged in an act described in violation of paragraph (1), knowing . . . that means of force, threats of force, fraud, coercion described in subsection (e)(2), or any combination of such means will be used to cause the person to engage in a commercial sex act." Paragraph (1) provides that whoever "recruits, entices, harbors, transports, provides, obtains, advertises, maintains, patronizes, or solicits by any means a person" is in violation of § 1591 of the TVPRA. Accordingly, to establish a violation of § 1591 of the TVPRA, there must be evidence that Plaintiffs were recruited, enticed, harbored, transported, provided, obtained, advertised, maintained, patronized, or solicited for the purpose of performing a commercial sex act, as applicable here, by fraud.

The undisputed evidence of the record indicates that Plaintiffs, who were in various stages of undress in locker room at Limestone, were secretly recorded by a hidden camera without their knowledge, allegedly by Murphy. Several years later, the Videos

from this footage ultimately ended up on multiple pornographic websites, including those operated by MindGeek and Hammy.  However, there is no evidence that anyone, including Murphy, ever recruited, enticed, harbored, transported, provided, obtained, advertised, maintained, patronized, or solicited Plaintiffs or any other person.

Several statutory interpretation guidelines are helpful in interpreting the meaning of the verbs in paragraph (1) and determining whether any of these actions occurred here. First, the title of this section of the statute.  *Dubin v. United States*, 599 U.S. 110, 120–21 (2023) ("This Court has long considered that 'the title of a statute and the heading of a section' are 'tools available for the resolution of a doubt' about the meaning of a statute." (citation omitted)).  Indeed, a title is "especially valuable [where] it reinforces what the text's nouns and verbs independently suggest."  *Dubin*, 599 U.S. at 121 (citing *Yates v. United States*, 574 U.S. 528, 552 (2015)).  Here, § 1591 is entitled: "*sex trafficking* of children or by force, fraud, or coercion."  *See* 18 U.S.C. § 1591.  Accordingly, the Court must consider the verbs utilized under paragraph (1) in the context of sex trafficking. Second, the verbs appear in a list, meaning they share common meanings and should be interpreted together.  *Yates*, 574 U.S. at 543 ("[W]e rely on the principle of *noscitur a sociis*—a word is known by the company it keeps—to 'avoid ascribing to one word a meaning so broad that it is inconsistent with its accompanying words, thus giving unintended breadth to the Acts of Congress.'").  Third, the context of the verbs, which all modify the word person.  *See United States v. Williams,* 553 U.S. 285, 294 (2008) ("a word is given more precise content by the neighboring words with which it is associated").

All these verbs focus on the role of the trafficker in asserting his or her control over the trafficking victims to submit them to engaging in commercial sex act.  Without a doubt,

some of these verbs are inapplicable to the facts of this case. There is no evidence, or even plausible allegation, that Plaintiffs were recruited, enticed, harbored, transported, provided, advertised, patronized, or solicited either directly or indirectly by any person or entity to engage in a commercial sex act. This leaves the verbs obtain and maintain, neither of which are defined by statute. By its plain meaning, "obtain" means to "get, acquire, or secure." In the context of sex trafficking, "obtaining" specifically focuses on the actions taken to acquire or bring someone under the control of a trafficker. Here Plaintiffs were not "acquired" or brought under the control of Murphy or anyone else. Maintain means "to keep something in its existing state." In the content of sex trafficking, "maintain" means to secure or make possible the ongoing performance of commercial sex acts by the victim. There is no evidence that Murphy, or any other individual, took actions to keep an ongoing control of Plaintiffs for performance of commercial sex acts.

While Murphy may well have obtained the footage fraudulently, this does not amount to sex trafficking as anticipated by § 1591. Moreover, the verbs in paragraph (1) all modify the word person, not *video* of a person. Thus, even if Murphy, the Uploaders, Hammy, or MindGeek obtained or maintained the Videos, this does not amount to these individuals or entity doing the same to *a person* especially in the context of the statute— which seeks to criminalize conduct related to *trafficking*. Because there is no evidence that any conduct occurred as outlined under paragraph (1), Plaintiffs cannot establish that "participation of venture" involving the conduct outlined in paragraph (1). Accordingly, Plaintiffs' arguments regarding the FOSTA exception, and with them their TVPRA claim as a whole, fail.

Furthermore, even if there were factual allegations that supported that Plaintiffs were recruited, enticed, harbored, transported, provided, obtained, advertised, maintained, patronized, or solicited for the purpose of performing a commercial sex act, as applicable here, by fraud, Plaintiffs would still fail to hold MindGeek or Hammy liable as a beneficiary, because there are no facts which establish, or even create a question of fact as to whether, MindGeek or Hammy took part in the *common* undertaking or enterprise which violated § 1591 of the TVPRA.  Plaintiffs' argument in favor of applying the FOSTA exception to Section 230 and in support of its claim for MindGeek and Hammy's liability generally under TVPRA rises and falls on the recording of Plaintiffs without their consent.  Here, the undisputed evidence shows that the Videos were created in 2012 and 2013 by placing a hidden spy camera in the visiting women's locker room at Limestone.  ECF No. 488 at 23.  It is further undisputed that in 2019, third parties, not the original creator of the Videos, uploaded the Videos to MindGeek and Hammy.  There is no evidence, and Plaintiffs do not contend, that the third-party Uploaders were Murphy, nor do they argue that the third parties were associated with Murphy or anyone else who secretly recorded them.  Notably, in their response in opposition to MindGeek's Motion for Summary Judgment, Plaintiffs assert that "*other parties* [besides the person who recorded them] were involved and uploaded the [V]ideos to a pornographic website owned by [MindGeek]."  ECF No. 488 at 39.  A plaintiff asserting beneficiary liability under the TVPRA must establish that the defendant had a *direct* association or a business relationship with their trafficker, the latter of which can be demonstrated by a pattern of conduct or a tacit agreement.  *See Acevedo v. eXp Realty, LLC*, 713 F. Supp. 3d 740, 783–84 (C.D. Cal. 2024).  The undisputed facts of the record indicate that the individual

who defrauded Plaintiffs was the person who placed the hidden camera in the locker room at Limestone. Further, record demonstrates that there was no direct or indirect association or relationship between MindGeek or Hammy and Plaintiffs' alleged "trafficker," the person who recorded them, such that Plaintiff can assert a beneficiary liability claim against MindGeek under the TVPRA.[21]

Plaintiffs contend that because they did not know they were being filmed and the videos were then uploaded to a pornographic website, the uploaded videos were induced by fraud, and this is enough to show a violation of § 1591 violation. ECF No. 488 at 41. However, this argument overlooks entirely that the fraud committed was not the upload of the Videos but the nonconsensual, secret filming of the Plaintiffs in the locker room. Again, Plaintiffs seek to hold MindGeek and Hammy liable in their roles as a beneficiary of a sex trafficking act. While the Videos were ultimately uploaded without Plaintiffs' consent, the commercial sex act that they were allegedly fraudulently induced to participate in, undressing when they "believed they were safe in the privacy of a locker room and had no reason to think that videos were being taken of them or would later be uploaded to a pornographic website," was accomplished by an individual's, allegedly Murphy's, placement of a hidden camera in that locker room.[22]  ECF No. 488 at 41.  The fraud on Plaintiffs was the initial production of the Videos.  There is no evidence to support

---

[21] Indeed, Plaintiffs have dismissed any claim that MindGeek and Murphy were in a civil conspiracy and, as noted above, have entirely dismissed their RICO claims against MindGeek and Hammy.  *See* ECF No. 488 at 31 n.10.

[22] The Court's analysis affords Plaintiffs generous latitude concerning whether a fraud actually occurred in this instance.  Because there is no factual basis tying MindGeek to the person who secretly recorded Plaintiffs without their consent in the first instance, the Court does not address the issue of whether the placement of a hidden camera amounts to fraudulent inducement under § 1591.

that the Uploaders induced Plaintiffs to remove their clothing on camera by fraud, nor is there any evidence that the Uploaders were in collaboration with, or connected in any way to, the person who secretly recorded them. Because there are no facts tying the person who recorded Plaintiffs and the Uploaders, there is no tie between MindGeek and that person or Hammy and that person to establish that either MindGeek or Hammy was a beneficiary by its participation in a "venture" as outlined under § 1591. Thus, Plaintiffs' TVPRA claim fails.

### d. Civil Conspiracy

Finally, Plaintiffs contend that their civil conspiracy claims against MindGeek and Hammy survive Section 230 immunity because they do not seek to hold MindGeek or Hammy liable as a publisher or speaker. ECF No. 488 at 24–25. Because Plaintiffs raise slightly different arguments regarding civil conspiracy for MindGeek and Hammy, the Court will address the arguments separately.

#### i. MindGeek

First, Plaintiffs contend their claim is premised upon MindGeek's agreement to share revenue with Uploader, Lordfauger18. *Id.* at 24, 31. Plaintiffs then go on to state that they "will dismiss the other conspiracy alleged in these counts between [MindGeek], Hamster, and Murphy." *Id.* at 31 n.10. However, this argument is substantially different than the allegation presented by Plaintiff in their Amended Complaint. *See* ECF No. 193 at 34–35. In their Amended Complaint, Plaintiffs allege that "[t]he Defendants conspired for the purpose of creating and trafficking sexually lewd content which directly invaded the Plaintiffs' rights to privacy guaranteed by the United States Constitution" and that the "[D]efendants engaged in a plan, scheme, conspiracy and course of conduct, pursuant to

which they knowingly or recklessly engaged in acts, transactions, practices and courses of business which resulted in the surreptitious and illegal filming of the Plaintiffs; the publication, republication and dissemination of the resulting videos; and the monetization of illegally obtained content." *Id.* Plaintiffs do not allege in their Amended Complaint that MindGeek conspired with anyone other than the other "Defendants" for the purposes of their civil conspiracy claim. *See id.* Plaintiffs may not now amend their pleadings in response to a motion for summary judgment to assert new allegations of a separate conspiracy between MindGeek and the Uploaders as the basis of their civil conspiracy claim. *See Smith*, 2020 WL 8413565, at *7 (citing *S. Walk*, 713 F.3d at 184–85).

Even if Plaintiffs had not affirmatively abandoned their claim that Murphy and MindGeek were involved in a civil conspiracy, as set out above, there are no facts linking Murphy and MindGeek or MindGeek and any other Defendant. To succeed on a claim for civil conspiracy there must be an agreement between "two or more persons."[23] Accordingly, even if the Court were to find Section 230 immunity were inapplicable, Plaintiffs' claim for civil conspiracy against MindGeek fails as a matter of law.

ii. Hammy

As noted, Plaintiffs' Amended Complaint asserts a civil conspiracy existed among all Defendants. ECF No. 193 at 34–35. But then Plaintiff contends in opposition to Hammy's Motion for Summary Judgment that its civil conspiracy claim is "premised on Hammy's agreement to share revenue with a party who uploaded illegal content as part of a conspiracy" and that "the conspiracy between the uploaders and Hammy to share

---

[23] As outlined above, this is true in all potentially applicable jurisdictions, so the Court need not decide the choice of law issue.

revenue with respect to the illegal content uploaded is not entitled to CDA immunity." ECF No. 492 at 30. For these reasons, Plaintiffs assert that the Court should decline to extend Section 230 immunity to Hammy. *Id.* Plaintiffs do not address any other alleged conspiracy with respect to Section 230. *See id.* Further, when addressing the merits of their underlying civil conspiracy claim, Plaintiffs assert that their Amended Complaint by referencing all the preceding paragraphs in the Amended Complaint "allege a civil conspiracy between Hammy and Cwdistribution.131." *Id.* at 42. As addressed above regarding MindGeek, Plaintiffs do not assert a claim for civil conspiracy in their Amended Complaint based on an agreement between Hammy and the Uploaders of the Videos, but rather a claim based on a conspiracy among the Defendants, and Plaintiffs may not amend their complaint in a response brief. *See* ECF No. 193; *Smith*, 2020 WL 8413565, at *7 (citing *S. Walk*, 713 F.3d at 184–85).

As such, Plaintiffs have not addressed Hammy's arguments regarding the applicability of Section 230 immunity based on alleged the presence of a civil conspiracy between it and any other Defendants. Nevertheless, the Court must still consider the merits of the underlying claim. Section 230 precludes liability for an internet service provider who, acting in its publishing capacity, published third-party content. Based on the undisputed facts before the Court in this case, there is no evidence that Hammy entered into an agreement with Defendants Murphy, Sharon Hammonds, Brenda F. Watkins, or Limestone. However, there is evidence that Hammy entered agreements with other Defendants, Wisebits and TrafficStars, to further the intellectual property and advertisement needs of its business. These actions were not taken in its role as an

internet service provider or as a publisher. Accordingly, Section 230 does not apply to Hammy's business agreements with Wisebits and TrafficStars.

The question then becomes whether these agreements amounted to a "civil conspiracy." A civil conspiracy requires a showing by a plaintiff that an agreement between two or more persons to accomplish an unlawful act.[24] Plaintiffs allege that Defendants engaged in a conspiracy to solicit or encourage the illegal filming of Plaintiffs and the publication of the Videos of Plaintiffs on Hammy's website, xHamster.com, thereafter. ECF No. 193 at 33. As stated, and as explained above regarding Wisebits, the agreements between Hammy, TrafficStars, and Wisebits involved their legitimate business needs and a review of the record reveals that Plaintiffs have provided no facts showing that an agreement existed to commit unlawful acts based upon these business agreements. Accordingly, the Court finds that Plaintiffs' claim for civil conspiracy fails as a matter of law because Plaintiffs have failed to provide sufficient evidence to establish an essential element of their claim.

       e. <u>Successive Uploads</u>

Plaintiffs assert that both MindGeek and Hammy republished the Videos on their website after they were initially taken down. ECF Nos. 488 at 3–4, 19, 45; 492 at 22. According to Plaintiffs, these Videos were reposted by MindGeek's employees in 2021, and Hammy reposted, through various means, the Videos in 2020, 2022, and 2024. *Id.* At the hearing on the Motions for Summary Judgment, Plaintiffs argued that one of the Plaintiffs testified that the Videos had been reposted in her deposition, which was

---

[24] As noted above, all the allegedly applicable jurisdictions require these elements to establish a civil conspiracy claim, so the Court need not address the Parties' choice of law arguments.

submitted to the Court in opposition to the Motions for Summary Judgment.  *See* ECF

Nos. 596 at 86–87; 488-25.  The Plaintiff's deposition provides in relevant part:

> Q. So as of October 24, 2019, the video had been removed from Pornhub, correct?
>
> A. Allegedly.
>
> Q. Why do you say "allegedly"?
>
> A. Because we know that it popped up other—again, after we'd already had it taken down.
>
> Q. How do you know it had popped up again after you had already had it taken down?
>
> A. Our lawyers had found it and our teammates had found it as well.
>
> Q. When you say the video had already popped up after it had been taken down, are you referring to the Pornhub website or to websites in general?
>
> A. I don't know exactly which sites it had popped up on. I also don't remember the exact time frames, but I know that at least once the site—that we had gotten word that the video had been taken down off of Pornhub and then it reappeared on Pornhub. I don't know if that was the exact date or not of that one, but I know that it had resurfaced at least once on Pornhub.
>
> Q. When did it resurface on Pornhub?
>
> A. I don't remember the exact date. . . . One of my teammates found it.
>
> Q. Did your teammate capture the video resurfaced on Pornhub?
>
> A. I'm not sure.
>
> Q. Do you have any notes or documentation of the video reappearing on Pornhub?
>
> A. I do not.
>
> Q. Which teammate captured the video or reported to you that the video had reappeared on Pornhub?
>
> A. I don't remember which one.

Q. Was the reappearance of the video on Pornhub captured in your group chat, your text chat?

A. I don't know.

ECF No. 554-1 at 265–66. Plaintiffs also rely on metadata to support these claims but provide no expert testimony regarding analysis of the metadata for reposting.[25]  *Id.* MindGeek contends that Plaintiffs have misinterpreted the metadata, and that the meta data actually shows the videos were not reposted but rather were updated by MindGeek's staff to reflect the reasons why they were removed. ECF No. 578 at 2. In support of its contention that the Videos were never reposted on Pornhub.com, MindGeek cites a supplemental declaration by Andreas Ignatious, MindGeek's employee who serves as Director of Trust & Safety, Compliance – Content Moderation & Performer Verification, reviewing the metadata. *See id.*  Mr. Ignatious supports this contention, and he further avers that "[t]here is no evidence nor any reason to believe that the Videos were ever re-uploaded to the Pornhub Website" after they were removed in late 2019. *See* ECF Nos. 578 at 4–6; 475-4 at 14. Hammy contends that Plaintiffs' citations as to the 2020 and 2022 reposting do not contain exhibits relevant to them, but rather are metadata as to MindGeek. ECF No. 580 at 12. Hammy further argues that the metadata cited as to the 2024 reposting is metadata from their website but reflects a system-wide update rather

---

[25] Plaintiffs' expert Scott Brandon reviewed and analyzed metadata, but he focused solely on whether the metadata shows MindGeek "materially contributed" to the Videos by adding tags or categories and creating thumbnails. *See* ECF Nos. 521, 540. Mr. Brandon did not provide any analysis or insight into whether the metadata shows that the Videos were reuploaded. *See id.* The Court notes that while the metadata was produced later in discovery, Plaintiffs have filed no motions to supplement their expert reports. Discovery is now closed, and the time has long passed for supplementation of expert reports. The Court further acknowledges that there are pending motions to exclude these expert opinions. *See* ECF Nos. 589, 611, 613, 614. Since the testimony provides no relevant analysis concerning Plaintiff's contentions about reposting, the Court declines to weigh on the admissibility of these experts' testimony at this juncture.

than a reposting of the Videos. *Id.* at 12–13. In support of this contention, Hammy cites to the supplemental declaration of Nikita Popov, Hammy's in-house counsel. ECF Nos. 580 at 12–13; 580-1 at 4.

The Federal Rules of Evidence provide that "[i]f a witness is not testifying as an expert, testimony in the form of an opinion is limited to one that is . . . not based on scientific technical or other specialized knowledge." Fed. R. Evid. 701(c). Metadata is a matter beyond the understanding of the average layperson, and, thus, "the interpretation and analysis of metadata requires an expert qualified in the field." *Allegis Grp., Inc. v. Bero*, 689 F. Supp. 3d 81, 108 (D. Md. 2023), *aff'd*, No. 23-2023, 2025 WL 2141298 (4th Cir. July 29, 2025) (citations omitted). The Court is not a factual expert on metadata, nor will it pretend to be by trying to ascertain the meaning of data point entries in the metadata produced in evidence. It is not the role of the Court to interpret metadata, and so the Court must rely on the testimony provided by the Parties' interpreting it. However, no party has provided *expert* opinion regarding the interpretation and analysis of the metadata in this case on whether it shows that the Videos were reposted after they were initially removed.

Both MindGeek and Hammy have presented testimony interpreting the metadata to show that the Videos were not re-uploaded, but neither Mr. Ignatious nor Ms. Popov have been identified as experts by MindGeek or Hammy, respectively. There is further no argument by either MindGeek or Hammy that these two individuals should qualify as experts on metadata. Plaintiffs have also provided no such evidence as the identified expert, Mr. Brandon, does not analyze whether the metadata shows the Videos were reposted. Further, their reliance on the testimony of one of the Plaintiffs is also

unpersuasive because (1) she is not an expert, and (2) her testimony reflects that she had no personal knowledge of the Videos being reposted and relies merely on hearsay within no definitive dates, times, or other specificities concerning the reposting of the Videos.  *See* ECF No. 554-1 at 265–66.

One of these cases has been pending for over five years and the other for almost four years.  No party has moved for further discovery on the metadata.  Ultimately the burden of showing the Videos were posted falls on the Plaintiffs.[26]  Because Plaintiffs have provided no testimony concerning whether the metadata shows the Videos were re-uploaded, the Court finds they have not carried their burden at summary judgment to establish that the Videos were re-published.  Because there is no admissible evidence to support the conduct that underlies each of their claims, Plaintiffs' claims fail on the merits.  Accordingly, MindGeek and Hammy's Motions for Summary Judgment are granted.

2.  *TrafficStars*

TrafficStars contends that it is entitled to summary judgment on each of Plaintiffs' claims because (1) if it is a single business enterprise with Hammy, then it is also entitled

---

[26] The Court recognizes that Section 230 has been interpreted as an affirmative defense, and thus to show its applicability generally the defendant must show affirmative evidence supporting this defense. *See Doe v. GTE Corp.*, 347 F.3d 655, 657 (7th Cir. 2003) (finding that § 230 is an affirmative defense); *Ray Commc'ns, Inc. v. Clear Channel Commc'ns, Inc.,* 673 F.3d 294, 299 (4th Cir. 2012) (citing *Celotex,* 477 U.S. at 331) (explaining that when a movant seeks summary judgment on an affirmative defense, it must conclusively establish all essential elements of that defense).  If employees of MindGeek or Hammy did repost the Videos, then it could potentially make both "internet content providers" taking them outside of Section 230's immunity.  Because there is no expert testimony to show affirmatively that the metadata does not show reposting, neither MindGeek nor Hammy has carried their initial burden to show that Section 230 should bar any claims based upon the reposting of the Videos.  However, regardless of the applicability of Section 230 immunity, the burden of proving the essential elements of their claims as to the merits falls on Plaintiffs.  Here, Plaintiffs have failed to do so.

to Section 230 immunity; or (2) even without immunity, each of Plaintiffs' claims against TrafficStars fail as a matter of law. ECF No. 477-1 at 23. Plaintiffs argue that TrafficStars is not entitled to Section 230 immunity because "due to the interconnectedness of the corporations, Hammy's actions are imputed to [TrafficStars], and both entities must be regarded as a single business entity" and both have thus "materially contributed to the creation of the illegal videos in question." ECF No. 493 at 25. Plaintiffs further contend that TrafficStars is not entitled to summary judgment on the merits of their claims against them. *Id.* at 26–28.

First, the Court finds that TrafficStars is not a single business enterprise with Hammy, and therefore it is not entitled to Section 230 immunity based on its amalgamation with Hammy. As set out above, to demonstrate the related single business enterprise theory, a party "must show both (1) the intertwining of the operations of the entities and (2) evidence of 'bad faith, abuse, fraud, wrongdoing, or injustice resulting from the blurring of the entities' legal distinctions.'" *Stoneledge*, 866 S.E.2d 542, 551. Again, the single business enterprise theory should not be applied "without substantial reflection" and that this theory only applies in rare circumstances. *Stoneledge*, 866 S.E.2d at 551.

Plaintiffs contend that TrafficStars is a single business enterprise with Hammy because they have "aligned their business operations to further a common goal: operating adult-content websites for profit" and "their shared business purpose has led to inequity, wrongdoing, and injustice." ECF No. 493 at 22. Plaintiffs cite evidence regarding Hammy and TrafficStars corporate ownership and organization and that advertising on Hammy's websites can only be accomplished through working with TrafficStars. *Id.* at 22–23.

Plaintiffs further assert that Hammy's "internet domains are managed in a way that enables the posting and monetization of sexually explicit images and videos without the consent of the individuals depicted." *Id.* at 22. TrafficStars argues there is no evidence to support finding they are a single business enterprise on either prong—intertwining or injustice. ECF No. 477 at 17.

While there is some evidence to indicate intertwining of TrafficStars and Hammy, the Court need not decide this issue because, even if there was sufficient evidence of intertwining, Plaintiffs have failed to provide evidence of "bad faith, abuse, fraud, wrongdoing, or injustice resulting from the blurring of the entities' legal distinctions" sufficient to trigger the application of a single business enterprise. The evidence in the record indicates that TrafficStars operated as the advertising firm for Hammy and sold advertisement space for their websites, including advertisements placed alongside the Videos. However, there is no evidence to indicate that TrafficStars was aware of the exact of content of the Videos, or any videos for that matter, on Hammy's website where their advertisements appeared. The only injustice identified by Plaintiffs is that TrafficStars generated revenue from the placement of advertisements beside these Videos and that now TrafficStars may avoid liability because of its corporate structure. However, as discussed in the Court's analysis of whether Wisebit was a single business enterprise with TrafficStars and Hammy, this conduct alone is insufficient to support a finding that the conduct of Hammy.

The Court finds the conduct of TrafficStars to be even more analogous to that of the parties in *Stoneledge* discussed above, where the Supreme Court of South Carolina rejected the application of the single business enterprise theory. *See Stoneledge*, 866

S.E.2d at 551. There, one entity was responsible for building housing, which was ultimately defective, and the other was "constructively aware" the housing was defective and responsible for marketing the sale of that housing. *Id.* The Supreme Court of South Carolina found, even though the profits of the marketing entity "were entirely dependent on [the sale of] the units," which was detrimental to the plaintiffs, this was insufficient to disregard the corporate form selected by the defendants and apply the single business enterprise theory.

Here, the case is even stronger against applying the single business enterprise theory to amalgamate TrafficStars and Hammy because there is no evidence that TrafficStars had knowledge, constructive or actual, that its advertisements appeared next to nonconsensual and illegally obtained videos of Plaintiffs. It is undisputed that Hammy's employees were responsible for reviewing content that was posted, and the evidence of record indicates that TrafficStars was not part of this process either directly or indirectly. Even if there were such evidence, the Supreme Court of South Carolina found that profiting from the sale of what a defendant had constructive knowledge was a defective product was not sufficient. At most, TrafficStars financially benefited from advertisements that appeared next to Hammy's content, but just like in *Stoneledge*, this conduct is not enough to demonstrate such "injustice" that is the "kinds of abuse" the corporate structure should not shield from. *Pertuis*, 817 S.E.2d at 280. Accordingly, the Court finds that the single business enterprise theory does not apply to Hammy and TrafficStars, and, thus, its analysis of liability as to Hammy and TrafficStars should be based on their separate entity status and one's actions may not be imputed to the other.

Because TrafficStars is a separate entity, it may not rely on Hammy's claims to Section 230 immunity. Again, to establish entitlement to immunity under Section 230, a defendant must show that: (1) it is a "'provider or user of an interactive computer service'"; (2) the plaintiff's claims hold it "responsible 'as the publisher or speaker of any information'"; and (3) the relevant information was "'provided by another information content provider.'" *Henderson*, 53 F.4th at 119 (4th Cir. 2022) (citing *Nemet Chevrolet, Ltd.*, 591 F.3d at 254; 47 U.S.C. § 230(c)(1)). An "interactive computer service" as "any information service, system, or access software provider that provides or enables computer access by multiple users to a computer server, including specifically a service or system that provides access to the Internet . . . ." 47 U.S.C. § 230(f)(2). Here, TrafficStars is an advertisement placement company. TrafficStars is not an "interactive computer service," and therefore is not entitled to Section 230 immunity. Thus, the Court turns to the merits of Plaintiffs' claims against TrafficStars. Plaintiffs assert claims: (1) violation of the TVPRA; (2) negligent monitoring; (3) false light; (4) civil conspiracy.[27] ECF No. 193 at 21–23, 32–35. The Court addresses each cause of action in turn.

First, the Court finds that Plaintiffs' claim based on violation of the TVPRA fails for many of the same reasons set out above in its discussion of Section 230 immunity as to MindGeek and Hammy. Plaintiffs' TVPRA claim is based upon 18 U.S.C. § 1591 and § 1595, which in combination allows a plaintiff to assert a civil claim against persons or entities who knowingly benefit from participating in a sex trafficking venture. ECF No. 193 at 21–23. However, as outlined above, Plaintiffs have failed to allege facts both (1)

---

[27] As noted above, Plaintiffs initially brought a RICO claim against TrafficStars but indicate in their briefing that they now dismiss this claim. *See* ECF No. 493 at 11.

establishing an underlying occurrence of sex trafficking, and (2) connecting any alleged sex trafficking to MindGeek or Hammy to establish that these parties participated in a sex trafficking venture.  Regarding TrafficStars, Plaintiffs only *allegations* are that TrafficStars benefited from a sex trafficking venture based on their placement of advertisements on Hammy's website, xHamster.com.  However, since Hammy's conduct has not been linked to an underlying sex trafficking event, Plaintiffs' claim against TrafficStars, which is based entirely on its collaboration with Hammy, also fails.  Accordingly, Plaintiffs' TVPRA claim is without merit and TrafficStars's Motion for Summary Judgment as to this claim is granted.

Turning next to Plaintiffs' claim for negligent monitoring, Plaintiffs assert that Defendants are liable based upon their failure to monitor the content on the pornographic websites where the Videos were posted.  *See* ECF Nos. 193 at 32–34.  TrafficStars asserts that because it had no role in operating xHamster.com, it had neither the ability nor obligation to monitor the content posted there by third parties.  Plaintiffs assert that TrafficStars is liable based on Hammy's negligence in monitoring xHamster.com.[28]  ECF No. 493 at 28.  However, the Court has already rejected that Hammy and TrafficStars were a single business enterprise and so Plaintiffs may not impute Hammy's failure to monitor to TrafficStars.  Instead, to succeed on its negligence claim against TrafficStars, Plaintiffs must present evidence that TrafficStars could not only control but was responsible for monitoring postings on Hammy's website and accordingly had a duty to

---

[28] Plaintiffs argue that TrafficStars is liable for Hammy's negligence due to the conspiracy between them.  ECF No. 493 at 28.  However, this argument conflates Plaintiffs' civil conspiracy claim with its negligence claim.  The Court addresses fully the argument that TrafficStars is liable for Hammy's negligence based on the conspiracy between them below in its analysis of Plaintiffs' civil conspiracy claim against TrafficStars.

Plaintiffs to do so.[29]   There is no such evidence before the Court.   The undisputed evidence in the record demonstrates that Hammy was responsible for the review and approval process for placement of all content on their website.   Accordingly, Plaintiffs' claim for negligent monitoring against TrafficStars also fails and summary judgment is proper as to this claim.

Next, the Court turns to Plaintiffs' false light claim.   Plaintiffs assert that the placement of the Videos of Plaintiffs next to certain illicit advertisements placed them in a false light.  ECF No. 193 at 33–34.  TrafficStars contest the Plaintiffs' false light claims because it had no control over what was or was not posted on xHamster.com and further that the state of South Carolina does not recognize a cause of action for false light.  ECF No. 477 at 31–32.   Plaintiffs contend that because the Videos were surrounded by "numerous hardcore sex and sex toy advertisements created by" TrafficStars, TrafficStars portrayed Plaintiffs in a false light and further that the state of injury for each Plaintiff sets the law and thus at least nine of the ten Plaintiffs have false light claims under the laws of their respective states. ECF No. 493 at 17, 28.[30]  The evidence shows that TrafficStars

---

[29] To succeed on a negligence cause of action requires Plaintiffs to show the existence of a legal duty, breach of that duty, causation, and damages.   *See Fettler v. Gentner*, 722 S.E.2d 26, 29 (S.C. Ct. App. 2012); *Osborne v. Keeney*, 399 S.W.3d 1, 17 (Ky. 2013); *Rodriguez–Escobar v. Goss*, 392 S.W.3d 109, 113 (Tex. 2013); *Sadler v. PacifiCare of Nev.*, 340 P.3d 1264, 1267 (Nev. 2014); *Gresser v. Dow Chem. Co.*, 989 N.E.2d 339, 349 (Ind. Ct. App. 2013).

[30] Plaintiffs also argue that TrafficStars addresses only the "false light claims" and not the "three invasion of privacy claims—false light, right of publicity, and unreasonable publication of private affairs."   ECF No. 493 at 28.   A review of Plaintiffs Amended Complaint shows that the only claim of these proposed claims actually asserted against TrafficStars is for "False Light."   *See* ECF No. 193.  Plaintiffs' claims for invasion of privacy are all asserted against Murphy, not TrafficStars.   *See id.* at 27–29.   As noted above, Plaintiffs may not amend their complaint in its response to a motion for summary

74

used categories and tags to decide what advertisements were placed next to which videos but was otherwise unaware of the content of the Videos.  It is undisputed that TrafficStars did not select the tags or categories associated with the Videos of Plaintiffs. Even to extent the Hammy chose the tags and categories for the Videos; as explained above, Hammy and TrafficStars are separate entities and Hammy's actions cannot be imputed to TrafficStars.[31]

Finally, turning to Plaintiffs' civil conspiracy claim, as outlined above, a conspiracy requires among other things, an agreement between two or more persons to accomplish an unlawful act.[32]  Plaintiffs argue that the evidence before the Court "demonstrates that Hammy and TrafficStars "conspired to profit by encouraging third parties to upload illegal videos of non-consenting females, violating South Carolina's 'peeping tom' and aggravated voyeurism laws."  ECF No. 493 at 19 (citing S.C. Code Ann. § 16-17- 470). Plaintiffs argue that Hammy created and sought out "Hidden Lockeroom" videos and then "collaborated with [TrafficStars] to place pornographic ads around the [V]ideos."  *Id.* at 19–20.   Specifically, TrafficStars "ensured that targeted keywords, tags, and titles matched the ads surrounding the Plaintiffs' videos," and then TrafficStars "shared the

---

judgment.  *Smith*, 2020 WL 8413565, at *7 (citing *S. Walk*, 713 F.3d at 184–85). Accordingly, there is no pending claim for invasion of privacy based on right of publicity and unreasonable publication of private affairs against TrafficStars for the Court to consider.

[31] Again, Plaintiffs assert that the conspiracy between Hammy and TrafficStars creates liability for TrafficStars for their false light claim based on Hammy's conduct. However, as noted above, this argument confuses the separate claims of conspiracy and false light, and the Court will address this argument in its analysis of Plaintiffs' civil conspiracy claim.

[32] As noted above, since the elements listed here are required in each possibly applicable jurisdiction, the Court does address the Parties' choice of law arguments.

revenue from this illegal activity" with Hammy. *Id.* at 20. TrafficStars asserts that there is no factual basis for Plaintiffs' civil conspiracy claim because there is no evidence that TrafficStars combined with anyone else to commit an unlawful act. ECF No. 477 at 32–33.

Summary judgment is warranted if the non-moving party fails to provide evidence that establishes an essential element of his or her claim. *Coleman*, 369 F. App'x. at 461. Here, the evidence in the record concerning TrafficStars agreement with Hammy is that it agreed to sell advertisement space on Hammy's website, xHamster.com, and that TrafficStars placed those advertisements based upon the tags and categories that corresponded with the Videos posted to xHamster.com. It is undisputed that TrafficStars receives revenue based on the views of their advertisements placed next to these Videos. It is also undisputed that this was true for advertisement placement across xHamster.com, not just for placement next to the Videos of Plaintiffs. However, there is no evidence indicating that TrafficStars agreed to accomplish an unlawful act—encouraging third parties to upload illegally obtained Videos. As noted above, to succeed on a civil conspiracy claim, the agreement between the parties must pertain to the unlawful acts. There is no evidence that TrafficStars agreed to place advertisements for the purpose of garnering more revenue from illegal content; TrafficStars agreement was meant to garner maximum profit from advertisements on all videos generally, regardless of their content. Accordingly, the Court finds Plaintiffs have not presented evidence of an essential element of its conspiracy claim and summary judgment is proper as to this claim.

In closing, the Court is compelled to note the insidious nature of the harm occasioned upon the Plaintiffs in this case. Their trust was allegedly betrayed by an

employee of a college where they were engaged in intercollegiate athletics, and that betrayal has resulted in a chain of events such that an incident more than a decade old still haunts them today.  This is true because once uploaded to the internet, these Videos may reappear from time to time on some platform or another for the foreseeable future. While the Court has faithfully applied the currently applicable law to the best of its ability herein, it seems apparent from the events and evidence in this case that the business of publishing and curating third-party content by specialized websites is far different today than at the time of the passage of Section 230.  It may very well be time to revisit the proper duties and responsibilities of such companies in today's world.  However, that is a job for Congress, not this Court.

## IV. CONCLUSION

For the reasons set forth above, the MindGeek Defendants, TrafficStars, Wisebits, and Hammy's Motions for Summary Judgment [475, 477, 478, 479][33] are **GRANTED**. Because these Motions are granted, these Defendants' pending Motions to Exclude [589, 611, 612, 613][34] are **DENIED AS MOOT**.

IT IS SO ORDERED.

s/ Donald C. Coggins, Jr.
United States District Judge

September 3, 2025
Spartanburg, South Carolina

---

[33] The corresponding Motions for Summary Judgment in C/A No. 7:21-cv-03193-DCC are likewise granted [C/A No. 7:21-cv-03193-DCC, ECF Nos. 286, 289, 290, 291].

[34] The corresponding Motions to exclude in C/A No. 7:21-cv-03193-DCC are also DENIED AS MOOT [C/A No. 7:21-cv-03193-DCC, ECF Nos. 399, 418, 419, 420].